```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE DISTRICT OF MARYLAND
 2

 3    In re:

 4    Brenda M. Fletcher     Case No.: 1:11-bk-21424
      Debtor
 5    _____       Chapter 13
      Brenda M. Fletcher     Adversary Proceeding No.:
 6                           19-ap-00218
      vs.
 7
      U.S. Bank, National
 8    Association, et al.
      Defendants
 9

10    _____

11          DEPOSITION OF GINA FEEZER

12    DATE:    November 3, 2022

13    TIME:    10:05 a.m. - 3:27 p.m.

14    PLACE:   Via Videoconference

15

16        Examination of the witness taken before:

17           Robin Reynolds, Court Reporter

18

19

20            FIRST COAST COURT REPORTERS
                  2442 ATLANTIC BOULEVARD
21     JACKSONVILLE, FLORIDA 32207 (904) 396-1050

22

23

24

25
```

INDEX

Witness:                                        Page

GINA FEEZER                                        4
   Direct Examination Mr. Finner                   4
   Cross Examination By Mr. Crowley              109
   Further Examination By Mr. Finner            117
   Further Examination By Mr. Crowley           121


EXHIBITS

Plaintiff's Exhibit No.:                        Page
   (referenced, not attached)

1 - Fifth Amended Notice of Taking                 5
Deposition

2 - Third Amended Complaint                         8
3 - Answer Re: U.S. Bank and PHH                    9
6 - Discovery Responses (multi-docs)              13
9 - Second Request for Production of              15
Documents

13 - Aurora's Payment History                     17
20 - copy of Aurora check request,                18
business records, plus section of
transaction history

15 - Export of Loan Transaction                   27
History by PHH for June of 2019
through December of 2019

16 - Servicing History                            32
12 - Multi-page Loan Document info                42
18 - Comment Log                                  43
19 - Exported Comments from PHH                   77
21 - Compilation of emails between                84
Lolita Millner and Michael Altman

22 - System Reports as relates to                 89
Disputed Items

---

```
                                                    2
 1            A P P E A R A N C E S

 2

      WENDELL FINNER, ESQUIRE
 3
         Wendell Finner, P.C.
 4       P.O. Box 246
         Oakland, Maryland 21550
 5
         appearing on behalf of the Plaintiff.
 6

 7    FRANCIS X. CROWLEY, ESQUIRE

 8       Blank Rome LLP
         One Logan Square
 9       130 North 18th Street
         Philadelphia, Pennsylvania 19103
10
         appearing on behalf of the Defendant.
11

12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

```
                                                    4
 1            S T I P U L A T I O N

 2        It was stipulated and agreed by and between

 3   counsel for the respective parties, and the

 4   witness, that the reading and signing of the

 5   deposition by the witness be RESERVED.

 6                    - - -

 7            G I N A   F E E Z E R

 8   who, after having been first duly sworn by the

 9   above mentioned Court Reporter, was examined and

10   did testify as follows:

11        D I R E C T   E X A M I N A T I O N

12   BY MR. FINNER:

13        Q    Good morning, Ms. Feezer.

14        A    Good morning.

15        Q    My name is Wendell Finner and I

16   represent the plaintiff in this matter.

17        How are you doing this morning?

18        A    I am good. How are you?

19        MR. FINNER:  Well, thanks.  Frank, did

20   you receive and maybe forward to the witness

21   a Dropbox share containing exhibits?

22        MR. CROWLEY:  Unfortunately our system

23   doesn't like Dropbox; we've had difficulty

24   to be able to access the exhibits.

25        (Brief recess.)
```

5

1  BY MR. FINNER:
2      Q  Thank you for your patience and
3  indulgence in getting the exhibits straight.
4          Ms. Feezer, could you go ahead and open
5  up the document titled 1?
6      A  **Okay.**
7      Q  Have you seen Exhibit 1 before?
8      A  **I have.**
9      Q  What is it?
10     A  **It's a copy of the Fifth Amended Notice**
11 **of Taking Deposition, which is scheduled for**
12 **today.**
13     Q  Are you here today in response to that
14 document?
15     A  **I am.**
16     Q  Are you the person who is designated by
17 the defendants to give testimony with respect to
18 each of the subjects contained in the numbered
19 paragraphs of Exhibit 1?
20         MR. CROWLEY:  Objection to the form.
21     For the record, Ocwen has objected as of
22     November 1st to certain categories, so the
23     witness is not being produced with regard to
24     the categories to which there is an
25     objection.

FIRST COAST COURT REPORTERS

6

1          You may answer.
2      A  **With respect to the categories that were**
3  **named -- or the topics that was named, yes, to**
4  **the extent of the information that our business**
5  **records would have that would relate to each of**
6  **these topics.**
7  BY MR. FINNER:
8      Q  Can you identify any numbered paragraphs
9  of Exhibit 1 that describe areas of testimony for
10 which you are not designated by Ocwen?
11         MR. CROWLEY:  Again, for the record, the
12     witness is not designated with regard to
13     those we objected to.  You have our
14     objections.
15         MR. FINNER:  Are you instructing the
16     witness not to answer?
17         MR. CROWLEY:  If the witness knows
18     specifically which ones the objections are
19     raised to, the witness may state.
20         If she does not, then she may answer to
21     the extent she's capable of doing so.
22     A  **I didn't review the objections so I'm**
23 **not exactly sure.**
24     **Like I said, I reviewed the deposition**
25 **notice with counsel, went over our business**

FIRST COAST COURT REPORTERS

7

1  records to the extent of the information that we
2  have that's contained within these topics.  So
3  that's the best that I can give you for a
4  response.
5  BY MR. FINNER:
6      Q  Are you the person designated -- well,
7  let me back up.
8          Could you state the name of your
9  employer, please, Ms. Feezer?
10     A  **Financial Corporation.**
11         MR. CROWLEY:  I'm sorry.  You may have
12     cut off there a little.
13     A  **Ocwen Financial Corporation.**
14 BY MR. FINNER:
15     Q  Are you familiar with the entity known
16 as Ocwen Loan Servicing LLC?
17     A  **Yes.**
18     Q  Do you understand Ocwen Loan Servicing
19 LLC to be a defendant in this lawsuit?
20     A  **I'm not sure.**
21     Q  Has Ocwen Loan Servicing LLC instructed
22 you to do anything with regard to this lawsuit?
23         MR. CROWLEY:  I'm going to instruct her
24     not to answer with regard to any
25     conversation that we have had in-house or

FIRST COAST COURT REPORTERS

8

1          with outside counsel.  You may answer,
2          otherwise.
3      A  **I don't understand your question.  And,**
4  **with respect to Ocwen Loan Servicing from --**
5  **Ocwen Loan Servicing is no longer Ocwen Loan**
6  **Servicing.  Ocwen Loan Servicing merged into PHH**
7  **Mortgage.**
8          **With respect to whether or not Ocwen**
9  **Loan Servicing is a party, I don't know; I can't**
10 **answer that legally.  With respect to them being**
11 **named as a party, it would be as it was named in**
12 **the complaint.**
13         **So the clarification of your question is**
14 **a little bit ambiguous to me based on who the**
15 **entity is now that stands in -- as named as Ocwen**
16 **Loan Servicing.**
17 BY MR. FINNER:
18     Q  Would you open up Exhibit 2, please?
19     A  **Okay.**
20     Q  Have you seen Exhibit 2 before?
21     A  **Yes, I have.**
22     Q  What is it?
23     A  **This is a copy of the Third Amended --**
24     Q  Go ahead and repeat your answer, please.
25     A  **Yes.  It is a copy of the Third Amended**

FIRST COAST COURT REPORTERS

9

1  Complaint.

2      Q   I am going to turn off my video in the
3  hopes that it reduces the load on whatever is
4  going on with the internet.

5      Could you open up Exhibit 3, please?

6      A   Okay.

7      Q   Have you seen this document before?

8      A   Yes.

9      Q   What is it?

10     A   This is the Answer With Respect to U.S.
11 Bank and PHH.

12     Q   Okay.  When you say PHH, does that refer
13 to a particular legal entity that you are
14 familiar with?

15     A   Well, as been previously stated, Ocwen
16 Loan Servicing merged into PHH Mortgage
17 Servicing.  So, with Ocwen Loan Servicing LLC no
18 longer being an entity, I refer to as PHH.

19     Q   The caption of Exhibit Number 3
20 identifies an entity called PHH Mortgage
21 Corporation.

22     That's the name of the entity you are
23 referring to as PHH?

24     A   Yes, sir.

25     Q   What is the relation -- first, could you

FIRST COAST COURT REPORTERS

10

1  give the name of your employer again, please?

2      A   Ocwen Financial Corporation.

3      Q   What's the relationship between Ocwen
4  Financial Corporation and PHH Mortgage
5  Corporation?

6      A   They are an indirect subsidiary to Ocwen
7  Financial Corporation.  They are the servicing
8  arm of what used to be Ocwen Loan Servicing.  PHH
9  Mortgage Servicing is now that mortgage servicing
10 in its entity.

11     Q   When you say PHH Mortgage Servicing, is
12 that a different entity from PHH Mortgage
13 Corporation?

14     A   Well, it's -- no, it's the same
15 corporation.  I refer to it as PHH, as opposed to
16 PHH Mortgage.

17     For purposes of this, I'll refer to it
18 as PHH, if you don't mind, otherwise, yes, the
19 entity's name is PHH Mortgage Corporation.

20     Q   Does PHH Mortgage Corporation own Ocwen
21 Financial Services?

22     A   Does PHH own Ocwen Financial Services?
23 I didn't understand.

24     Q   Are they a parent or subsidiary?

25     A   Parent.

FIRST COAST COURT REPORTERS

11

1      Q   Ocwen Financial Services owns PHH
2  Mortgage Corporation; is that your understanding?

3      MR. CROWLEY:  Objection,
4  mischaracterizes prior testimony.  You may
5  answer.

6      A   First of all, it's Ocwen Financial Corp,
7  and it's not with respect to ownership; it is a
8  subsidiary to Ocwen Financial Corp with respect
9  to the servicing portion of the company.

10     It's not -- it was -- it has the same
11 function that Ocwen Loan Servicing LLC had prior
12 to the merger.

13 BY MR. FINNER:

14     Q   When you say "it," are you referring now
15 to PHH?

16     A   Correct; the servicing arm.  When I say
17 "it," it's the servicing arm, whether it be Ocwen
18 Loan Servicing LLC, who then merged into PHH;
19 that is PHH is still now the servicing arm by
20 merger with respect to Ocwen Loan Servicing.

21     Q   And is PHH, in your understanding, a
22 division or subsidiary of Ocwen Financial --

23     MR. CROWLEY:  Objection to form to the
24 extent it calls for a legal conclusion.

25     You may answer with regard to what you

FIRST COAST COURT REPORTERS

12

1  understand of the business relationship of
2  PHH.

3      A   I already stated it was a subsidiary to
4  Ocwen Financial Corporation.

5  BY MR. FINNER:

6      Q   When you say "it," you mean PHH?

7      A   Yes.

8      Q   Sorry that's confusing.  Looking at
9  Exhibit Number 3, do the numbered paragraphs in
10 Exhibit Number 3 --

11     MR. CROWLEY:  You broke up there,
12     Mr. Finner.

13 BY MR. FINNER:

14     Q   Is Exhibit Number 3 the current Answer
15 to PHH of the allegations of the complaint that
16 you saw as Exhibit Number 2?

17     A   Yes.  It states it's the Answer to the
18 Third Amended Complaint.

19     Q   Are there any amendments to Exhibit
20 Number 3 which you understand are necessary to
21 completely PHH's response to the complaint?

22     MR. CROWLEY:  Objection to form.  You
23 can answer.

24     A   I would not know that independent of
25 knowledge from counsel.  So, in order to respond

FIRST COAST COURT REPORTERS

13

1  to that, I don't think that I can without giving
2  you a legal answer.
3          I don't know.  That would be something I
4  would ask counsel.
5  BY MR. FINNER:
6      Q   Okay.  Could you open up Exhibit Number
7  6, please?
8      A   Okay.
9      Q   Have you seen Exhibit Number 6 before?
10     A   Yes, I have.
11     Q   What is it?
12     A   It's a response with respect to
13  discovery, and it covers the multiple -- it was
14  Plaintiff's First Request for Production of
15  Documents, and it was the objections as well as
16  the notations of the Bates-stamped business
17  records that was produced pursuant to the
18  categories.
19     Q   Did you have any personal involvement in
20  PHH's response to Ms. Fletcher's First Request
21  for Production of Documents?
22     A   No, I did not.
23     Q   Other than the documents which have been
24  withheld under an assertion of attorney/client
25  privilege, are you aware of any documents that

14

1  PHH has that are responsive to the first request
2  which has not been produced?
3          MR. CROWLEY:  Again, try not to disclose
4      any communication you had with counsel.  You
5      may respond.
6      A   Well, to be honest, I did not do any
7  type of analysis of the production of documents
8  as it was -- as they were produced or presented
9  with respect to how legal counsel felt a response
10  needed to be as related to the complaint.  What I
11  can state is that I reviewed the business records
12  and the production of documents in preparation
13  for my deposition, and the business records that
14  were produced were -- or the Bates-stamped
15  records that I reviewed are the records that I
16  reviewed in our business-records-system image
17  of -- our business records images.
18          So, with respect to the response, I
19  defer to legal counsel to answer that question.
20          But, with respect to the business
21  records, yes, the business records that were
22  produced and Bates stamped were business records
23  of Ocwen Loan Servicing, now PHH.
24  BY MR. FINNER:
25     Q   Are you aware of any business records

15

1  which were withheld from production?
2          MR. CROWLEY:  I object to form.
3      A   Well, with respect -- I wasn't involved
4  with the production.  I can't -- I don't know,
5  basically, the answer.  I don't know.
6  BY MR. FINNER:
7      Q   Go ahead and open up, please, Exhibit
8  Number 9.
9      A   Okay.
10     Q   Have you seen Exhibit Number 9 before?
11     A   I have.
12     Q   What is it?
13     A   This is the Second Request for
14  Production of Documents.
15     Q   Would you read the title of Exhibit
16  Number 9, please?
17     A   PHH Corporation Successor Merger to
18  Ocwen Loan Servicing LLC's Response to
19  Plaintiff's Second Request for Production of
20  Documents.
21     Q   Does reading that title modify in any
22  way your understanding of what Exhibit Number 9
23  is?
24          MR. CROWLEY:  Objection to form.
25     A   I don't understand your question.

16

1  BY MR. FINNER:
2      Q   What do you understand this document to
3  be?
4      A   It is the defendant's response to a
5  Second Request for Production of Documents from
6  the plaintiff.
7      Q   Do you have an understanding as to
8  whether PHH has produced all responsive documents
9  to that Second Request for Production of
10  documents?
11          MR. CROWLEY:  Objection to the extent
12      that you would have to rely on information
13      provided to you by counsel.
14     A   Again, my answer isn't going to change
15  from the prior production, in that I wasn't
16  involved.
17          And the question that you are asking me
18  involves information that, based on the
19  litigation, that the servicer would have provided
20  to our counsel and our counsel would have
21  responded as appropriate to the categories.
22          So, with respect to anything beyond what
23  was produced, then those are my business records;
24  I can talk about those.  The legal questions you
25  are asking me, I wouldn't have any knowledge

17

1  outside of discussions with counsel.
2  BY MR. FINNER:
3      Q   Is your answer, again, that you don't
4  know whether all business records that are
5  responsive have been produced?
6      A   I would not have -- I would have to ask
7  legal counsel that question, because -- no, I
8  don't have that knowledge.  It was -- this is a
9  legal document.  We produced our business
10 records.  That was -- that would have been, how
11 should I say -- whatever would have been subject
12 to production would have been produced, as
13 stated, within the second request of how each
14 category was responded to.
15     Q   Okay.  Open up, if you would, please,
16 Exhibit Number 13.
17     A   Okay.
18     Q   Ms. Feezer, have you seen Exhibit Number
19 13 before?
20     A   Yes, I have.  I'm trying to see which
21 copy this is.
22     Q   What is Exhibit Number 13?
23     A   A copy of Aurora's payment history, and
24 it looks like it was just the portion that
25 contains the -- doesn't contain the bankruptcy

18

1  accounting, just contains the ongoing -- their
2  ongoing balances.
3      Q   And when you refer to Aurora, are you
4  referring to a particular entity?
5      A   Well, it was the prior servicer who was
6  servicing the loan prior to it being transferred
7  to Ocwen.
8      Q   Do you know the date of that servicing
9  transfer?
10     A   Not off the top of my head, no.
11     Q   Would you open up, please, Exhibit
12 Number 20.
13     A   Okay.
14     Q   Do you have that in front of you?
15     A   Yes.
16     Q   Please review all of the pages of
17 Exhibit Number 20 and then tell me if you have
18 seen this document before.
19     A   Well, Exhibit Number 20 is actually two
20 documents.  The first, page one, is a copy of
21 Aurora check request.  And then pages 2 through
22 11 is actually a copy of Aurora's business
23 records and a section of their transaction
24 history.
25     Q   Do the business records of PHH contain

19

1  any documents from Aurora other than the five
2  pages of Exhibit Number 13 and the 11 pages of
3  Exhibit Number 20?
4      A   There is a -- so, Exhibit 13, like I
5  said, is a copy of PHH's transaction history.
6  But, once Ms. Fletcher filed bankruptcy, they
7  removed a section of the accounting and placed
8  that -- I don't see that in this transaction
9  history.
10         And, with respect to 20, this section
11 has -- the top portion of it actually has the
12 accounting with respect to the amount that was
13 removed from Exhibit Number 20 -- I'm sorry, not
14 Exhibit Number 20 -- Exhibit 13, the sums.  So
15 those are -- those two transaction histories
16 together account for the missing section of the
17 history in 13.
18     Q   What do you mean when you say "missing
19 section of the history"?
20     A   Well, I think that the manner in which
21 they conducted their -- Aurora, the manner in
22 which they conducted their Bankruptcy Proof of
23 Claim, they would fully remove the main
24 transaction history and create a separate
25 accounting which is deferred to Ocwen as a

20

1  deferred principle balance.
2          Essentially, it was all of the amounts
3  that was removed from the main account
4  transaction history and placed into a separate
5  account in order to post payments, once the
6  trustee makes payments, to pay that portion down
7  so that their main transaction history, which is
8  Exhibit 13, would remain as current ongoing
9  balances on the account.
10         So, as the customer would have made
11 post-petition payments, they would have then
12 applied them based on what the first
13 post-petition due date would have been, moving
14 forward, and calculating those balances in an
15 ongoing post-petition manner.
16     Q   So, if you look at the first page of
17 Exhibit Number 13, first line is "borrow loan
18 transcript to borrower."
19         What do you understand that indication
20 to mean?
21     A   This is the transaction history.  It's
22 just the label that their system recorded once
23 they exported the transaction history from their
24 system.
25     Q   "Borrow loan transcript to borrower" is

**21**

1 an Aurora designation; is that your
2 understanding?
3    A   Yes.
4    Q   And are you saying that the information
5 that was contained in Exhibit Number 13 was
6 something on PHH's system at some point?
7        MR. CROWLEY:  Objection to form.  You
8    may answer.
9    A   Your question is a little bit confusing.
10 What you mean by placed on PHH's system -- if you
11 could clarify what you mean by "placed on their
12 system."
13 BY MR. FINNER:
14    Q   You understand Exhibit Number 13 to be a
15 document that was generated from PHH's business
16 records?
17    A   Yes, it is.
18    Q   Do you understand Exhibit Number 13 to
19 be an image of a report that was generated by
20 Aurora?
21    A   Yes, it is.
22    Q   Exhibit Number 13 is not then a report
23 that was generated off of PHH's business records;
24 is that correct?
25        MR. CROWLEY:  Objection to form.  Are

FIRST COAST COURT REPORTERS

**22**

1 you asking whether the data was or whether a
2 copy of the document was?
3        MR. FINNER:  I'm asking whether Exhibit
4    Number 13 was produced as an image that came
5    from Aurora or whether it was generated by
6    using PHH's business records' system to
7    create a report.
8        MR. CROWLEY:  Objection to form.  You
9    may answer.
10    A   It is a business record that was
11 generated by Aurora from their system of records
12 and provided to Ocwen at the time of the service
13 transfer.  We received it as an image, and it was
14 then placed in the imaging file under
15 Ms. Fletcher's loan number and sent to our
16 business records over at PHH when the loan then
17 subsequently Boarded from Ocwen Loan Servicing
18 over to PHH.
19        So it was a prior servicer's business
20 records, and it is listed in the system of
21 records as a prior servicer transaction history.
22        MR. CROWLEY:  You broke up a little bit
23    in your response.  We got "the image
24    uploaded," and then you broke up a couple
25    words after you came back on.

FIRST COAST COURT REPORTERS

**23**

1    A   It was uploaded -- after we service
2 transferred from Ocwen Loan Servicing to PHH, it
3 was uploaded into the imaging system as the prior
4 servicer's transaction history.
5 BY MR. FINNER:
6    Q   Would your answer be the same with
7 respect to Exhibit Number 20, in that Exhibit
8 Number 20 is images from Aurora's system?
9    A   Other than the first page, yes.  The
10 first page is actually a check request and
11 basically a form they use with respect to
12 notation of some business transaction during
13 their servicing period of June 21, 2011.
14    Q   That first page, is that contained in
15 PHH's business records in a form other than an
16 imaged document?
17        MR. CROWLEY:  Objection to form.  You
18    can answer.
19    A   No.
20 BY MR. FINNER:
21    Q   So you're saying that page 1 is an image
22 as well, but it's a different sort of image than
23 pages 2 through 11 of Exhibit Number 20?
24        MR. CROWLEY:  Objection to form.  You
25    may answer.

FIRST COAST COURT REPORTERS

**24**

1    A   Yes.  Image 1 is like a correspondence,
2 if you will, notes, but like the cashiering
3 department.  But the pages 2 through 11 are
4 actually exports of information contained on
5 their servicing records or servicing system as it
6 relates to PHH's loan, and there is a portion of
7 it that is also, as is noted on page 7, that is
8 the amounts that was removed from the main
9 transaction history.
10        The top portion is the amounts that
11 would have been set forth to establish what was
12 in the Proof of Claim.  And you'll see these same
13 balances that is forwarded over to page 7 also
14 removed from the transaction history; that is, I
15 think, Exhibit Number 20 -- or 13.  Exhibit 13.
16 BY MR. FINNER:
17    Q   Exhibit 13 and Exhibit Number 20, which
18 is a total of 16 pages in the exhibits, do PHH's
19 business records contain any other images from
20 Aurora related to PHH's loan?
21    A   Without looking at every single file, I
22 don't know.  Not that -- I couldn't verify it.  I
23 just don't know right now.
24    Q   I'm going to request the production of
25 any other images from Aurora related to

FIRST COAST COURT REPORTERS

25

1  Ms. Fletcher's loan?
2       MR. CROWLEY:  I believe some additional
3  documents were produced already.  I'm trying
4  to look at Exhibit Number 12.  But I
5  believe, certainly, there's documents in
6  there that are not part of what you've shown
7  this witness or Aurora with regard to your
8  request for any additional documents that
9  have not been produced.
10      We'll take it under advisement after you
11  send the request.  So I'm clear, your
12  request is?
13      MR. FINNER:  Images from Aurora
14  pertaining to Ms. Fletcher's loan.
15      MR. CROWLEY:  Images that PHH has
16  related to Ms. Fletcher's loan.  Okay.
17  BY MR. FINNER:
18  Q   Open up Exhibit Number 14, please.
19  After you've had a chance to look at it, tell me
20  if you have seen this document before?
21  A   I have.
22  Q   What is it?
23  A   **This is Ocwen's payment reconciliation**
24  **history.**
25  Q   What do you understand the payment

26

1  reconciliation history to contain?
2  A   **This is one of the report files of the**
3  **transaction history that was on the Ocwen Loan**
4  **Servicing platform, and it contains the notation**
5  **of the payments received and disbursements made**
6  **with respect to escrow, things of that nature;**
7  **any fees and costs assessed to the loan, as well**
8  **as any credits, debits, with respect to any**
9  **accounting that would relate to adjustments that**
10  **was made on the loan, and the corrections of any**
11  **adjustments made on the loan, as well as the**
12  **running totals of the unpaid principle balance in**
13  **the escrow account.**
14  Q   And when you say "Ocwen Loan Servicing
15  platform," do you refer to Ocwen's system of
16  records with respect to PHH's loan?
17  A   **Yes.  It would have come out of the**
18  **servicing platform as an export of the data.  It**
19  **would have been contained within the servicing**
20  **history.  And, once it's printed -- as of the**
21  **date that it would have printed, it would have**
22  **printed all of the transactions that would have**
23  **taken place on behalf the loan as of the date of**
24  **the report.**
25  Q   Does that platform have a name?

27

1  A   **Real Servicing.**
2  Q   Do you know the dates that Real
3  Servicing was used with regard to keeping a
4  record of Ms. Fletcher's loan?
5  A   **It would have been from Boarding to June**
6  **of 2019.**
7  Q   What happened to the records of
8  Ms. Fletcher's loan in June of 2019?
9  A   **The loan was service transferred, and**
10  **the business records was exported and provided**
11  **into PHH's servicing platform.**
12  Q   What's the name of PHH's servicing
13  platform?
14  A   **Black Knight MSP.**
15  Q   Open Exhibit Number 15, please.  Look it
16  over and tell me if you've seen it before.
17  A   **Can you say the exhibit number again?**
18  Q   15.
19  A   **Okay.  Thank you.  Yes, I've seen it.**
20  Q   What is it?
21  A   **This is an export of the transaction**
22  **history by PHH for the loan service from June of**
23  **2019 through December of 2019.**
24  Q   Are you referring to only the first page
25  of Exhibit Number 15 when you say "through

28

1  December of 2019"?
2  A   **Yes.  It's incorporated effective**
3  **February 23rd of 2021.**
4  Q   Can you say, looking at Exhibits 13, 14,
5  15, and that seventh page of Exhibit Number 20
6  that you talked about, whether those three
7  exhibits and the one page of Exhibit Number 20
8  contain a complete history of transactions of
9  Ms. Fletcher's loan through that date of February
10  23, 2021?
11      MR. CROWLEY:  Objection to form.  You
12  may answer.
13  A   **You are asking me if 13, 14, 15 --**
14  BY MR. FINNER:
15  Q   13, 14, 15 and page 7 of Exhibit Number
16  20.
17  A   **Yes.  That would be a complete history.**
18  Q   Okay Exhibit 16, please.  Open and
19  confirm if you have seen this document before.
20  A   **Yes, I have.**
21  Q   What is it?
22  A   **It is an export of the transaction**
23  **history of the time that Ocwen serviced the loan.**
24  Q   When you call it an "export," can you
25  explain how it's generated?

29

1    A    I didn't generate it, so I'm not sure
2  what method they used.
3          But generally it would be a matter of
4  just pulling it up out of the database report and
5  producing it in the format that it was in Real
6  Servicing, so it would have come from the
7  stage -- the database with the staging
8  information in it, staging table.
9          But, with respect to -- I mean, this is
10  a similar report that I am familiar with pulling
11  through that method, but I'm not sure how this
12  one was pulled or produced.
13    Q    What is a staging table?
14    A    It's essentially a database that held
15  the fields of information that was populated in
16  the database, so, in order to create a report,
17  you can pull that information from the staging
18  tables based on the format of the report setup.
19          So, there's reports that are set up, the
20  pulled fields, that would have been the report
21  that would have pulled a payment transaction
22  history or Detailed Transaction History or
23  comments, or things of that nature, that's used
24  to be in Ocwen Loan Servicing's database, which
25  was Real Servicing.

FIRST COAST COURT REPORTERS

31

1  been prior to the transfer over to PHH.
2          So more than likely this may have been a
3  cut and paste out of the transaction history into
4  this format as well, because this was during the
5  time of Ocwen Loan Serving.
6    Q    Is there any information contained in
7  Exhibit Number 16 that tells you how this report
8  was prepared?
9    A    Well, now that I know that it was done
10  at the time it was at Ocwen, there is a method
11  that you could use to export it directly from the
12  transaction history, right directly from the
13  system, and that would be pretty much the format
14  that you would have here in this exhibit.
15    Q    And that's exporting data contained on
16  Real Servicing, into another format, the format
17  you described as the staging table?
18    A    Well, the staging tables were in -- any
19  database has a staging table, whatever they call
20  it; it has a manner in which they keep data that
21  is populated into a field that, when you pull up
22  that particular loan, it will populate this
23  information.
24          So, with respect to the underlying data
25  that was contained within Real Servicing, this

FIRST COAST COURT REPORTERS

30

1    Q    So you're saying this is a report
2  created from data that was maintained in Real
3  Servicing?
4          MR. CROWLEY:  Objection to form.  You
5    may answer.
6    A    To the extent that it is contained in
7  there, I didn't export -- I'm familiar with the
8  data contained in here, and the format, how it is
9  formatted in this report, in this exhibit.  I can
10  state that's what the data is; I can't state
11  where the report exported -- how it exported, I
12  should say.
13  BY MR. FINNER:
14    Q    Do you see any information in Exhibit
15  Number 16 that indicates the date the report was
16  created?
17    A    It had to have been with respect to a
18  date -- no.  But it is a full history, as it goes
19  all the way through to the -- it looks like
20  there's a servicing transfer on here of 2/21/19.
21    Q    Is that your understanding of the date
22  that the records of Ms. Fletcher's loan were
23  placed on the Black Knight system?
24    A    This servicing history was exported in,
25  actually, February of 2019, so this would have

FIRST COAST COURT REPORTERS

32

1  report, as I was looking at it -- and that's why
2  I said I wasn't sure, because I didn't export it.
3  But it looks very familiar to the format that is
4  utilized by the research department and Busman
5  (phonetic), that, if a customer was to request a
6  transaction history, they would be able to go to
7  certain business units, such as those
8  departments, and would have the ability to export
9  it directly from the transaction history and then
10  place it into a correspondence.  And this is the
11  format that that would look like.
12          In the sense that it was only dated
13  through information up until February of 2019,
14  more than likely that is the way this particular
15  transaction history was created.
16    Q    Would you expect to see any information
17  in servicing notes that would indicate that a
18  report like this was prepared?
19    A    Not necessarily.  You would -- if it was
20  part of a research response, maybe.  But
21  generally you probably wouldn't see it, like, if
22  somebody just pulled it for purposes of reviewing
23  it, you know, internally, or things of that
24  nature.
25    Q    Open up Exhibit Number 17, please.  Take

FIRST COAST COURT REPORTERS

33

1 a look at it.

2 And, after everybody has it, just let us
3 know whether you've seen Exhibit 17 before.

4 **A Yes, I have.**

5 **Q** What is it?

6 **A The Detailed Transaction History of**
7 **Ocwen Loans.**

8 **Q** What's the difference between the
9 detailed transaction and a payment reconciliation
10 history?

11 **A The Detailed Transaction History is**
12 **actually the history, that is the main history,**
13 **if you will, that's going to record the payments**
14 **and disbursements in a report, and this**
15 **information is also contained in the payment**
16 **reconciliation history.**

17 **The payment reconciliation history**
18 **actually was created and added to the system in**
19 **order to be able to print a report, a transaction**
20 **history report, that would contain other columns**
21 **such as fees and costs, late charges that was**
22 **assessed to the account, and give a little bit**
23 **more detailed information. And the payment**
24 **reconciliation information is also information**
25 **which was contained and populates on account**

34

1 **statements under the activity section of the**
2 **report.**

3 **So they are similar in nature; it's just**
4 **that the Detailed Transaction History is**
5 **condensed to basically just populating**
6 **information regarding payments received, posted,**
7 **disbursements made from escrow, things of that**
8 **nature.**

9 **Q** Would that mean the Detailed Transaction
10 History is a subset of the information contained
11 in the payment reconciliation history?

12 MR. CROWLEY: Objection to form. You
13 may answer.

14 **A Actually it would be reverse of that.**
15 **It would be that the detailed that -- the**
16 **reconciliation history is a subset of the**
17 **information contained in the Detailed Transaction**
18 **History report, along with information that was**
19 **also contained in the fees and costs module,**
20 **late-charge module, and any of the other -- any**
21 **of the other categories with respect to payment**
22 **posting, with respect to trustee payments posted,**
23 **to a post-petition payment posted.**

24 MR. FINNER: I'd like to ask for a short
25 break now. Is ten minutes good? Or try to

35

1 resume sooner?

2 MR. CROWLEY: Ten minutes is fine.

3 (Brief recess.)

4 MR. FINNER: Let's go back on.

5 BY MR. FINNER:

6 **Q** Let's stay with Exhibit Number 16, if we
7 could.

8 Can you tell, Ms. Feezer, can you
9 explain what it means to say that a loan is
10 Boarded?

11 **A Okay. You kind of broke up.**

12 **Q** Explain what Boarding a loan means.

13 **A When a loan is Boarded, it means, we, as**
14 **a servicer, we were designated as the servicer**
15 **and we will Board the information into our**
16 **system. And then, on the effective date, the**
17 **prior servicer will forward the financial, any**
18 **financial information which would be our opening**
19 **financial information, which we will populate**
20 **into the system.**

21 **And then, once Ocwen is officially**
22 **servicing the loan, then there is a process that**
23 **is utilized by the loan setup team, as well as**
24 **various units at Ocwen, which will start working**
25 **on making verification of the data that we had**

36

1 received from the prior servicer in our system on
2 a moving-forward basis.

3 **Q** Do the first eight transactions that are
4 shown on Exhibit Number 17 constitute all of the
5 Boarding entries that were made on Ms. Fletcher's
6 loan when servicing was acquired from Aurora?

7 **A I didn't hear the exhibit number.**

8 **Q** Exhibit 17. Let me go ahead and get off
9 the video and save the stream.

10 Do those first eight transactions dated
11 April of 2012 constitute the entry of Boarding
12 transactions for Ms. Fletcher's loan?

13 **A The first three are the initial**
14 **information that we received. The next -- the**
15 **sixth line down is the information that we had**
16 **received with respect to the deferred principle**
17 **balance. And then the information above that**
18 **with the negatives on it, which is four**
19 **transactions in the middle, that is going to be**
20 **the adjustments that Ocwen made with respect to**
21 **the deferred principle balance that Aurora had**
22 **indicated to us was the amounts that was due**
23 **under the Proof of Claim.**

24 **Q** So I guess start with lines two and
25 three, transaction code NLB and ESP. And could

37

1  you explain what information is being put on
2  Ocwen's system with those entries?
3       A   Yes.  This is a notation of an escrow
4  shortage adjustment and then the unpaid principle
5  balance of the loan, as well as the -- I believe
6  that was the -- I think it was the late charges
7  also Boarded in under the other column.
8       Q   Where are you seeing the late charges?
9  I'm seeing "late charge adjustment" six or seven
10 lines down, with transaction code CA.
11      A   That's correct.  Those are going to be
12 the amounts where we see that $60,768.32.
13          Ocwen did an adjustment in order to
14 break this amount down that was extracted from
15 Aurora's transaction history at the time the
16 Proof of Claim was created, and this was the
17 balance that they reported to us that was still
18 due.
19          And then, based upon the adjustments at
20 that time, it was broke down to state that there
21 was the $2,474.15, which is in the late charges,
22 which was in the Proof of Claim, and then this
23 negative $23,428.63, which is the balance of the
24 escrow at the time of the bankruptcy.
25          And then there is this $30,331.91, which

38

1  ultimately was the interest portion of the
2  payments which Ocwen will waive.  And then they
3  Boarded back into the $181,042.55, the 3,604.81,
4  which is the amount that Ocwen indicated -- or
5  from this breakdown, was what Ocwen stated was
6  the unpaid principle balance, based on the fact
7  that they knew that the trustee had disbursed
8  over $10,000 to Aurora, making the assumption
9  that Aurora posted this to principle and interest
10 payments, as Ocwen would have, in a bankruptcy.
11 But we later found out that, upon receipt of
12 their transaction history, that is not the
13 manner in which they had posted that payment.
14          So, with respect to Ocwen setting these
15 balances up and putting them -- incorporating
16 them back into the transaction history, we only
17 included, of the $5,450 that was stated in the
18 Proof of Claim --
19      MR. CROWLEY:  You froze.
20      A   As Aurora stated in their Proof of
21 Claim, the principle balance was $5,450.  I
22 believe Ocwen only placed back into the system
23 3,604.81 of that amount.
24 BY MR. FINNER:
25      Q   How does that explanation you just gave

39

1  correspond with the information that you have
2  already described on page 7 of Exhibit Number 20,
3  that's PHH Bates stamped 02508?
4       MR. CROWLEY:  Objection to form.  You
5  may respond.
6       MR. FINNER:  Let me strike that
7  question.
8  BY MR. FINNER:
9       Q   Can you see any correspondence between
10 the amounts that are shown on page 7 of Exhibit
11 Number 20 and the various setup transactions in
12 April of 2012, which is on page 1 of Exhibit 17?
13      A   With respect to the amount, if you look
14 at the manner in which the calculations were
15 made, this is the beginning of the loan Boarding
16 over, and the interim reconciliation of that
17 amount, the breakdown of this amount, was based
18 off of the bankruptcy records with respect to the
19 Proof of Claim and the trustee's ledger.
20          So the balances that you are going to
21 get, that is listed for the adjustments on the
22 entries that we just went over on Exhibit 17,
23 were actually based upon those type of records.
24          With respect to what the balance is with
25 respect to Exhibit Number 20, on page 7, this is

40

1  going to be the balances that was essentially
2  what Aurora was stating that was owed as of the
3  time.  And this is where, when you go back to
4  correlate these two, if you look at Exhibit
5  Number 20, under principle amounts that is going
6  to be owed, it's going to be $5,450.97, Ocwen
7  only added in $3,604.81 of that amount.
8           With respect to the amount of interest
9  that was still due, Aurora is noting that
10 $33,081.99 would still be due.  Ocwen had stated
11 it was 30,331.91.
12          With respect to the amounts for the
13 other balances, we're going to see -- if you go
14 up to the middle of that chart, on page 7 of 20,
15 we are going to see the amount for the late
16 charges there, which is the balance that Ocwen
17 had placed in the system, and then --
18      MR. CROWLEY:  You broke up after talking
19 about the late charge.
20      A   Back at Exhibit Number 20, at page 7,
21 underneath late charges, I was discussing the
22 charge of $750 that Aurora had assessed to this
23 account, and it was listed as "miscellaneous
24 bankruptcy."
25          So, with respect to the amounts of money

41

1  then that Aurora had received from the trustee
2  and posted, you'll see on 4/11 of 2012 they
3  received $8,993.22, and they applied $8,243.22 of
4  that money towards the outstanding interest of
5  $41,325.21, which was reported in the Proof of
6  Claim, and the other $750 they used to clear up
7  whatever the miscellaneous bankruptcy charge of
8  750 dollars was.
9      So, with respect to the amounts that
10  they had received and posted, it was listed -- it
11  was reported to us that the balance was only
12  60,000. But, once we were able to obtain the
13  transaction history, we were able to actually
14  make a clear verification of how those balances
15  were then subsequently -- those funds were then
16  subsequently applied at Aurora.
17  BY MR. FINNER:
18      Q   Is there any information on Ocwen's
19  system of records that describes the variances
20  that you said were applied to the numbers that
21  were received from Aurora on Boarding?
22      A   I want to say yes. From my review -- I
23  did an independent review of these calculations
24  based on the business records. But, with respect
25  to what is contained in the business records,

FIRST COAST COURT REPORTERS

42

1  yes, these adjustments are contained in the
2  transaction history, and they would be contained
3  in the comments log as well, as there is going to
4  probably be corresponding communications within
5  the comment log that is going to kind of enhance
6  the understanding of what this breakdown would
7  have equated to, with respect to the reliance of
8  the record of how they broke this payment down to
9  get to these figures, in order to have the
10  60,768.12 change from this deferred principle
11  balance and incorporate them back into the
12  transaction history, the balances back into the
13  transaction history.
14      Q   Do you know whether that comments log
15  has been produced?
16      A   Yes, it has.
17      Q   Now is a good time for us to go to
18  Exhibit Number 12.
19      And if you could identify the Bates
20  numbers that contains that comments log, that
21  would be the question, please?
22      A   It looks like it's going to start on
23  Bates stamp 1517, and it's going to go through
24  for -- 1517 to 1742, which covered Ocwen's
25  comments log all the way up to PHH's comments,

FIRST COAST COURT REPORTERS

43

1  and looks like that went through to February 23rd
2  of 2021.
3      Q   Now, are you referring, with those
4  numbers, to the H numbers of the PDF that you see
5  in Exhibit Number 12, starting at Bates PHH 0156?
6      A   Yes. The Bates stamp and page number
7  are different. So page number 1742 of Exhibit 12
8  refers to PHH Bates stamp 1761, and page 1517 of
9  Exhibit 12 is to PHH Bates stamp 1536.
10      Q   Would you open up Exhibit Number 18,
11  please.
12      Have you seen this before?
13      A   Yes.
14      Q   What is it?
15      A   A portion that was in what I just
16  answered for Exhibit 12. This is the comment
17  log, which is PHH 1636 through PHH 1746. Okay.
18  That's the last comment. So this is an export of
19  the comment notes from Ocwen Loan Servicing only,
20  not PHH.
21      Q   Are those entries something that would
22  also be described as servicing notes?
23      A   Yes, they were.
24      Q   And they contain the comment fields that
25  you described when you were talking about the

FIRST COAST COURT REPORTERS

44

1  manner in which the loan was Boarded?
2      A   Well, it's going to contain any
3  servicing history note as it relates to how the
4  loan was serviced. So, if there was any type of
5  servicing activity that takes place, it's noted
6  in the comment log in some entry.
7      For instance, if an account statement
8  goes out, it would be noted that a billing
9  statement was sent. If a call comes in, it's
10  noted that we received a customer call, so there
11  would be notes regarding that call. So it's
12  recording various different servicing activities
13  under what we refer to as the "comment log."
14      Q   The first entry on Exhibit Number 18 has
15  a comment "loan shell Boarded on 5/16/2012."
16      Do you see that, Ms. Feezer?
17      A   I do.
18      Q   What does that refer to?
19      A   It notes that we were --
20      MR. CROWLEY: You are breaking up again.
21      A   Just general information.
22      MR. CROWLEY: You broke up again.
23      A   I'm sorry. We received the basic
24  information regarding the loan that would
25  ultimately be serviced transferred to us. So,

FIRST COAST COURT REPORTERS

45

1  when we receive that, we open a shell, and it's
2  assigned a loan number. And then this loan
3  number would be provided, depending on the type
4  of goodbye letter. This one indicates that it
5  was going to be a joint hello/goodbye letter.
6         So this would have been information that
7  would have been contained in that particular
8  letter regarding the account number that Ocwen
9  would than associate to that loan, and, in order
10 to obtain that, we have to open a shell of that
11 information and Board it into our system. And
12 then on the effective date of service, then we
13 would get the retiring servicer's financial
14 information that we would then upload into the
15 system.
16 BY MR. FINNER:
17    Q   Do you know why that effect -- sorry --
18 why that shell Boarding dated in May of 2012 is
19 several weeks after the initial transaction
20 increase that we were looking at on Exhibit
21 Number 17?
22    A   With respect -- I didn't understand what
23 the question was. With respect to Aurora's
24 information or Ocwen's information?
25    Q   The entries that you have described as

FIRST COAST COURT REPORTERS

46

1  loan Boarding entries on Exhibit Number 17 took
2  place between April 21st, 2012 and April 24,
3  2012.
4         Do you know why the shell Boarding in
5  the comments is dated several weeks later in May
6  of 2012?
7    A   Ocwen, when we Board a loan in, we will
8  always leave a buffer of time with respect to
9  being able to post transactions that possibly
10 could have been received by the prior servicer
11 that they did not necessarily post on their
12 account.
13       For instance, it would be that, let's
14 say that the customer would send in an automated
15 payment and didn't see the hello/goodbye letter
16 and realize that the payment needed to go to
17 Ocwen, as opposed to Aurora, Aurora could then
18 forward that payment to us, and then Ocwen would
19 have the ability, due to this gate, that they
20 open it up, and they can actually date it as the
21 date that Aurora received it and not isolate it
22 to the actual date, you know, like posting it to
23 a date when Ocwen then started Boarding it.
24       So, if we would have strictly Boarded
25 this in and said June the 1st, we wouldn't have

FIRST COAST COURT REPORTERS

47

1  had the ability to go back and give the customer
2  credit for posting a payment that could have been
3  received by the prior servicer on a different
4  date.
5    Q   Your answer just described a discrepancy
6  between -- I'm looking now at Exhibit Number
7  18 -- between the first entry with the shell
8  Boarding on the 16th and the third entry with the
9  anticipated activation date of June 6?
10        MR. CROWLEY: Objection to form. You
11    may answer.
12    A   I didn't hear.
13 BY MR. FINNER:
14    Q   On Exhibit Number 18, the first entry on
15 the first page says "loan shell Boarded on
16 5/16/2012," and the third entry says there was an
17 anticipated activation date of June the 6th,
18 2012.
19        Is the difference between those two
20 dates that period you were describing in order to
21 handle a transition of payments?
22    A   Based on the transaction history date.
23    Q   Well, for starters, I'm just looking at
24 the comments on Exhibit Number 18 that says they
25 were loan shell Boarded on May 16th, anticipated

FIRST COAST COURT REPORTERS

48

1  to activate on June 6th?
2    A   We would have had the information about
3  the loan in our system as of May the 16th of
4  2012, but we would always leave a window of time
5  before this date of May 16, 2012, in order to be
6  able to post payments that possibly could have
7  been received by Aurora that they did not post in
8  their transaction history, but received.
9        And then Ocwen would need to be able to
10 post it as of the date that Aurora received it.
11       So we give a date range to go back and
12 post during that time period.
13       So, in this particular instance, it
14 would have been --
15       MR. CROWLEY: You broke up again.
16    A   -- to the May date that we Boarded the
17 shell. So Ocwen would have opened its Boarding
18 date.
19       Even though we opened the shell on
20 5/16/2012, we would have opened up the
21 transaction history to be able to accept -- to
22 date something, to give it an effective date, as
23 opposed to the date received, to be able to have
24 the ability to effect a date item that possibly
25 could have been received by the prior servicer.

FIRST COAST COURT REPORTERS

49

1  And that would have been one month prior to that
2  shell Boarding date, or approximately a month, so
3  it would have been into April of 2012.
4  BY MR. FINNER:
5      Q   Thank you, Ms. Feezer.
6          Now I'd like you to turn to page 91 of
7  Exhibit Number 18, the comments log that's Bates
8  stamped PHH 01626, and describe, if you can, what
9  the entry on that first page refers to?
10     A   We're on the comments of September 23 of
11 2016?
12     Q   Yes.
13     A   This is a comment -- this is just a
14 basic bankruptcy comment.  That is communications
15 that was made between the -- looks like the
16 business unit and their attorney.
17     Q   Do you understand what is referenced to
18 as Notice of Final Cure response?
19     A   Am I familiar with what a Notice of
20 Final Cure refers to?
21     Q   Okay.  What does a Notice of Final Cure
22 refer to?
23     A   Well, yes, once the trustee makes their
24 final disbursement under the plan, then they file
25 a Notice of Final Cure, in order for the creditor

50

1  that they had disbursed funds to throughout the
2  bankruptcy, to verify that they had received the
3  funds and to respond to the notice with respect
4  to the account that they had received the funds
5  under the Proof of Claim and that they were
6  applied to the account.
7      Q   And do you know if such a notice was
8  filed in Ms. Fletcher's case?
9      A   Yes, it was.
10     Q   And going back to page 89 of Exhibit
11 Number 18, Bates stamped 01624, does that
12 indicate that the trustee's notice was filed on
13 September 2nd of 2016 --
14         MR. CROWLEY:  Sorry.  What page?
15         MR. FINNER:  Page 89 of Exhibit Number
16     18, Bates stamped 01624.
17 BY MR. FINNER:
18     Q   Does it indicate that the trustee's
19 Notice of Final Cure was filed September 2nd of
20 2016?
21     A   Well, the notes on here are actually a
22 reconciliation and part of a reversal of
23 cashiering, and that's not with respect to the
24 response.  It's not -- it noted that there was a
25 notice filed, but it's within the reconciliation

51

1  form, within the bankruptcy reconciliation that
2  was completed.  Which, it starts -- it looks like
3  these were truncated at the bottom when they
4  exported it.  So the opening column is going to
5  be at the bottom of that, and that was on 9/17 of
6  '16, that there was an interim reconciliation
7  completed.  And then go back to the top, and it
8  starts at the top -- there's the information
9  regarding the reconciliation, and it's saying the
10 reconciliation was completed on 9/17/16.  And
11 then it gives reference.  And it says it's not
12 yet -- the Bankruptcy Court hasn't discharged it
13 yet.
14         A Notice of Final Cure was filed on 9/2
15 of 2016.  And then it's going through the various
16 points with respect to them reviewing the account
17 as it relates to the amounts on the Proof of
18 Claim previously filed.
19         And the next comment on this page refers
20 to -- the next comment is referring to this
21 reversal on 9/17.  So this was a request to the
22 cashiering department in order to reverse funds
23 in the amount of $1,900 and post it towards --
24 and then it gives the amounts below -- post it
25 towards these fees.

52

1          So they are having them take money or
2  misapplied expenses to the amount of $1,400 and,
3  together with the funds that was in the trustee
4  expense account for $522, and then reapply it.
5      Q   When you say that there was a
6  truncation, does that mean that it appears to be
7  that all of the information that was on the
8  system didn't make it onto the pages contained in
9  this exhibit when the report was generated?
10     A   This looks to me like the entire
11 comment.  But, generally, whenever -- if you look
12 at the top of the comment, it starts above, with
13 the entry with respect to the alias code and the
14 date and the department information.
15     Q   If you flip back to the previous page,
16 number 88, where there're a number of redactions,
17 does that fill in the information that you are
18 looking for?
19     A   Not that.  I'm looking -- I'm trying to
20 explain to you, when I was looking at the
21 comments, it appears to me -- I'm just letting
22 you know that the comment starts above, and then
23 the information about what that comment is falls
24 at the bottom of the comment.
25         So the top of this -- so, looking at

53

1  page 89, which is PHH 1624, there are two
2  comments on this page; first one is, the RECOM
3  was completed, the interim RECOM was completed,
4  and it was on 9/17 of 2016.
5      And, if you go to the top of the page
6  where that comment is, and then it stops -- that
7  comment stops at where that line is, then it
8  talks about the reconciliation.  Then you'll see
9  right below that, says "reversal request to
10  cashier."  And you'll see information contained
11  in that comment.
12      And then at the very bottom, starts the
13  RVRQ, which is the alias code for what
14  information's populated in the comment log.  So
15  the headers for the comments are at the bottom of
16  the comment, as opposed to up at the top of the
17  comment.  That was just an exporting --
18      MR. CROWLEY:  All we heard --
19      A   Didn't change the justification at the
20  top as opposed to the bottom.
21      MR. FINNER:  Thank you.
22  BY MR. FINNER:
23      Q   Can you describe in general what a
24  bankruptcy reconciliation refers to and what the
25  steps are in doing one of those?

FIRST COAST COURT REPORTERS

54

1      A   Yes.  Well, there is now two processes
2  now that the trustee has the Notice of Final
3  Cure.  So, once the -- once we receive a Notice
4  of Final Cure, an interim reconciliation will be
5  completed to review the account with respect to
6  the postings and to make sure that any of the
7  sums that was in the expense account was applied
8  to the loan and if there is any adjustments that
9  will need to be made.
10      It will look very similar to the
11  comments contained on the Bates stamp 1624 of
12  PHH.
13      So, once that adjustment is done, that
14  way, they will be able then to respond to and be
15  able to determine the amounts that was posted and
16  if the account -- if we had received all of the
17  trustee's payments.
18      So then the next reconciliation would
19  then come at the stage of the account being then
20  receiving a discharge.
21      Q   Have you reviewed the response to the
22  Notice of Final Cure?
23      A   All I heard was "did you review," and
24  then you froze.
25      Q   Did you review the response to the

FIRST COAST COURT REPORTERS

55

1  Notice of Final Cure that was filed in
2  Ms. Fletcher's case?
3      A   Yes, I've seen it.
4      Q   I'm trying to see if we've got it.  I'll
5  find that at our next break.
6      Is it your understanding that the
7  reversals that were requested in the comments
8  that you've described to us were applied to
9  Ms. Fletcher's loan and incorporated into the
10  response, Notice of Final Cure?
11      MR. CROWLEY:  Objection to form.  You
12      may answer.
13      A   Well, yes.  Once the adjustments was
14  made to the account, that's the whole purpose of
15  doing the interim reconciliation, is to make sure
16  that all of the funds that we have that is, even
17  in the expense account, that have been accounted
18  for, so that we know what amounts -- so that we
19  can add up how much we received based on how much
20  we were supposed to receive from the amount from
21  the Proof of Claim.
22      So, yes, that's the whole purpose, is to
23  look at the account, analyze the account so that
24  we're able to then respond to the Notice of Final
25  Cure.

FIRST COAST COURT REPORTERS

56

1  BY MR. FINNER:
2      Q   I'd like you, if you could, to review
3  the portion of Exhibit Number 18 that starts on
4  page 86, which would be Bates 1621, going up
5  through that entry on the 23rd of September, that
6  a response was filed, and that's on page 91, and
7  identify the changes to the account that were
8  initiated or requested in the process of this
9  bankruptcy reconciliation in September of 2016.
10      MR. CROWLEY:  Objection to form.
11      (Brief pause.)
12      A   Okay.  I reviewed pages 86 through 91.
13  And your question was, where did it reflect that
14  the adjustments were made.
15      If you go to page 90 of the PDF, which
16  is Exhibit 18, which is PHH Bates stamp 1625,
17  you're going to see a series in the middle of the
18  page, and it's going to start "reversal processes
19  funds that were needed to apply to expenses."
20      Then you are going to see the various
21  amounts there with the amounts by it and the
22  batch number.  Whenever you see an adjustment
23  made on an account, instead of it having a
24  designation of a batch number that would have
25  been assembled from, say, receiving a

FIRST COAST COURT REPORTERS

57

1 post-petition payment or a trustee payment, it's
2 going to be the customer's account number. So
3 these would be referred to as adjustments.
4          The first set is going to be that there
5 was --
6          MR. CROWLEY: Sorry. You broke up.
7     A    -- 438.20. The first set lists the
8 adjustments and starts at 522.63 and ends at the
9 then posting at 522.63.
10          So there's five entries that comprise
11 that adjustment.
12 BY MR. FINNER:
13     Q    Is it your understanding that those
14 adjustments were applied to the account as it was
15 reflected in the response that was filed with the
16 Notice of Final Cure?
17     A    Well, yes. The Notice of Final Cure
18 would be filed based on the information in the
19 system as of that date. Yes.
20     Q    On page 87 of this Exhibit 18, Bates
21 1622, there is an entry about two-thirds of the
22 way down the page dated September 9, 2016, begins
23 "please locate funds."
24          Do you see that entry, Ms. Feezer?
25     A    I do.

58

1     Q    What does that refer to?
2     A    If you go to page -- on page 87, that we
3 were on, there was a request from the research
4 department that says that they need to check
5 whether or not a payment was posted by the prior
6 servicer and that they did not have a copy of the
7 prior servicer's transaction history to verify
8 that they were sending this work-flow to verify
9 it over to cashiering.
10     Q    Did cashiering respond?
11     A    Yes. They basically -- so, when they
12 sent it over to cashiering, they essentially gave
13 them the path that the transaction history was
14 located on. Looks like it would be on Bates
15 stamp 1623, at the top; they are giving them the
16 path of the prior loan setup, provided the --
17 well, the loan setup comment that they inserted.
18          But they're saying the prior servicer's
19 transaction histories, the path within the bulk,
20 that it has been emailed to the location of the
21 prior servicer's histories. So they had provided
22 them the research of the path in order to pull
23 the prior servicer's history.
24     Q    If you can turn two pages forward to
25 Bates stamp 1625, it's page 90 of Exhibit 18.

59

1     A    Okay.
2     Q    Can you describe what's going on on this
3 first line entry at the top of this page?
4     A    This is the reconciliation review that
5 was conducted based on the amounts of the -- with
6 respect to the Proof of Claim, and they are
7 sending a recommendation with respect to
8 adjustments that need to be made on the account
9 with respect to the Ocwen business records, the
10 amounts that would have been listed that was
11 not -- how you want to the say -- they didn't
12 file a notice with the Bankruptcy Court in order
13 to get permission to assess -- to have these fees
14 then assessed to the loan and make it a part of
15 the amounts that are due post petition, so they
16 are basically going through and outlining
17 post-petition fees and costs that were on the
18 loan that we would then need to review from the
19 loan.
20     Q    And can you tell from this document the
21 identity of the user who is making that
22 recommendation?
23     A    Well, the comment was placed in there by
24 user with the user ID VENKATMU. I'm not sure
25 what that person -- not sure what their name is,

60

1 but that was the ID, that's the user ID.
2     Q    For simplicity, can we refer to that
3 user as user V?
4     A    That's fine.
5     Q    To whom was that recommendation made or
6 to what department; do you know?
7     A    This is part of the reconciliation team.
8 They would have then sent this to their --
9 whoever was identified as their manager at the
10 time, and then they would review it to get the
11 approval in order to forward this for processing.
12     Q    Can you see in this Exhibit 18 what the
13 subsequent history of that recommendation was and
14 whether or not it was approved or implemented?
15     A    Yes, it was implemented. There were
16 adjustments that were made to the account with
17 respect to moving the post-petition fees and
18 costs from the loan.
19     Q    Can you identify that entry on any of
20 the exhibits that you've already looked at,
21 whether it's the transaction histories or this
22 comments' log?
23          MR. CROWLEY: Objection to form. You
24     may answer.
25     A    If you look at Exhibit 14, there is

61

1   going to be adjustments that was made on PHH --
2   doesn't have a Bates stamp number.  So Exhibit 14
3   at page 5.
4       Q   Is there a Bates 00010 on the far right?
5       A   Yes, it is.  So it would be 10, Bates
6   stamp 10 of Exhibit 14.
7           And there is adjustments that's made for
8   credits of these invoices.  In the middle of the
9   page you're going to see 650, basically just a
10  credit, and then 176.00, 928.82 and 206.01.
11      Q   Is there a reason why those amounts that
12  you've identified on page 5 of Exhibit 14 don't
13  correspond to the amounts that are given in the
14  note at the top of page 90 of Exhibit 18?
15      A   Well, with respect to how they are
16  listed in here, I'm not sure how or why they
17  broke it out in these figures.
18          But, with respect to the adjustments,
19  those are the credits that was applied.
20          So I didn't look at it in that manner to
21  reconcile it, but those were the credits as it
22  relates to the amounts during that time period
23  with respect to the reconciliation of removing
24  the fees from the account.
25      Q   And, if you go back and forth between

62

1   that page on Exhibit 14, page 90 of Exhibit 18,
2   those dates correspond to the indication on
3   Exhibit 18, under PYMT0003 code; is that right?
4       MR. CROWLEY:  Objection to form.
5       A   Yes.  It appears to be a reversal
6   notation that cashiering would have incorporated
7   into that log as relates to the transaction
8   history.
9   BY MR. FINNER:
10      Q   Now, staying on this page 90 of Exhibit
11  18, if you go to the first entry dated September
12  21, 2016, that's again by this user we've
13  identified as V, and the code is NOFCX, can you
14  describe what information is being provided by
15  that comment?
16      A   That is closing out the work-flow with
17  respect to filing the Notice of Cure Response.
18      Q   What does the next line, says "rejected
19  by QC" mean?
20      A   This is a commercial loan business unit
21  that would be in control of the operations of --
22  this is going to be the commercial -- this
23  comment is essentially closing out a work-flow to
24  the bankruptcy department reconciliation team,
25  because it would then be handled by the

63

1   commercial -- this wouldn't have been processed
2   in the bankruptcy, the general bankruptcy
3   department that would handle residential
4   accounts; it would be then processed by the
5   commercial department.
6       Q   When you say "this" wouldn't be
7   processed, are you talking about the bankruptcy
8   reconciliation that was performed in September of
9   2016?
10      A   Well, not necessarily the bankruptcy
11  reconciliation.  It would be with respect to the
12  commercial department then handling the account
13  from that point on, so they would have then the
14  commercial department -- so this brings us into a
15  different distinction of what is happening here,
16  is that, if this was in a standard residential,
17  rather than the business unit, the bankruptcy
18  department would then, in its normal course, then
19  make the file, prepare and have prepared or send
20  to be prepared to the attorney, depending on how
21  they do it in that particular state, the
22  information to be filed with respect to the
23  Notice of Final Cure.
24          In this particular instance the account
25  is a commercial account, so this information that

64

1   was comprised by the review is then going to be
2   submitted to the commercial department, and they
3   are going to process this Notice of Final Cure
4   through their business practice.
5           And this is just essentially the
6   bankruptcy unit closing out the flow that they
7   would have then followed with respect to making
8   sure that the Notice of Final Cure was then
9   filed.
10          So they were closing it out and the
11  commercial department is picking it up.
12      Q   And between this page and the next page,
13  do you see -- and by this page and the next page,
14  I mean page 90 and 91 of Exhibit 18, Bates 1625
15  and 26.
16          Is there any indication that the
17  commercial department took any action with
18  respect to the Notice of Final Cure?
19      A   Well, it appears that he had sent it to
20  counsel with respect to filing it with the Court,
21  and they sent it to Leah Freedman.
22      Q   When you say "they," are you now
23  referring to the team at the commercial
24  department that you've been describing?
25      A   Yes.

65

1    Q    On this page 90, under that September 21
2    entry by user V, there is another entry also
3    dated September 21, 2016 with a code of RECON
4    REJ.
5        Do you see that, Ms. Feezer?
6    A    Yes, I do.
7    Q    What information is being provided by
8    that comment?
9    A    This is the comment that is essentially
10   part of that work-flow.  So we need to close it
11   out because the business unit, the bankruptcy
12   business unit, isn't going to take the next step
13   in order to process this.  So they have to close
14   out these work-flows.
15       So this is a part of closing out that
16   work-flow that you see with the Notice of Final
17   Cure with the X through it.  It's going to be
18   essentially closing out the work-flow, and then
19   the commercial business unit was handing it.
20   Q    And the bankruptcy unit that you are
21   describing in your testimony, is that what the
22   comment refers to when it speaks of LM BK?
23   A    No.  A LM BK is going to be a loss
24   mitigation, like a single point of contact.
25   Q    And can you tell us why they are

66

1    indicating no adjustment should be made on the
2    loan?
3    A    The commercial department needed the
4    reconciliation completed through the
5    reconciliation department of the bankruptcy unit;
6    then they are going to do the reconciliation.
7        They are not going to physically handle
8    or create or, by them completing it, it is not
9    going to then trigger it back to the bankruptcy
10   department.  So they are closing out the
11   work-flow to the bankruptcy department, doesn't
12   continue on and send a notice to the attorney or
13   file a notice because the commercial department
14   is going to do it.
15       So the reconciliation is done, and the
16   commercial department is saying "don't do
17   anything, I'm going to pick it up from here," and
18   that's what is happening here.
19       This is stopping the work flow and
20   stopping the notice from being handled in the
21   bankruptcy department.  It's sent over to the
22   commercial department, and their agents are going
23   to handle it.
24       And looks like they have a, what refers
25   to as a LM BK designation, which is probably

67

1    their loss mitigation bankruptcy department in
2    Houston, which is the commercial office.
3    Q    Let's turn to page 101 of Exhibit 18,
4    Bates stamp PHH 0136.
5        Ms. Feezer and Mr. Crowley, could you
6    indicate when you have gotten there?
7        MR. CROWLEY:  I'm sorry.  Page 101
8    PHH -- I'm on it.
9    A    I'm there.
10   BY MR. FINNER:
11   Q    Could you read that first comment on the
12   page, Ms. Feezer, and tell us what the author
13   meant with regard to Ms. Fletcher's loan with the
14   words "it was a split loan that wasn't adjusted
15   correctly"?
16       MR. CROWLEY:  Object to the extent she
17       has to speculate as to what someone may or
18       may not have said.  If you want to ask the
19       witness what she understands, that's maybe a
20       different question.
21       MR. FINNER:  Thank you.
22   BY MR. FINNER:
23   Q    What does it mean to the reader?
24   A    This comment kind of coincides with a
25   string of comments that was also noted, but I'm

68

1    familiar with the string of comments.  So the
2    context in which this comment then flows through
3    is essentially kind of giving a summation, if you
4    will, about the confusion, I think is the word
5    they used about being confused.
6        But essentially what happened is that
7    Lolita Milner is trying to surmise the fact that
8    this was a complicated case in the fact that we
9    did make adjustments on this based on the way
10   Aurora had reported to us at the time we began
11   servicing the balances that were due.
12       The next sentence, where she's saying
13   that it was a split loan that wasn't adjusted
14   correctly, we know that, based upon the hours and
15   hours of research that they had put into getting
16   these adjustments, previous adjustments done
17   throughout this loan, that, you know, that we
18   needed to incorporate -- we found out that Aurora
19   pulled out of the main transaction history of
20   their system of record, and they created a
21   deferred principal balance that comprised all of
22   those numbers that we went over earlier.
23       And they -- so Ocwen doesn't keep two
24   systems of records.  Ocwen keeps a Proof of Claim
25   module, which it would track those amounts in

69

1   order of application of receiving payments from
2   the trustee, as opposed to doing it this way,
3   where they're creating [inaudible] of records.
4        So Ocwen then took this split loan,
5   broke down the deferred principle balance that
6   Aurora had created and placed those figures in
7   there, which we went over the balances that they
8   placed in there.
9        So then they are talking about that the
10  Motion for Relief was not filed due to that issue
11  on that end, meaning that, when they very
12  first -- that's where all this came into play, is
13  that they wanted to file a Motion for Relief from
14  stay because Ms. Fletcher's stopped making
15  post-petition payments.
16       We had received two after the loan
17  Boarded over, and she didn't make any payments
18  from August of 2012 all the way through to 2014.
19  So we were getting no post-petition payments.
20       So they are talking about we couldn't
21  have filed a Motion for Relief due to the issues
22  on our end, meaning, when we Boarded it in, that
23  unpaid, deferred unpaid principle balance was in
24  a forbearance module that we would have then
25  utilized to incorporate payments with respect to

71

1   Court to get relief from the automatic stay.
2        Leading up to that, during one of those
3   calls Ms. Fletcher spoke to Michael Altman and
4   she asked about a modification. And he said "you
5   already have a low interest rate. Why don't we
6   really focus back on to reinstating this
7   account."
8        And then she said "I would really like
9   to get more information on the modification."
10       During that time there was negotiations
11  between Ms. Fletcher's bankruptcy attorney
12  Ms. Fletcher, Mr. Altman, and our bankruptcy
13  attorney about what was going to take place. And
14  essentially this said that the outcome of this
15  was that, she disputed the amount, she sent in
16  proof of payments that she made, and we then, the
17  commercial department, painstakingly went through
18  every single check and payment identified, each
19  and every one of those payments, and advised her
20  that we had credited everything that was
21  received.
22       So these negotiations took place over
23  several months, and that pushed us up to the
24  discharge, so that's where this kind of email is
25  just kind of giving a summation overview of

70

1   a Consent Order. So we couldn't even file a
2   Motion for Relief based on the fact that this
3   deferred principle balance was holding up that
4   space; we needed to move to into Real Servicing.
5        So it says this matter is now out of
6   bankruptcy. But I think Altman, which I think
7   was Michael Altman, was going to try to work
8   something out with the borrower in helping to
9   bring the account current, possibly a
10  modification.
11       And, again, as I had said, this series,
12  this email is leading up to a series of emails
13  where the customer stopped making payments after
14  we got the adequate protection order.
15       And so, when the customer stopped making
16  payments, obviously it was creating a negative
17  balance in the escrow. It was creating -- you
18  know, the fact that the account wasn't
19  post-petition current, we had an adequate
20  protection order, and we were trying to work out
21  some kind of -- or the commercial department was
22  trying to work out some type of remedy for the
23  customer to bring the account back into
24  post-petition current status, as opposed to
25  having to go ahead and file the notice with the

72

1   events that transpired, and says "you may want to
2   speak to him on how to proceed with the
3   bankruptcy now that it's been discharged."
4        Because at this point all of the
5   post-petition payments that was recorded in the
6   Notice of Final Cure would have still been due.
7   I mean, we did receive and account for the
8   amounts that was pre-petition and accounted in
9   the Proof of Claim, but the fact remains that
10  Ms. Fletcher failed to make a very large number
11  of her post-petition payments.
12   Q   And you know that there was a Motion for
13  Relief from Stay filed on December 12th of 2013,
14  right?
15   A   Yes. And that stemmed into a Consent
16  Order for Adequate Protection payment, payment --
17  which she did make the payments with respect to
18  the Consent Order, saying the -- I think it was
19  four payments she had to make in addition to her
20  regular monthly payment. And then she stemmed
21  off from doing that and just made the adequate
22  protection payment and didn't continue to make
23  the regular payment.
24       So I'm not sure what happened but, then
25  again, there was a big gap of not making

73

1  payments.
2       And, unfortunately, due to the way that
3  she did it -- and I did go through and I
4  personally reviewed it.  Based on the payments
5  that she made, even at the end, because of the
6  timing of her making these payments, she was
7  never post-petition current, because she jumped
8  from making a payment then in June and tried to
9  make up a payment in December, but it was still
10  short I think an $8,000 payment, and it would
11  have only covered four payments, and she was six
12  payments past due at that point.
13       Q   The reason I asked you, you testified
14  about payment default in '12 and '13, and my
15  question is whether the payment defaults those
16  years, 2012 and 2013, were resolved by payments
17  made under the 2014 Consent Order?
18       A   Unfortunately, no.  She got close, yes,
19  but then she stopped making payments.
20       And, as I was reviewing the history, the
21  whole entire history of the loan -- I guess the
22  takeaway of that is she evidently had some type
23  of personal issues with her mom which didn't come
24  out until her discussions closer to the
25  discharge.

74

1       And I speculate to say that, because she
2  didn't say that at the time.  But she was -- when
3  I reviewed Ms. Fletcher's loan -- I mean, when
4  she was at Aurora she was making her
5  post-petition payments each and every month and
6  she was post-petition current when she Boarded.
7       And then she made two post-petition
8  payments with Ocwen, and then she didn't make
9  payments for a period of time.  And Ocwen had to
10  go through and adjust this account in order to
11  file the Motion for Relief, which then stemmed
12  into the adjustments of breaking down that
13  deferred unpaid principle balance and getting it
14  back correctly into the loan so that Ocwen could
15  then file of Motion for Relief.
16       Once the Motion for Relief was filed,
17  they worked out a Consent Adequate Protection
18  order to give Ms. Fletcher the ability to make up
19  these payments.  And she was pretty good about
20  the payments until later, and then she just -- it
21  just kind of fell apart with respect to keeping
22  up her regular, monthly, post-petition payment
23  thereafter.
24       Like I said, she tried to bridge the gap
25  by making the $8,000 payment, but it was still

75

1  short by two months, so she would have been two
2  months still past due.  But they didn't act on it
3  at the time, the commercial department didn't,
4  they worked with her to get the payments
5  received.  Then it ultimately, through requests
6  from her attorney to make sure the numbers were
7  accurate, they did review them, made the
8  adjustments, and then they got into the
9  discussion again with respect to the proof of
10  payments and things of that nature, which leads
11  up to that.
12       So that was the whole bankruptcy
13  post-petition in a nutshell for the overview
14  about what happened.  So this is the end
15  negotiation, which did not net her making any
16  more of a payment other than the $3,000
17  initially.
18       And basically her attorney says, "until
19  you verify the escrow and the amounts," then
20  she's not going to make any more of these
21  payments.
22       And then Lolita Milner and Michael
23  Altman worked to do this verification, which they
24  did.  It was in the system.  And they reported it
25  to her.  And, needless to say, they then net it

76

1  to, the bankruptcy was discharged.
2       So there was no remedy in order for her
3  to bring these amounts that she didn't make under
4  the bankruptcy current other than to reinstate
5  the loan now that she had a discharge.
6       Q   Looking at this now, which is
7  correspondence between Lolita Milner and Michelle
8  Penley, do you know what department Lolita Milner
9  worked in at this time?
10       A   Yes.  She is in the commercial business
11  unit.
12       Q   Is Michelle Penley also in that unit?
13       A   I'm not sure about Michelle.  I do know
14  that Lolita is.
15       Q   And that next page, page 102 of 18 has a
16  full signature block for Ms. Penley.  Does that
17  help?
18       A   Okay.  She was the portfolio manager
19  then, yes, she was in the commercial department.
20  So that makes sense, because there were -- in
21  order to get a loan modification, they would have
22  to have had investor approval.  It makes sense
23  that she was involved; she would have been
24  working on those numbers.
25       MR. FINNER:  I'm ready to move on from

77

1    this exhibit.  And I have a lot of windows
2    open, so I'm going to go through the
3    exhibits, not going to be referring to any
4    more, and you guys can close them as well.
5        Okay.  Well, we have to leave 12 up.
6    Let's take another ten minutes.
7        (Brief recess.)
8        MR. FINNER:  Let's go back on.
9    BY MR. FINNER:
10       Q    Could you open up Number 19, please.
11   And, after everybody has it open, can you say
12   whether you've seen this document before?
13       A    Yes, I have.  It is the exports of the
14   comments from PHH servicing the loan.
15       Q    It's different from Exhibit 18 because
16   it reflects comments made after the PHH's
17   transfer; that's what's going on here?
18       A    Well, this is -- 18 is Ocwen's comment
19   logs from Real Servicing.  And then 19 is going
20   to be the comment log from PHH's MSP system.
21       Q    What does NOTS statement refer to in the
22   title of Exhibit 19?
23       A    That is a title that is used by Black
24   Knight for their reports, and it's basically
25   saying its a customer-account note statement.

78

1        NOTS would be the code that you would
2    use in order -- it's with the loan number, under
3    the loan number, and then you have to place in
4    the work station, and then the notes code, and it
5    will pull up the system notes that's listed in
6    this report.
7        Q    Looking at the eighth comment on this
8    first page of Exhibit 19, comment dated February
9    16, 2021, with the user IDBLC, it's -- I'm
10   sorry -- user ID 8LV.  See that comment?
11       A    What's the date on that?
12       Q    February 16, 2021.  It's the third
13   comment of that date.
14       MR. CROWLEY:  What page?
15       MR. FINNER:  Bates stamp 01761.  I think
16   it's page 815.  I'm sorry.
17       A    8LV?
18       MR. CROWLEY:  Sorry.  I'm still not
19   there.
20       MR. FINNER:  Page 15 of Exhibit 19.
21       MR. CROWLEY:  I'm there.
22   BY MR. FINNER:
23       Q    My question is -- Ms. Feezer, this
24   comment refers to worksheets.  My question is
25   whether worksheets described in this comment were

79

1    ever produced with defendant's document
2    production?
3        A    I'd have to go back and look to see.  I
4    don't know.  I think that they're -- if I'm not
5    mistaken, they reopened the bankruptcy module at
6    that juncture because these are now bankruptcy
7    comments.  And they are looking to, I guess,
8    answer questions with respect to these balances.
9        So they are asking for the worksheets
10   with respect to the timing of the modification to
11   what they are requesting.  Ocwen's, this loan
12   modification, would have been done under Real
13   Servicing.  And Real Servicing, based on the fact
14   that all those systems that they use have been
15   decommissioned, there were sheets that they were
16   requesting, and PHH actually images those under
17   the customer's loan number.
18       But Ocwen actually referred to those
19   within the actual database.  So I don't know that
20   there would have been any calculation sheets that
21   would have been available as of June of 2017.
22       However, what would be available would
23   be the transaction histories with respect to the
24   amounts that was then either capitalized or
25   waived during the process of the loan

80

1    modification, together with the comments of Real
2    Servicing with respect to the balances and the
3    amounts that was approved.
4        Q    When was Real Servicing decommissioned?
5        A    I want to say in July or August of 2019.
6        Q    Can you describe the steps that were
7    taken by Ocwen and PHH after the filing of this
8    adversary proceeding in 2019 to preserve the
9    account records of Ms. Fletcher's loan that were
10   contained on Real Servicing?
11       A    Well, Real Servicing, the database
12   itself --
13       MR. CROWLEY:  I was on mute.  I'm
14   objecting to the extent it calls for
15   disclosure of communications with counsel.
16       Other than that, you may answer.
17       A    I was going to say the database itself
18   was decommissioned, but the business records that
19   was contained within Real Servicing was then
20   incorporated and transferred over into a loan
21   Boarding of any type of -- any type of loan, and
22   it was Boarded into MSP, and Ocwen's business
23   records was incorporated within PHH's business
24   records.
25       So, with respect to systems of a prior

81

1  servicer, I mean, they are not necessarily -- you
2  know, like, even if we use MSP, our account would
3  have been closed and our new account would be
4  under PHH.
5       So this is not necessarily the ability
6  to say that we can keep the actual system up and
7  operating, but, with respect to the business, the
8  underlying business records, we do have those
9  records as it would relate to the images that was
10 then transferred from Ocwen Loan Servicing over
11 to PHH's imaging system, as well as the
12 underlying information in the stage-five tables
13 that we previously talked about.  Those are
14 available through the ability to pull a report
15 based on obtaining the comments logs, which has
16 been produced here in that format, as well as the
17 other type of data points that was contained
18 within the system.
19      But, with respect to other ancillary
20 databases that we would have utilized that would
21 have been a third-party database, you know, the
22 database may still exists, but the client's
23 underlying account wouldn't.  So we wouldn't
24 necessarily have access to those records if the
25 account is no longer active.

FIRST COAST COURT REPORTERS

82

1    Q   Did Ocwen or PHH, after they were served
2  with Ms. Fletcher's lawsuit, undertake any steps
3  to ensure that the records of PHH's account would
4  remain available for the use of the lawsuit?
5       MR. CROWLEY:  Same objection.
6    A   Well, with respect to establishing
7  records, we don't -- with an active loan, we
8  wouldn't destroy records on an active loan.
9       And, with respect to the fact that it's
10 in litigation, there is litigation flags on the
11 loan.  So, to the extent that the account is
12 noted it's in litigation, there's -- it's really,
13 being an active loan, it's not -- there's -- it's
14 not the posture of business records being no
15 longer kept on this loan; it's still an active
16 loan.
17      Q   With respect to those client accounts
18 that went away when Real Servicing was retired,
19 was any effort made by Ocwen or PHH to preserve
20 for this litigation the information that could no
21 longer be accessed through client accounts?
22      MR. CROWLEY:  Same objection.
23      A   Well, with respect to the information,
24 Ocwen utilized Real Servicing to document any
25 type of modification.  So the fact that this

FIRST COAST COURT REPORTERS

83

1  particular agent at PHH is referring to a system
2  under what PHH's servicing model is doesn't
3  necessarily mean that that's what Ocwen's
4  servicing model was.
5       So the fact that they were referring to
6  a worksheet, Ocwen's worksheet, is with respect
7  to a loan modification, as noted in our comment
8  log, there would have been -- the person would
9  have pulled the numbers that would have been
10 noted, and they would have -- that information
11 would have been contained within the comment log.
12      So, with respect to the accounting, that
13 would then flow over into the transaction
14 history.
15      So I'm not sure to what extent they
16 thought there was a worksheet available with
17 respect to the underlying numbers, but the
18 information is contained in the transaction
19 history if they were to add them and make these
20 calculations manually.
21      Q   So are you saying, that after Real
22 Servicing went down, there wasn't any information
23 with Ms. Fletcher's loan that could no longer be
24 accessed?
25      MR. CROWLEY:  Objection to form.  You

FIRST COAST COURT REPORTERS

84

1  can answer.
2    A   No, that's not what I stated.  No, her
3  information that was contained in Real Servicing
4  is accessible through the underlying data tables
5  that was contained in Real Servicing, is
6  available to pull reports, to pull that
7  information, such as the transaction histories,
8  the comment logs.
9       With respect to the business records,
10 they were then transported to the new imaging
11 system.
12      So her servicing history is in tact with
13 respect to Ocwen's servicing of the loan.  I'm
14 not sure what -- just because a system is not
15 used, as I stated, that doesn't mean the
16 information is not obtainable.
17 BY MR. FINNER:
18      Q   Open up Exhibit Number 21, please.
19      When everybody has it open, could you
20 tell us whether you've seen this document before?
21      MR. CROWLEY:  I'm there.
22      A   Yes, I have seen it before, and it's a
23 compilation of emails between Lolita Millner and
24 Michael Altman, who is in the commercial
25 department, and they are around the timeframe of

FIRST COAST COURT REPORTERS

85

1  moving forward with the fact that we are -- we
2  weren't receiving post-petition payments for a
3  large period of time.
4       So this is communication started in
5  August of 2016 regarding the accounting and
6  payments. This is when they were accounting for
7  the payments' applications.
8  BY MR. FINNER:
9       Q  What system are these emails contained
10  on?
11      A  The data server for -- I'm not sure what
12  the server is called. They would be in our
13  network drives with respect to -- I'm not sure if
14  it's IT or the -- I'm not sure exactly which
15  department is in charge of them, if it's in the
16  IT department, but all of Ocwen's emails is
17  pretty much contained, from my understanding, on
18  a network drive or a network server.
19      Q  And do these 12 pages in Exhibit Number
20  21 constitute all of the emails contained on that
21  email related to -- strike.
22      Do these 12 pages of Exhibit Number 21
23  constitute all of the emails with regard to
24  Ms. Fletcher's account that are contained on the
25  drive or server that you just testified about?

FIRST COAST COURT REPORTERS

86

1       MR. CROWLEY: Objection to form. Also
2    object to the extent it calls for any
3    discussions with counsel.
4       A  To be honest with you, I'm not sure how
5  they were obtained. I wasn't involved in the
6  production of those documents, so I'm not exactly
7  sure what the source was, how they were produced.
8       So I don't know, sitting here today, the
9  answer to that question.
10      MR. FINNER: I'm going to ask for
11    production of all emails that are related to
12    Ms. Fletcher's accounts and identification
13    of all emails that won't be produced due to
14    attorney/client privilege.
15      MR. CROWLEY: We'll take your request
16    under advisement. I would ask that, at the
17    end of the deposition, since there is more
18    than one, that you give us a concise list of
19    what your requests are, and we'll take them
20    under consideration.
21  BY MR. FINNER:
22      Q  Go ahead. And, actually, sticking with
23  Exhibit Number 21, there is a gap in the emails
24  from August 11th of 2016, which is the emails
25  from the first four pages, to April 25th of 2017,

FIRST COAST COURT REPORTERS

87

1  the date of the email contained on the last page,
2  Bates stamped 2002.
3       Were there any emails sent or received
4  regarding Ms. Fletcher's account between August
5  11, 2016 and April 25, 2017?
6       MR. CROWLEY: Objection to form. You
7    may answer.
8       A  With respect to -- I don't have the
9  details regarding how they were compiled, so,
10  again, I don't believe that all of them are
11  related.
12      If you look at the subject line, the
13  subject line is different with respect to some of
14  these emails. So I don't know that this is
15  one -- I would not suspect this is one
16  large-trailing email. I do know that they are --
17  the subject matter of the emails is basically
18  proof of payment and things of that nature.
19      So the best I can answer is, I don't
20  think that they are all inclusive. And I'm not
21  sure, based on the sourcing, so I don't know if
22  what email gap with respect to the account would
23  have been in between that timeframe, other than
24  the fact that, if you do look into Ocwen's
25  comment log, a lot of this communication is

FIRST COAST COURT REPORTERS

88

1  contained within the comment log. And emails
2  kind of give it more of a context on what was
3  being said back and forth.
4       But the communication is pretty much
5  outlined in the comment log as to what was going
6  on with the account and who was handling it.
7  BY MR. FINNER:
8       Q  Does Real Servicing have the ability to
9  include images from communications in the comment
10  log?
11      A  Only if a user would have cut and pasted
12  the information in there. It didn't have -- like
13  the emails would have come through Outlook and
14  the -- obviously the database would have not been
15  in Outlook, I guess. It's not like they are the
16  same operating system, if you will.
17      So the communication would have had to
18  have been cut and pasted into the comment log and
19  saved as a comment by the person. So it would
20  have been a physical task, not an automated task.
21      Q  And Exhibit Number 21 contains online
22  images of a number of these emails. Would there
23  be any way to get those actual images of
24  screenshots and checks and things like that into
25  the comments of Real Servicing?

FIRST COAST COURT REPORTERS

89

1    A   No.  Because the comment log is only
2  going to take digital text, but the images that
3  you are looking at in this 21 are screenshots of
4  what the Real Servicing looked like.  That's the
5  desktop of the transaction history with respect
6  to the loan, and somebody just did a screenshot
7  or cut and pasted that and placed it in the
8  email.
9        And, with respect to the images of the
10  checks, or any of other images, they would have
11  been then obtained through some type of either
12  clipart image or a jpeg image that would have
13  been received and then incorporated -- would have
14  been clipart from whatever the source of the
15  information from where they were obtaining the
16  information was.
17    Q   Open, please, Exhibit Number 22.  And
18  tell us, when everybody is up to speed, whether
19  you've seen this document before?
20    A   Yes, I have seen it.  And this is one of
21  our system reports as relates to disputed items.
22        So it would be an analysis of an issue
23  or concern as it would relate to the senior
24  management and upper management reviewing the
25  process of the underlying identified dispute.

FIRST COAST COURT REPORTERS

90

1    Q   Does this particular report have a name?
2    A   Yes.  I mean, I refer to it as a
3  root-cause report, but I believe it does have a
4  name; risk management report, I believe it is.
5    Q   Have you heard the term "risk
6  convergence report"?
7    A   Yes, I believe that's what they call it.
8  I refer to it as a root-cause report.
9    Q   Can you tell by looking at Exhibit
10  Number 22 the period of time that's described by
11  these pages?
12    A   Looks like it was November of 2015.
13    Q   You might have to magnify it a little,
14  but please scroll to page 4 and identify the time
15  period contained?
16    A   January of 2016.
17    Q   What time period is referenced by the
18  pages after page 7?
19    A   February of 2016.
20    Q   Were any risk convergence reports
21  produced after February of 2016?
22    A   Produced in production?
23    Q   No.  Did Ocwen or PHH have such reports
24  after February of 2016?
25    A   I wasn't involved with obtaining these

FIRST COAST COURT REPORTERS

91

1  documents.
2        [Experiencing technical issues.]
3  BY MR. FINNER:
4    Q   The last thing we heard --
5        (The Court reporter read back the last
6        question and answer.)
7    A   My Zoom went all the way down.  No, I
8  wasn't involved with obtaining the documents, so
9  I would have to check with the risk management
10  team, through counsel, because I didn't obtain
11  these.
12        But they are not loan level documents.
13  These are obtained through approval to get them,
14  because they're basically administrative
15  documents.
16  BY MR. FINNER:
17    Q   Do any records, risk convergence
18  reports, exist for periods prior to November of
19  2015?
20    A   Again, I'm not familiar with the -- I
21  didn't obtain the report, so that's something I
22  would have to verify through the risk management
23  team and counsel.  Because I wouldn't even have
24  had access to these as a lien analyst with
25  respect to, they are not a lien-level type

FIRST COAST COURT REPORTERS

92

1  document.
2        So they were obtained through upper
3  management in order to even have them released.
4  So I don't know.
5    Q   Can you identify any time-period or
6  periods for which you are aware that risk
7  convergent reports exist?
8    A   I don't know.  I don't have any personal
9  knowledge on when -- what the benchmarks are or
10  any of that type of data.
11        Again, they're administrative records
12  and they are not loan level, which is what I
13  would handle in a customer dispute; loan-level
14  type documentation or servicing.
15        So, again, I would have to verify that
16  through getting approval through the company in
17  order to make any inquiry with respect to their
18  administrative records regarding the risk
19  convergence.
20    Q   What's your job title at Ocwen
21  Financial?
22    A   A Senior Loan Analyst.
23    Q   What's the name of the team or group in
24  which you work?
25    A   I work in the law department.  We're

FIRST COAST COURT REPORTERS

93

1  basically a corporate representative who is
2  responsible for reviewing contested litigated
3  matters that are within the law department and
4  reporting our findings on any research or
5  verification of the business records to outside
6  counsel.
7         Then, of course, that involves from time
8  to time that we would have to appear for either
9  depositions such as this, trials to verify and
10 answer to the servicing history of the loan.
11        And we deal with, again, loan-level type
12 matters as it relates to a customer's account,
13 not necessarily business records, because that
14 would be beyond the customer's account into the
15 administrative end; that's not what our business
16 unit does.
17   Q   Does that mean that you don't have
18 access to reports that are contained in Exhibit
19 22?
20   A   No.  They are administrative records
21 that are -- these type of records would have
22 needed approval to even obtain those.
23        So, with respect to that process, that
24 was -- I was not involved in that process.  I
25 know I have only had access to them based on the

94

1  fact that they were produced and was a topic of
2  this particular litigation.  I am familiar with
3  the information contained within them as an
4  employee of Ocwen for a number of years and
5  understand the underlying purpose of processing
6  of the reports.
7         But, with respect to having access to
8  those reports, there is really nothing in my job
9  duty that gives rise to need access to those type
10 of reports, because it's the customer's account,
11 and accounting is all contained within the
12 comment log.
13        So, if there was a dispute or any type
14 of issue that would have been raised regarding
15 the customer disputing or having any issue with
16 the account, all of that is contained within the
17 comment log.
18        So there is really no reason to look to
19 the administrative records, which are not even
20 categorized by a loan number, but by a process
21 that an administrative view of the business
22 records would be.
23   Q   Do you have an understanding of the
24 Chapter 13 Bankruptcy issues that are described
25 in Exhibit Number 22?

95

1   A   In particular?  I mean, 22 is a long
2  document.
3         Is there anything in particular that you
4  are referencing to?
5   Q   Have either Ocwen or PHH in the course
6  of their business operations identified any
7  deficiencies with regard to the way its data
8  system allowed them to handle loans of borrowers
9  who is in Chapter 13 Bankruptcy?
10        MR. CROWLEY:  Objection to the extent it
11        calls to disclose information learned from
12        discussion with counsel.
13        And I think this is beyond the scope,
14        but I will allow her to answer as best she
15        can without revealing discussions with
16        counsel.
17   A   I was going to say, to talk to anything
18 beyond what the face of the document indicates, I
19 would be -- again, as I stated, this is an
20 administrative document that I only have access
21 to based on the fact that it was produced for
22 this discovery.  It's not contained in
23 Ms. Fletcher's loan.
24        So, anything that I have learned about
25 this particular document has been in the confines

96

1  of counsel and the fact that it was produced.
2         So I can, again, just state that the
3  information contained in there is basically what
4  the issue was and what it identified and what the
5  process was.  That's basically all the
6  information that I have.
7  BY MR. FINNER:
8   Q   When did you begin working at Ocwen?
9   A   In October of 2004.
10   Q   What was of the system of record at that
11 time?
12        MR. CROWLEY:  Objection.  You may
13        answer.  Are you asking about the servicing
14        platform?
15 BY MR. FINNER:
16   Q   Do you understand the question I asked,
17 Ms. Feezer, about the system of record?
18   A   Well, that's what I had asked you --
19 well, counsel had asked.
20        Are you referring to the database?
21        MR. FINNER:  I can ask that question,
22        Frank.
23 BY MR. FINNER:
24   Q   What was the servicing platform that
25 Ocwen used on its loan secured by Real Property

97

1  when you began working at Ocwen?
2      A  Real Servicing.
3      Q  And did Real Servicing remain the
4  servicing platform until the PHH merger?
5      A  Yes.  It was.
6      Q  Did PHH use Real Servicing at all
7  following the merger?
8      A  No.
9      Q  From the time you started until the time
10  of the merger are you aware of any changes made
11  in the way that Real Servicing maintains or makes
12  information available about customers who are in
13  Chapter 13 Bankruptcy?
14      MR. CROWLEY:  Objection to form.  You
15  can answer.
16      A  I didn't really understand.
17  BY MR. FINNER:
18      Q  Can you describe any changes that you
19  know of during the course of your employment in
20  the way that Real Servicing maintains or reflects
21  loans whose customers are in Chapter 13?
22      A  I still -- the question is very vague to
23  me.  I don't understand what you mean, was there
24  any changes that would change the way that it
25  reflects an account in Chapter 13.

FIRST COAST COURT REPORTERS

99

1  correspond that would be sent out based on the
2  fact that there was that BK flag on the loan.
3      That's the best I can answer your
4  question, as I'm understanding it.
5  BY MR. FINNER:
6      Q  You are not aware of any changes during
7  that time period?
8      MR. CROWLEY:  Objection to form.  That's
9  not what the witness said.  Go ahead.
10      A  With respect to the fact that various
11  communication would be based on -- as the
12  progress of the loan goes, and as laws change,
13  yes, there may be different processes or
14  different formats of a template of a letter,
15  things of that nature.
16      But, with respect to their -- with
17  respect to the changes, the changes would have
18  been with the progression of, say, the types, the
19  way the Proof of Claim form changed, then the way
20  that information is contained in Real Servicing
21  would then populate into the new form.
22      So the underlying Real Servicing
23  information was still contained within there and
24  identified as a bankruptcy loan.  But maybe the
25  processes of sending a letter or account

FIRST COAST COURT REPORTERS

98

1      Can you give me a little bit more
2  information about what you are referring to?
3  Because Real Servicing always would have
4  identified a bankruptcy loan, and it would have
5  been based on the BK flag and whatever chapter
6  they filed.  So if they filed Chapter 13, it
7  would be a BK-13 on the loan.
8      I'm not following your question as to
9  what you mean "was there changes to this."
10      Q  Between 2004 and 2019 did users of the
11  Real Servicing platform gain the ability to
12  access any additional information or any
13  information formatted or presented in different
14  ways for borrowers who are in bankruptcy?
15      MR. CROWLEY:  Objection to form.
16      A  I'm not following your question
17  about -- with respect to what Real Servicing
18  identified as a bankruptcy case.
19      If the loan was identified in
20  bankruptcy, there would be a BK flag up, again,
21  with the chapter.  So, with respect to being able
22  to identify a loan in BK, all systems, anybody
23  that opened the account would see that there
24  would be a BK flag on there and it had certain
25  operational affects with respect to the type of

FIRST COAST COURT REPORTERS

100

1  statement, something like that, would have
2  changed, along with the progression of time and
3  requirements by the Bankruptcy Court or
4  municipalities and certain type of letters that
5  needs to be sent out, things of that nature.
6  BY MR. FINNER:
7      Q  Turn, if you can, to page 21 of Exhibit
8  Number 22.
9      Looks as though the first un-redacted
10  portion is on the ninth line, begins BK BU on the
11  far left?
12      Do you see that, Ms. Feezer?
13      A  Yes.
14      Q  You may need to enlarge your view to be
15  able to read this text.
16      A  Mine was set to 400.
17      Q  Okay.  Can you just read that first
18  sentence, BK BU.  You don't have to read to into
19  the record; just read it to yourself and state
20  whether you were aware there was a dashboard
21  implemented as described in this?
22      A  Well, with respect to the dashboard,
23  this dashboard is, again, Real Servicing.  This
24  dashboard they're referring to is in Real
25  Resolution, and its -- well, Real Resolution, and

FIRST COAST COURT REPORTERS

101

1  I think it changed over to Equator or something
2  else.
3       This dashboard basically is tracking the
4  referral package.  This isn't necessarily talking
5  about Real Servicing; it's talking about how Real
6  Resolution or Equator, or whatever was in the
7  portal that was utilized during this time period
8  by the business unit, to communicate with outside
9  counsel when they were submitting a report for
10  any type of action.
11      Q  Is Real Resolution such a portal?
12      A  Well, Real Servicing is one of the
13  original -- I know that the bankruptcy department
14  switched over to Equator at some point.  I
15  apologize, but I don't have the date ingrained in
16  my brain as to when that happened.
17      But essentially it was the same type of
18  mechanism used to communicate between outside
19  counsel with respect to the timeline of the
20  dashboard, if you will.  So it basically has the
21  dates the referral was sent.  And then it has the
22  milestones that the coordinator is going to then
23  check to make sure that -- as this referral goes
24  out, they check to see -- like, it refers to a
25  Motion for Relief.  They are going to send a

102

1  referral up, they're going to say the date that
2  they did that and follow-up -- that's going to
3  tell them in so many days to follow up with the
4  one that was filed and follow up to see if it was
5  filed.
6       So this is what -- this is referring to
7  here, in this dashboard, with respect to tracking
8  this, and this information would then speak back
9  to and be populated into Real Servicing in some
10  form or fashion with respect to, a Motion for
11  Referral was sent out, things of that nature.
12      It's not like it's an -- information
13  that's not housed or contained within Real
14  Servicing, but it's being -- the portal was
15  being -- sort of talks to the attorney and
16  transmits the document in a secured platform
17  through those portals.
18      Q  Would you go back to page 20 of this
19  Exhibit Number 22.
20      And if you go to the eighth line, first
21  non-redacted line, first sentence on the
22  left-hand side, "Ocwen does not have an effective
23  control in place to ensure pre- and post-petition
24  bankruptcy payments are applied timely and
25  accurately.

103

1       And my first question is, can you tell
2  from the document if either the name of the
3  individual or that person's job capacity of who
4  made the observation that's contained in this
5  sentence?
6       A  I apologize.  I think my system may have
7  froze in the middle of where you wanted me to
8  look at.  I think I got the second part.  Point
9  me to --
10      Q  Eight lines down on page 20 of Exhibit
11  22, sentence begins "Ocwen does not have."
12      And the question is, what is the name of
13  the individual or that person's job capacity who
14  wrote that sentence?
15      A  You are referring to the line "Proof of
16  Claim"?
17      Q  No.
18      A  Okay.
19      Q  We're on page 20, it's eight lines down,
20  nine lines including the header.  On page 20 of
21  Exhibit 22, eight lines down, sentence starts
22  "Ocwen does not have."
23      Do you see that?
24      A  I'm sorry.  So you are talking about the
25  first block.  I was counting eight lines down

104

1  from that block.  I apologize.
2       I see that line, yes.
3       Q  Do you know who wrote that line?
4       A  Let me read it.
5       No, it doesn't indicate in this as to
6  who actually made this analysis, other than the
7  fact that it was from an external audit and it's
8  relating to a GSE type -- so it looks to me
9  like -- because Fannie and Freddie have very
10  specific timelines, guidelines, things of that
11  nature, so this is -- this wasn't an internal
12  comment being made.
13      This was an external audit based on a
14  review with the guise from the eye of Fannie --
15  well, looks like Freddie guidelines.
16      Q  If you go back to the previous page,
17  page 19, looks like the way the spreadsheet is
18  printed -- I'd like you to look at the line for
19  issue number 194 and let us know if that gives
20  you more information about the misapplication
21  issue?
22      A  I lost part of -- you broke up.  I heard
23  "go to 194 and we're going to look at the issue
24  that was identified."
25      Q  Yes.  Does line -- does the information

105

1  in that line beginning with 194 give you any more
2  information regarding who was involved with this
3  misapplication of Chapter 13 Bankruptcy plan
4  payments issued?
5        MR. CROWLEY:  Objection to form.  You
6  may answer.
7     A   Well, with respect to this particular
8  line, it's identifying the business units that is
9  involved, and it would identify the department
10 and who was involved, who would have been the
11 manager of the department at the time.
12       So, with respect to, again, the source
13 of the information, it doesn't necessarily
14 provide, just other than identifying now the
15 business unit that's involved.
16 BY MR. FINNER:
17    Q   Do you know where Matthew Tanner worked
18 in February of 2016?
19    A   I am not aware of a Matthew Tanner, so I
20 don't know.
21    Q   Do you know where Kelly Gonzales worked
22 in February of 2016?
23    A   I'm not familiar with a Kelly Gonzales
24 either, so, no, I do not know.
25    Q   Do you know where Patrick Cox worked in

FIRST COAST COURT REPORTERS

106

1  2016?
2     A   I am familiar with Patrick Cox.  I'm not
3  sure what office he was out of.  I would have to
4  check.  I believe it was West Palm, but I'm not
5  sure.
6     Q   Do you know where he works now?
7     A   I don't know if he's with our company
8  anymore.  I would have to check.
9     Q   What was your job title when you began
10 at Ocwen in 2004?
11    A   I was the manager of the bankruptcy
12 department.
13    Q   When did you assume your current role?
14    A   In May of 2006.
15    Q   Since that time have you testified in
16 other court proceedings?
17    A   Well, that would have been May of --
18 during the time I was the bankruptcy manager, did
19 I testify?  I managed the bankruptcy department.
20       But, yes, since May of 2006 in my role
21 as Senior Loan Analyst I have testified on behalf
22 of the company.
23    Q   Do you know how many trials you've
24 testified at?
25    A   I do not.

FIRST COAST COURT REPORTERS

107

1     Q   More than a hundred?
2     A   Well, considering the amount of time, I
3  would probably say that's not an
4  under-estimation.  It's been a lot.
5     Q   Do you know how many depositions you've
6  testified at?
7     A   I do not.
8     Q   More than a hundred?
9     A   Definitely probably more than a hundred,
10 yes.
11    Q   Have you always used the name "Gina
12 Feezer" professionally?
13    A   No.  When I first was hired at Ocwen I
14 was married and my name was Gina Johnson.  Upon
15 getting a divorce, I have taken my maiden name
16 "Feezer," so I can't remember exactly what
17 time -- I think it was in 2013, somewhere around
18 that, that I converted back to Feezer, as opposed
19 to Johnson.
20    Q   Open up Exhibit 24, please.
21       MR. CROWLEY:  Okay.
22    A   Here it is.
23 BY MR. FINNER:
24    Q   On the second page of this Exhibit,
25 about two thirds of the way down, there is a

FIRST COAST COURT REPORTERS

108

1  reference to the testimony of Ocwen's corporate
2  representative and senior loan analyst Gina
3  Johnson?
4        MR. CROWLEY:  I object to any line of
5        questioning about the document; it's not
6        within the scope of the deposition notice.
7        I'll allow the witness to answer.
8     A   You said on page -- what line?
9  BY MR. FINNER:
10    Q   Page 2, about four fifths of the way
11 down that paragraph, headed "Proof at Trial"?
12    A   Okay.
13    Q   Does this document refer to your
14 testimony in another case?
15    A   Yes.
16    Q   Do you remember this case?
17    A   Let me just look through here.
18       Yes, I do.
19       MR. FINNER:  That's all of the questions
20 I have at this time.  Because there appears
21 to be some documents that we're going to be
22 asking for, I'm going to continue rather
23 than end the deposition.
24       I don't mind if you have any cross,
25 Frank, if you want to go ahead.

FIRST COAST COURT REPORTERS

109

1      MR. CROWLEY:  I do have cross.  We don't
2   necessarily agree it should be kept open.  I
3   would like to take a break for five minutes
4   and see what questions I may ask.
5      (Brief recess.)
6               **CROSS EXAMINATION**
7   BY MR. CROWLEY:
8      Q   I think I just have about five
9   questions.
10      Ms. Feezer, if you would turn back to
11   Exhibit 18, page 87?
12      A   All right.
13      Q   And this is in reference to questions
14   earlier from Mr. Finner about the entry that says
15   "please locate funds in the amount of $2,471."
16      Do you see that?
17      A   Yes.
18      Q   Now, if you would now take a look,
19   please, at Exhibit Number 20, on the first page?
20      A   Okay.  I've got to open it back up.
21   Okay.
22      Q   Does this check request you testified
23   about earlier, does it relate to that entry in
24   the notes that I just showed you?
25      A   Yes.

110

1      Q   In what way?
2      A   In the fact that it was a check that
3   Ms. Fletcher presented to Aurora during the time
4   of her -- I guess prior to her filing bankruptcy
5   they rejected a payment that they had received
6   and they returned it back to her.  And it looks
7   like they did it on 6/21 of 2011.  And it does
8   not show this amount was posted to her
9   transaction history in any way, whatsoever.
10      Q   Was that the resolution of the request
11   in the note?
12      A   Yes.  I mean, eventually, yes.  I mean,
13   it was researched and verified and reverified
14   based on the fact that, like I said, Ms. Fletcher
15   and her attorney, at the time that they were
16   trying to get adequate protection payment, well,
17   to make the payment again, to bring the account
18   current again, post-petition.
19      They double-checked this again and
20   verified, despite the fact that she had a check
21   that she submitted, they didn't post it, and
22   these were business records that were in our
23   system that basically was the outcome of what
24   happened with that particular check and that they
25   returned it to back to the borrower.

111

1      Q   Since it was returned back to the
2   borrower, should it have been posted into the
3   records?
4      MR. FINNER:  Objection to the form of
5      the question.
6      A   If it was returned, it wouldn't be
7   posted on the transaction history as a credit for
8   a payment.
9   BY MR. CROWLEY:
10      Q   Okay.
11      A   But there is obviously going to be
12   business records, because this was part of the
13   servicing history.
14      Q   Thank you.  If you would now go back to
15   Exhibit 18 again, page --
16      A   90.
17      Q   Yes, 90.  Specifically I'm going to
18   refer you to the entries on 9/21 with references
19   to "hence, closing work-flow, reconciliation
20   rejected by QC.  Received call from LM BK
21   Department Houston.  No adjustment should be made
22   to the loan at this time."
23      Do you recall discussing those entries
24   earlier with Mr. Finner?
25      A   Yes.

112

1      Q   As I recall your testimony, this
2   indicated bankruptcy group was no longer to
3   proceed with the reconciliation; is that correct?
4      A   Correct.
5      Q   Who was going to take it over at that
6   point?
7      A   Well, the commercial department.  The
8   commercial department just had the reconciliation
9   completed, but the reconciliation team that's
10   within the bankruptcy department at Ocwen -- this
11   is a commercial loan, so any of the accounting
12   and account adjustments would have then been
13   handled by the commercial department, because
14   they were handling all of the account review
15   analyses and things of that nature.
16      So that would have kicked back over to
17   Michael Altman and Lolita Milner, and they would
18   have then taken it from there in order to make
19   whatever adjustments necessary.
20      Q   Did they, in fact, do a reconciliation?
21      A   Yes, absolutely.  That department was
22   doing a reconciliation a number of times, yes.
23      Q   And have you reviewed the final
24   reconciliation that they did?
25      A   Yes.  It was very extensive and it was

113

1 very inclusive. They actually went back, and
2 based on that exchange between Ms. Fletcher and
3 her attorney about sending in proof of payments,
4 that made that verification through all of the
5 payments that she had submitted, and they
6 addressed and identified how they were all
7 posted. And the account was then adjusted and
8 corrected.
9         And all that was taking place, based on
10 the line of communication back and forth, again,
11 while trying to get this adequate protection
12 order back on track and get the account
13 post-petition current.
14         By the time the loan had actually
15 reached the stage -- reached the stage of
16 receiving this, we were basically on a timing of
17 waiting for the last trustee payment to disburse.
18 They already knew how it was going to apply.
19 Once it applied, that is pretty much it and the
20 account was ultimately discharged.
21 Q   And, based on your review, was that
22 reconciliation accurate?
23 A   Yes.
24         MR. FINNER: Objection to the form of
25 that question.

114

1 A   With respect to the accounting, like I
2 said, they went all the way back and they
3 addressed each and every single payment, each and
4 every single application of that payment, and the
5 full reconciliation was actually done prior to
6 the actual receiving the discharge.
7         We finally received the last trustee
8 payment that was applied. And then the payment
9 that the customer made, the $3,000 payment, was
10 received and applied. So all of the funds were
11 received and applied, but the account was never
12 brought post-petition current prior to the
13 discharge being entered.
14 BY MR. CROWLEY:
15 Q   If you would look at page 101 of that
16 same exhibit, please. This is the reference from
17 Lolita Millner dated December 14, 2016, that you
18 testified about earlier?
19 A   Right.
20 Q   Okay. In there, it says "this is a very
21 complicated case. It was a split loan that
22 wasn't adjusted correctly."
23         Who was it that didn't adjust it
24 correctly?
25 A   Well, as we found out at Ocwen, after

115

1 receiving the histories, is that, if you look at
2 the manner in which Aurora had split the payment
3 amount, they reported to Ocwen that the
4 account was -- that the balance left was the
5 $60,000. I think I addressed this early on when
6 we were looking at that transaction history.
7         But the reality is, if you look at the
8 business records in the trustees' ledger,
9 simultaneously with the adjustments that they are
10 reporting to us, it would appear that Aurora is
11 saying over 13,000 was applied towards this loan,
12 when we know that, by the trustee's own ledger,
13 the trustee hadn't even disbursed $13,000 towards
14 that deferred principle balance.
15         So they had the categories -- even
16 though they separated it and deferred it as a
17 deferred principle balance, they didn't have all
18 the funds correctly inside of that deferred
19 principal balance, thus causing some of the
20 confusion.
21         Once it Boarded at Ocwen with respect to
22 what the categories were, and as I'd testified
23 about earlier, that's when we went through those
24 few entries on the transaction history about how
25 Ocwen then took that $60,000, broke it up, and

116

1 placed it back on the loan in, as we identified,
2 the four categories that covered that amount of
3 the $60,000.
4 Q   Okay. If you would now look at Exhibit
5 22, please, page 20?
6 A   Okay.
7 Q   This was the entry that says Ocwen did,
8 you know, have effective control in place to
9 ensure pre- and post-petition payments were
10 applied timely and accurately.
11         With regard to that sentence, in your
12 review of the business record relating to this
13 loan, did you see any indication that pre- and
14 post-petition payments were not applied timely or
15 accurately on Ms. Fletcher's loan?
16         MR. FINNER: Objection to the form of
17 the question.
18 BY MR. CROWLEY:
19 Q   You may answer.
20 A   No. When we received a payment, it was
21 posted, and it posted -- according to the spread,
22 there doesn't appear in any of the transaction
23 history postings that it was posting/paying down
24 any balance other than what the payment amount
25 was intended.

117

1    Q   And, finally, there was some discussion
2  earlier regarding worksheets regarding the loan
3  balance on the loan module.
4        Have you reviewed the loan module?
5    A   Yes, I have.
6    Q   In terms of the review of the business
7  records that you testified to earlier, was the
8  principle amounts in the loan module accurate?
9        MR. FINNER:  Objection to form of the
10  question.  You can answer.
11   A   Well, it was reflective of the amounts
12  that was showing post-discharge and it, you know,
13  covered any post discharge -- I think it was two
14  post-discharge payments was applied to the loan,
15  and, yes, it accurately reflected the amounts
16  that were due at the time of the discharge of the
17  bankruptcy as it related to the amounts reflected
18  and noted in the payment to cure or the response
19  to the trustee's payment to cure that the
20  commercial department had filed in the Bankruptcy
21  Court.
22       MR. CROWLEY:  Thanks.  I have nothing
23  further.
24       MR. FINNER:  One follow-up.
25          **FURTHER EXAMINATION**
            FIRST COAST COURT REPORTERS

118

1  BY MR. FINNER:
2    Q   You had talked about viewing documents
3  that reflected the commercial department's
4  reconciliation of Ms. Fletcher's loan.
5        Do you remember that testimony?
6    A   I do.
7    Q   Were those documents that you reviewed
8  included in Exhibit Number 12, which is the full
9  set of production?
10   A   Let me pull up 12 gain.  But I think, if
11  you look at the -- which probably is better if
12  you actually had a copy of the one from
13  Bankruptcy Court.  At page Bates stamp PHH 201
14  there is a chart that is contained within there
15  that they had filed with the Notice of Final
16  Cure.
17       And then let me see if the --
18       MR. CROWLEY:  Wendell, may I ask one
19  question?
20       MR. FINNER:  I think it would be good if
21  Ms. Feezer reviewed all of the production.
22  She already testified about it.
23   A   I'm now down to 19.  I'm in the 19's, so
24  we're getting there.
25       A better copy of that chart allocation
            FIRST COAST COURT REPORTERS

119

1  of payments is also found on Bates stamp 2031.
2  **You can actually see the chart on that one.**
3  BY MR. FINNER:
4    Q   Does that complete your answer,
5  Ms. Feezer; are there any other documents that
6  reflect the reconciliation that you've testified
7  to about the commercial department?
8    A   **I mean, outside of the comments and**
9  **various emails.  But, yes, there is basically the**
10  **results of the full reconciliation that had taken**
11  **place with respect to responding to the Notice of**
12  **Final Cure.**
13   Q   Other than communications between Ocwen
14  and its attorneys, are you aware of any documents
15  that relate to Ms. Fletcher's account that are
16  not contained in Exhibit 12?
17   A   As relates to the accounting?
18       MR. CROWLEY:  Objection to form.  But
19  you may answer.
20   A   **With respect to business records of**
21  **accounting, or business records, I'm -- I guess I**
22  **don't understand the question.**
23       Can you clarify?
24  BY MR. FINNER:
25   Q   Any business records of your company
            FIRST COAST COURT REPORTERS

120

1  about Ms. Fletcher's loan that aren't contained
2  in Exhibit Number 12 besides communications with
3  your company's attorneys?
4        MR. CROWLEY:  Objection to form.  You
5  can answer.
6    A   **To the extent I can best answer that, a**
7  **lot of the information was between the business**
8  **unit, the commercial business unit, and counsel**
9  **as they were working toward this post-petition**
10  **delinquency.**
11       But, with respect to what I can say that
12  is not privilege to that, is all of comment
13  communication that is contained in the comment
14  log of Ocwen Loan Servicing.
15   Q   Is your answer that you are not aware of
16  any documents other than attorney/client
17  communications about Ms. Fletcher's loan that
18  aren't contained in Exhibit Number 12?
19       MR. CROWLEY:  Objection to form.  You
20  can answer.
21   A   **Not that I am aware of, no.**
22       MR. FINNER:  That's all I have for now.
23       MR. CROWLEY:  If I may, I have one
24  follow-up question.
25       MR. FINNER:  Uh-huh (nods yes).
            FIRST COAST COURT REPORTERS

121

FURTHER EXAMINATION

BY MR. CROWLEY:

Q   With regard to the reconciliation by the commercial loan department, was that also reflected in the attachment that was submitted to the Bankruptcy Court in response to the Notice of Final Cure?

A   Yes, it was.

MR. CROWLEY:  Thank you.  That's all I have.

_ _ _

(End of proceeding at 3:27.)

FIRST COAST COURT REPORTERS

---

123

C E R T I F I C A T E

STATE OF FLORIDA  )

COUNTY OF DUVAL  )

I, Robin Reynolds, Certified Court Reporter and Notary Public, duly qualified in and for the State of Florida, do hereby certify that I was authorized to and did stenographically report the foregoing deposition;

And that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 11th day of November, 2022.

*Robin Reynolds*

------------------------------------

Robin Reynolds, Court Reporter

FIRST COAST COURT REPORTERS

---

122

CERTIFICATE OF OATH

STATE OF FLORIDA  )

COUNTY OF DUVAL  )

I, the undersigned authority, do hereby certify that the aforementioned witness appeared before me via videoconference and was first duly sworn to testify to the whole truth.

WITNESS my hand and official seal this 3rd day of November, 2022.

*Robin Reynolds*

------------------------------------

Robin Reynolds, Court Reporter

FIRST COAST COURT REPORTERS

---

124

E R R A T A  S H E E T

IN RE:  FLETCHER V U.S. BANK, et al
DEPOSITION OF:  Gina Feezer
DATE TAKEN:    November 3, 2022

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES HERE

Please sign, date, and return this sheet to our office.  If additional lines are required for corrections, attach additional sheets.

At the time of the reading and signing of the deposition, the following changes were noted:

PAGE  LINE  SHOULD READ:

____  _____
____  _____
____  _____
____  _____
____  _____
____  _____
____  _____
____  _____
____  _____
____  _____

_____
Gina Feezer          Date:

e-copy:  Wendell Finner, Esq.

FIRST COAST COURT REPORTERS

## $

**$1,400** [1] - 52:2
**$1,900** [1] - 51:23
**$10,000** [1] - 38:8
**$13,000** [1] - 115:13
**$181,042.55** [1] - 38:3
**$2,471** [1] - 109:15
**$2,474.15** [1] - 37:21
**$23,428.63** [1] - 37:23
**$3,000** [2] - 75:16, 114:9
**$3,604.81** [1] - 40:7
**$30,331.91** [1] - 37:25
**$33,081.99** [1] - 40:10
**$41,325.21** [1] - 41:5
**$5,450** [2] - 38:17, 38:21
**$5,450.97** [1] - 40:6
**$522** [1] - 52:4
**$60,000** [3] - 115:5, 115:25, 116:3
**$60,768.32** [1] - 37:12
**$750** [2] - 40:22, 41:6
**$8,000** [2] - 73:10, 74:25
**$8,243.22** [1] - 41:3
**$8,993.22** [1] - 41:3

## '

**'12** [1] - 73:14
**'13** [1] - 73:14
**'16** [1] - 51:6

## 0

**00010** [1] - 61:4
**0136** [1] - 67:4
**0156** [1] - 43:5
**01624** [2] - 50:11, 50:16
**01626** [1] - 49:8
**01761** [1] - 78:15
**02508** [1] - 39:3

## 1

**1** [8] - 3:9, 5:5, 5:7, 5:19, 6:9, 23:21, 24:1, 39:12
**10** [2] - 61:5, 61:6
**101** [3] - 67:3, 67:7, 114:15
**102** [1] - 76:15

**109** [1] - 3:4
**10:05** [1] - 1:13
**11** [5] - 18:22, 19:2, 23:23, 24:3, 87:5
**117** [1] - 3:5
**11th** [2] - 86:24, 123:19
**12** [15] - 3:19, 25:4, 42:18, 43:5, 43:7, 43:9, 43:16, 77:5, 85:19, 85:22, 118:8, 118:10, 119:16, 120:2, 120:18
**121** [1] - 3:5
**12th** [1] - 72:13
**13** [30] - 1:5, 3:12, 3:14, 17:16, 17:19, 17:22, 19:2, 19:4, 19:14, 19:17, 20:8, 20:17, 21:5, 21:14, 21:18, 21:22, 22:4, 24:15, 24:17, 28:4, 28:13, 28:15, 94:24, 95:9, 97:13, 97:21, 97:25, 98:6, 105:3
**13,000** [1] - 115:11
**130** [1] - 20:20
**14** [10] - 25:18, 28:4, 28:13, 28:15, 60:25, 61:2, 61:6, 61:12, 62:1, 114:17
**15** [9] - 3:12, 3:16, 27:15, 27:18, 27:25, 28:5, 28:13, 28:15, 78:20
**1517** [3] - 42:23, 42:24, 43:8
**1536** [1] - 43:9
**16** [9] - 3:18, 24:18, 28:18, 30:15, 31:7, 35:6, 48:5, 78:9, 78:12
**1621** [1] - 56:4
**1622** [1] - 57:21
**1623** [1] - 58:15
**1624** [2] - 53:1, 54:11
**1625** [3] - 56:16, 58:25, 64:14
**1636** [1] - 43:17
**16th** [3] - 47:8, 47:25, 48:3
**17** [9] - 3:14, 32:25, 33:3, 36:4, 36:8, 39:12, 39:22, 45:21, 46:1
**1742** [2] - 42:24, 43:7
**1746** [1] - 43:17
**176.00** [1] - 61:10
**1761** [1] - 43:8
**18** [26] - 3:14, 3:19,

43:10, 44:14, 47:7, 47:14, 47:24, 49:7, 50:11, 50:16, 56:3, 56:16, 57:20, 58:25, 60:12, 61:14, 62:1, 62:3, 62:11, 64:14, 67:3, 76:15, 77:15, 77:18, 109:11, 111:15
**18th** [1] - 2:9
**19** [8] - 3:20, 77:10, 77:19, 77:22, 78:8, 78:20, 104:17, 118:23
**19's** [1] - 118:23
**19-ap-00218** [1] - 1:6
**19103** [1] - 2:9
**194** [3] - 104:19, 104:23, 105:1
**1:11-bk-21424** [1] - 1:4
**1st** [2] - 5:22, 46:25

## 2

**2** [8] - 3:11, 8:18, 8:20, 12:16, 18:21, 23:23, 24:3, 108:10
**2/21/19** [1] - 30:20
**20** [28] - 3:14, 18:12, 18:17, 18:19, 19:3, 19:10, 19:13, 19:14, 23:7, 23:8, 23:23, 24:15, 24:17, 28:5, 28:7, 28:16, 39:2, 39:11, 39:25, 40:5, 40:14, 40:20, 102:18, 103:10, 103:19, 103:20, 109:19, 116:5
**2002** [1] - 87:2
**2004** [3] - 96:9, 98:10, 106:10
**2006** [2] - 106:14, 106:20
**201** [1] - 118:13
**2011** [2] - 23:13, 110:7
**2012** [13] - 36:11, 39:12, 41:2, 45:18, 46:2, 46:3, 46:6, 47:18, 48:4, 48:5, 49:3, 69:18, 73:16
**2013** [3] - 72:13, 73:16, 107:17
**2014** [2] - 69:18, 73:17
**2015** [2] - 90:12, 91:19
**2016** [21] - 49:11, 50:13, 50:20, 51:15, 53:4, 56:9, 57:22, 62:12, 63:9, 65:3,

85:5, 86:24, 87:5, 90:16, 90:19, 90:21, 90:24, 105:18, 105:22, 106:1, 114:17
**2017** [3] - 79:21, 86:25, 87:5
**2019** [12] - 3:17, 3:17, 27:6, 27:8, 27:23, 28:1, 30:25, 32:13, 80:5, 80:8, 98:10
**2021** [5] - 28:3, 28:10, 43:2, 78:9, 78:12
**2022** [3] - 1:12, 122:11, 123:19
**2031** [1] - 119:1
**206.01** [1] - 61:10
**21** [12] - 3:20, 23:13, 62:12, 65:1, 65:3, 84:18, 85:20, 85:22, 86:23, 88:21, 89:3, 100:7
**21550** [1] - 2:4
**21st** [1] - 46:2
**22** [11] - 3:22, 89:17, 90:10, 93:19, 94:25, 95:1, 100:8, 102:19, 103:11, 103:21, 116:5
**23** [2] - 28:10, 49:10
**23rd** [2] - 28:3, 43:1, 56:5
**24** [2] - 46:2, 107:20
**2442** [1] - 1:20
**246** [1] - 2:4
**25** [1] - 87:5
**25th** [1] - 86:25
**26** [1] - 64:15
**27** [1] - 3:16
**2nd** [2] - 50:13, 50:19

## 3

**3** [8] - 1:12, 3:11, 9:5, 9:19, 12:9, 12:10, 12:14, 12:20
**3,604.81** [2] - 38:3, 38:23
**30,331.91** [1] - 40:11
**32** [1] - 3:18
**32207** [1] - 1:21
**396-1050** [1] - 1:21
**3:27** [2] - 1:13, 121:12
**3rd** [1] - 122:10

## 4

**4** [3] - 3:3, 3:4, 90:14

**4/11** [1] - 41:2
**400** [1] - 100:16
**42** [1] - 3:19
**43** [1] - 3:19
**438.20** [1] - 57:7

## 5

**5** [3] - 3:9, 61:3, 61:12
**5/16/2012** [3] - 44:15, 47:16, 48:20
**522.63** [2] - 57:8, 57:9

## 6

**6** [4] - 3:12, 13:7, 13:9, 47:9
**6/21** [1] - 110:7
**60,000** [1] - 41:12
**60,768.12** [1] - 42:10
**650** [1] - 61:9
**6th** [2] - 47:17, 48:1

## 7

**7** [9] - 24:7, 24:13, 28:15, 39:2, 39:10, 39:25, 40:14, 40:20, 90:18
**750** [1] - 41:8
**77** [1] - 3:20

## 8

**8** [1] - 3:11
**815** [1] - 78:16
**84** [1] - 3:20
**86** [2] - 56:4, 56:12
**87** [3] - 57:20, 58:2, 109:11
**88** [1] - 52:16
**89** [4] - 3:22, 50:10, 50:15, 53:1
**8LV** [2] - 78:10, 78:17

## 9

**9** [7] - 3:11, 3:12, 15:8, 15:10, 15:16, 15:22, 57:22
**9/17** [3] - 51:5, 51:21, 53:4
**9/17/16** [1] - 51:10
**9/2** [1] - 51:14
**9/21** [1] - 111:18
**90** [9] - 56:15, 58:25, 61:14, 62:1, 62:10,

64:14, 65:1, 111:16, 111:17
**904** [1] - 1:21
**91** [4] - 49:6, 56:6, 56:12, 64:14
**928.82** [1] - 61:10

# A

**a.m** [1] - 1:13
**ability** [9] - 32:8, 46:19, 47:1, 48:24, 74:18, 81:5, 81:14, 88:8, 98:11
**able** [15] - 4:24, 32:6, 33:19, 41:12, 41:13, 46:9, 48:6, 48:9, 48:21, 48:23, 54:14, 54:15, 55:24, 98:21, 100:15
**absolutely** [1] - 112:21
**accept** [1] - 48:21
**access** [9] - 4:24, 81:24, 91:24, 93:18, 93:25, 94:7, 94:9, 95:20, 98:12
**accessed** [2] - 82:21, 83:24
**accessible** [1] - 84:4
**according** [1] - 116:21
**account** [67] - 19:16, 20:3, 20:5, 20:9, 26:13, 33:22, 33:25, 40:23, 44:7, 45:8, 46:12, 50:4, 50:6, 51:16, 52:4, 54:5, 54:7, 54:16, 54:19, 55:14, 55:17, 55:23, 56:7, 56:23, 57:2, 57:14, 59:8, 60:16, 61:24, 63:12, 63:24, 63:25, 70:9, 70:18, 70:23, 71:7, 72:7, 74:10, 77:25, 80:9, 81:2, 81:3, 81:23, 81:25, 82:3, 82:11, 85:24, 87:4, 87:22, 88:6, 93:12, 93:14, 94:10, 94:16, 97:25, 98:23, 99:25, 110:17, 112:12, 112:14, 113:7, 113:12, 113:20, 114:11, 115:4, 119:15
**accounted** [2] - 55:17, 72:8
**accounting** [13] - 18:1, 19:7, 19:12,

19:25, 26:9, 83:12, 85:5, 85:6, 94:11, 112:11, 114:1, 119:17, 119:21
**accounts** [4] - 63:4, 82:17, 82:21, 86:12
**accurate** [3] - 75:7, 113:22, 117:8
**accurately** [4] - 102:25, 116:10, 116:15, 117:15
**acquired** [1] - 36:6
**act** [1] - 75:2
**action** [4] - 64:17, 101:10, 123:17, 123:18
**activate** [1] - 48:1
**activation** [2] - 47:9, 47:17
**active** [5] - 81:25, 82:7, 82:8, 82:13, 82:15
**activities** [1] - 44:12
**activity** [2] - 34:1, 44:5
**actual** [5] - 46:22, 79:19, 81:6, 88:23, 114:6
**add** [2] - 55:19, 83:19
**added** [2] - 33:18, 40:7
**addition** [1] - 72:19
**additional** [3] - 25:2, 25:8, 98:12
**addressed** [3] - 113:6, 114:3, 115:5
**adequate** [5] - 70:14, 70:19, 72:21, 110:16, 113:11
**Adequate** [2] - 72:16, 74:17
**adjust** [2] - 74:10, 114:23
**adjusted** [4] - 67:14, 68:13, 113:7, 114:22
**adjustment** [8] - 37:4, 37:9, 37:13, 54:13, 56:22, 57:11, 66:1, 111:21
**adjustments** [25] - 26:9, 26:11, 36:20, 37:19, 39:21, 42:1, 54:8, 55:13, 56:14, 57:3, 57:8, 57:14, 59:8, 60:16, 61:1, 61:7, 61:18, 68:9, 68:16, 74:12, 75:8, 112:12, 112:19, 115:9
**administrative** [8] -

91:14, 92:11, 92:18, 93:15, 93:20, 94:19, 94:21, 95:20
**Adversary** [1] - 1:5
**adversary** [1] - 80:8
**advised** [1] - 71:19
**advisement** [2] - 25:10, 86:16
**affects** [1] - 98:25
**aforementioned** [1] - 122:7
**agent** [1] - 83:1
**agents** [1] - 66:22
**agree** [1] - 109:2
**agreed** [1] - 4:2
**ahead** [8] - 5:4, 8:24, 15:7, 36:8, 70:25, 86:22, 99:9, 108:25
**al** [1] - 1:8
**alias** [2] - 52:13, 53:13
**allegations** [1] - 12:15
**allocation** [1] - 118:25
**allow** [2] - 95:14, 108:7
**allowed** [1] - 95:8
**Altman** [8] - 3:21, 70:6, 70:7, 71:3, 71:12, 75:23, 84:24, 112:17
**ambiguous** [1] - 8:14
**Amended** [6] - 3:9, 3:11, 5:10, 8:23, 8:25, 12:18
**amendments** [1] - 12:19
**amount** [20] - 19:12, 37:14, 38:4, 38:23, 39:13, 39:17, 40:7, 40:8, 40:15, 51:23, 52:2, 55:20, 71:15, 107:2, 109:15, 110:8, 115:3, 116:2, 116:24
**amounts** [32] - 20:2, 24:8, 24:10, 36:22, 37:12, 39:10, 40:5, 40:12, 40:25, 41:9, 51:17, 51:24, 54:15, 55:18, 56:21, 59:5, 59:10, 59:15, 61:11, 61:13, 61:22, 68:25, 72:8, 75:19, 76:3, 79:24, 80:3, 117:8, 117:11, 117:15, 117:17
**analyses** [1] - 112:15
**analysis** [3] - 14:7, 89:22, 104:6

**analyst** [2] - 91:24, 108:2
**Analyst** [2] - 92:22, 106:21
**analyze** [1] - 55:23
**ancillary** [1] - 81:19
**Answer** [4] - 3:11, 9:10, 12:14, 12:17
**answer** [49] - 6:1, 6:16, 6:20, 7:24, 8:1, 8:10, 8:24, 11:5, 11:25, 12:23, 13:2, 14:19, 15:5, 16:14, 17:3, 21:8, 22:9, 23:6, 23:18, 23:25, 28:12, 30:5, 34:13, 47:5, 47:11, 55:12, 60:24, 79:8, 80:16, 84:1, 86:9, 87:7, 87:19, 91:6, 93:10, 95:14, 96:13, 97:15, 99:3, 105:6, 108:7, 116:19, 117:10, 119:4, 119:19, 120:5, 120:6, 120:15, 120:20
**answered** [1] - 43:16
**anticipated** [3] - 47:9, 47:17, 47:25
**apart** [1] - 74:21
**apologize** [3] - 101:15, 103:6, 104:1
**appear** [3] - 93:8, 115:10, 116:22
**appeared** [1] - 122:7
**appearing** [2] - 2:5, 2:10
**application** [2] - 69:1, 114:4
**applications** [1] - 85:7
**applied** [18] - 20:12, 41:3, 41:16, 41:20, 50:6, 54:7, 55:8, 57:14, 61:19, 102:24, 113:19, 114:8, 114:10, 114:11, 115:11, 116:10, 116:14, 117:14
**apply** [2] - 56:19, 113:18
**appropriate** [1] - 16:21
**approval** [5] - 60:11, 76:22, 91:13, 92:16, 93:22
**approved** [2] - 60:14, 80:3
**April** [7] - 36:11, 39:12, 46:2, 49:3, 86:25, 87:5

**areas** [1] - 6:9
**arm** [4] - 10:8, 11:16, 11:17, 11:19
**assembled** [1] - 56:25
**assertion** [1] - 13:24
**assess** [1] - 59:13
**assessed** [4] - 26:7, 33:22, 40:22, 59:14
**assigned** [1] - 45:2
**associate** [1] - 45:9
**Association** [1] - 1:8
**assume** [1] - 106:13
**assumption** [1] - 38:8
**ATLANTIC** [1] - 1:20
**attached** [1] - 3:8
**attachment** [1] - 121:5
**attorney** [11] - 49:16, 63:20, 66:12, 71:11, 71:13, 75:6, 75:18, 102:15, 110:15, 113:3, 123:14
**attorney/client** [3] - 13:24, 86:14, 120:16
**attorneys** [3] - 119:14, 120:3, 123:16
**audit** [2] - 104:7, 104:13
**August** [5] - 69:18, 80:5, 85:5, 86:24, 87:4
**Aurora** [36] - 3:14, 18:3, 18:21, 19:1, 19:21, 21:1, 21:20, 22:5, 22:11, 24:20, 24:25, 25:7, 25:13, 36:6, 36:21, 38:8, 38:9, 38:20, 40:2, 40:9, 40:22, 41:1, 41:16, 41:21, 46:17, 46:21, 48:7, 48:10, 68:10, 68:18, 69:6, 74:4, 110:3, 115:2, 115:10
**Aurora's** [6] - 3:14, 17:23, 18:22, 23:8, 37:15, 45:23
**author** [1] - 67:12
**authority** [1] - 122:6
**authorized** [1] - 123:9
**automated** [2] - 46:14, 88:20
**automatic** [1] - 71:1
**available** [7] - 79:21, 79:22, 81:14, 82:4, 83:16, 84:6, 97:12
**aware** [10] - 13:25,

14:25, 92:6, 97:10, 99:6, 100:20, 105:19, 119:14, 120:15, 120:21

**B**

**balance** [25] - 20:1, 26:12, 36:17, 36:21, 37:5, 37:17, 37:23, 38:6, 38:21, 39:24, 40:16, 41:11, 42:11, 68:21, 69:5, 69:23, 70:3, 70:17, 74:13, 115:4, 115:14, 115:17, 115:19, 116:24, 117:3
**balances** [14] - 18:2, 20:9, 20:14, 24:13, 38:15, 39:20, 40:1, 40:13, 41:14, 42:12, 68:11, 69:7, 79:8, 80:2
**Bank** [3] - 1:7, 3:11, 9:11
**bankruptcy** [49] - 17:25, 19:6, 37:24, 38:10, 39:18, 40:24, 41:7, 49:14, 50:2, 51:1, 53:24, 56:9, 62:24, 63:2, 63:7, 63:10, 63:17, 64:6, 65:11, 65:20, 66:5, 66:9, 66:11, 66:21, 67:1, 70:6, 71:11, 71:12, 72:3, 75:12, 76:1, 76:4, 79:5, 79:6, 98:4, 98:14, 98:18, 98:20, 99:24, 101:13, 102:24, 106:11, 106:18, 106:19, 110:4, 112:2, 112:10, 117:17
**BANKRUPTCY** [1] - 1:1
**Bankruptcy** [11] - 19:22, 51:12, 59:12, 94:24, 95:9, 97:13, 100:3, 105:3, 117:20, 118:13, 121:6
**based** [30] - 8:14, 16:18, 20:12, 29:18, 37:19, 38:6, 39:17, 39:23, 41:24, 47:22, 55:19, 57:18, 59:5, 68:9, 68:14, 70:2, 73:4, 79:13, 81:15, 87:21, 93:25, 95:21, 98:5, 99:1, 99:11, 104:13, 110:14, 113:2, 113:9, 113:21

**basic** [2] - 44:23, 49:14
**basis** [1] - 36:2
**batch** [2] - 56:22, 56:24
**Bates** [28] - 13:16, 14:14, 14:22, 39:3, 42:19, 42:23, 43:5, 43:6, 43:8, 43:9, 49:7, 50:11, 50:16, 54:11, 56:4, 56:16, 57:20, 58:14, 58:25, 61:2, 61:4, 61:5, 64:14, 67:4, 78:15, 87:2, 118:13, 119:1
**Bates-stamped** [2] - 13:16, 14:14, 14:14
**began** [3] - 68:10, 97:1, 106:9
**begin** [1] - 96:8
**beginning** [2] - 39:15, 105:1
**begins** [1] - 57:22, 100:10, 103:11
**behalf** [4] - 2:5, 2:10, 26:23, 106:21
**below** [2] - 51:24, 53:9
**benchmarks** [1] - 92:9
**best** [5] - 7:3, 87:19, 95:14, 99:3, 120:6
**better** [2] - 118:11, 118:25
**between** [22] - 3:20, 4:2, 10:3, 33:8, 39:9, 46:2, 47:6, 47:7, 47:19, 49:15, 61:25, 64:12, 71:11, 76:7, 84:23, 87:4, 87:23, 98:10, 101:18, 113:2, 119:13, 120:7
**beyond** [4] - 16:22, 93:14, 95:13, 95:18
**big** [1] - 72:25
**billing** [1] - 44:8
**bit** [5] - 8:14, 21:9, 22:22, 33:22, 98:1
**BK** [11] - 65:22, 65:23, 66:25, 98:5, 98:20, 98:22, 98:24, 99:2, 100:10, 100:18, 111:20
**BK-13** [1] - 98:7
**Black** [2] - 30:23, 77:23
**black** [1] - 27:14
**Blank** [1] - 2:8
**block** [3] - 76:16, 103:25, 104:1

**Board** [3] - 35:15, 45:11, 46:7
**Boarded** [16] - 22:17, 35:10, 35:13, 37:7, 38:3, 44:1, 44:15, 46:24, 47:15, 47:25, 48:16, 69:17, 69:22, 74:6, 80:22, 115:21
**Boarding** [14] - 27:5, 35:12, 36:5, 36:11, 39:15, 41:21, 45:18, 46:1, 46:4, 46:23, 47:8, 48:17, 49:2, 80:21
**borrow** [2] - 20:17, 20:25
**borrower** [5] - 20:18, 20:25, 70:8, 110:25, 111:2
**borrowers** [2] - 95:8, 98:14
**bottom** [6] - 51:3, 51:5, 52:24, 53:12, 53:15, 53:20
**BOULEVARD** [1] - 1:20
**Box** [1] - 2:4
**brain** [1] - 101:16
**break** [4] - 34:25, 37:14, 55:5, 109:3
**breakdown** [3] - 38:5, 39:17, 42:6
**breaking** [2] - 44:20, 74:12
**Brenda** [2] - 1:4, 1:5
**bridge** [1] - 74:24
**brief** [2] - 4:25, 56:11
**Brief** [3] - 35:3, 77:7, 109:5
**bring** [4] - 70:9, 70:23, 76:3, 110:17
**brings** [1] - 63:14
**broke** [14] - 12:11, 22:22, 22:24, 35:11, 37:20, 40:18, 42:8, 44:22, 48:15, 57:6, 61:17, 69:5, 104:22, 115:25
**brought** [1] - 114:12
**BU** [2] - 100:10, 100:18
**buffer** [1] - 46:8
**bulk** [1] - 58:19
**business** [65] - 3:15, 6:4, 6:25, 12:1, 13:16, 14:11, 14:13, 14:16, 14:17, 14:20, 14:21, 14:22, 14:25, 16:23, 17:4, 17:9, 18:22, 18:25, 21:15, 21:23,

22:6, 22:10, 22:16, 22:19, 23:12, 23:15, 24:19, 27:10, 32:7, 41:24, 41:25, 49:16, 59:9, 62:20, 63:17, 64:4, 65:11, 65:12, 65:19, 76:10, 80:18, 80:22, 80:23, 81:7, 81:8, 82:14, 84:9, 93:5, 93:13, 93:15, 94:21, 95:6, 101:8, 105:8, 105:15, 110:22, 111:12, 115:8, 116:12, 117:6, 119:20, 119:21, 119:25, 120:7, 120:8
**business-records-system** [1] - 14:16
**Busman** [1] - 32:4
**BY** [60] - 4:12, 5:1, 6:7, 7:5, 7:14, 8:17, 11:13, 12:5, 12:13, 13:5, 14:24, 15:6, 16:1, 17:2, 21:13, 23:5, 23:20, 24:16, 25:17, 28:14, 30:13, 35:5, 38:24, 39:8, 41:17, 45:16, 47:13, 49:4, 50:17, 53:22, 56:1, 57:12, 62:9, 67:10, 67:22, 77:9, 78:22, 84:17, 85:8, 86:21, 88:7, 91:3, 91:16, 96:7, 96:15, 96:23, 97:17, 99:5, 100:6, 105:16, 107:23, 108:9, 109:7, 111:9, 114:14, 116:18, 118:1, 119:3, 119:24, 121:2

**C**

**CA** [1] - 37:10
**calculating** [1] - 20:14
**calculation** [1] - 79:20
**calculations** [3] - 39:14, 41:23, 83:20
**capable** [1] - 6:21
**capacity** [2] - 103:3, 103:13
**capitalized** [1] - 79:24
**caption** [1] - 9:19
**Case** [1] - 1:4
**case** [7] - 50:8, 55:2, 68:8, 98:18, 108:14, 108:16, 114:21

**cashier** [1] - 53:10
**cashiering** [7] - 24:2, 50:23, 51:22, 58:9, 58:10, 58:12, 62:6
**categories** [9] - 5:22, 5:24, 6:2, 13:18, 16:21, 34:21, 115:15, 115:22, 116:2
**categorized** [1] - 94:20
**category** [1] - 17:14
**causing** [1] - 115:19
**certain** [4] - 5:22, 32:7, 98:24, 100:4
**certainly** [1] - 25:5
**CERTIFICATE** [1] - 122:1
**Certified** [1] - 123:6
**certify** [3] - 122:7, 123:8, 123:13
**chance** [1] - 25:19
**change** [5] - 16:14, 42:10, 53:19, 97:24, 99:12
**changed** [3] - 99:19, 100:2, 101:1
**changes** [8] - 56:7, 97:10, 97:18, 97:24, 98:9, 99:6, 99:17
**chapter** [2] - 98:5, 98:21
**Chapter** [8] - 1:5, 94:24, 95:9, 97:13, 97:21, 97:25, 98:6, 105:3
**charge** [8] - 34:20, 37:9, 40:19, 40:22, 41:7, 85:15
**charges** [6] - 33:21, 37:6, 37:8, 37:21, 40:16, 40:21
**chart** [4] - 40:14, 118:14, 118:25, 119:2
**check** [14] - 3:14, 18:21, 23:10, 58:4, 71:18, 91:9, 101:23, 101:24, 106:4, 106:8, 109:22, 110:2, 110:20, 110:24
**checked** [1] - 110:19
**checks** [2] - 88:24, 89:10
**Claim** [17] - 19:23, 24:12, 36:23, 37:16, 37:22, 38:18, 38:21, 39:19, 41:6, 50:5, 51:18, 55:21, 59:6, 68:24, 72:9, 99:19, 103:16
**clarification** [1] -

8:13
**clarify** [2] - 21:11, 119:23
**clear** [3] - 25:11, 41:6, 41:14
**client** [2] - 82:17, 82:21
**client's** [1] - 81:22
**clipart** [2] - 89:12, 89:14
**close** [4] - 65:10, 65:13, 73:18, 77:4
**closed** [1] - 81:3
**closer** [1] - 73:24
**closing** [8] - 62:16, 62:23, 64:6, 64:10, 65:15, 65:18, 66:10, 111:19
**COAST** [1] - 1:20
**code** [9] - 36:25, 37:10, 52:13, 53:13, 62:3, 62:13, 65:3, 78:1, 78:4
**coincides** [1] - 67:24
**column** [2] - 37:7, 51:4
**columns** [1] - 33:20
**comment** [56] - 42:5, 43:16, 43:18, 43:19, 43:24, 44:6, 44:13, 44:15, 49:13, 49:14, 51:19, 51:20, 52:11, 52:12, 52:22, 52:23, 52:24, 53:6, 53:7, 53:11, 53:14, 53:16, 53:17, 58:17, 59:23, 62:15, 62:23, 65:8, 65:9, 65:22, 67:11, 67:24, 68:2, 77:18, 77:20, 78:7, 78:8, 78:10, 78:13, 78:24, 78:25, 83:7, 83:11, 84:8, 87:25, 88:1, 88:5, 88:9, 88:18, 88:19, 89:1, 94:12, 94:17, 104:12, 120:12, 120:13
**Comment** [1] - 3:19
**comments** [24] - 29:23, 42:3, 42:14, 42:20, 42:25, 46:5, 47:24, 49:7, 49:10, 52:21, 53:2, 53:15, 54:11, 55:7, 67:25, 68:1, 77:14, 77:16, 79:7, 80:1, 81:15, 88:25, 119:8
**Comments** [1] - 3:20
**comments'** [1] - 60:22

**commercial** [32] - 62:20, 62:22, 63:1, 63:5, 63:12, 63:14, 63:25, 64:2, 64:11, 64:17, 64:23, 65:19, 66:3, 66:13, 66:16, 66:22, 67:2, 70:21, 71:17, 75:3, 76:10, 76:19, 84:24, 112:7, 112:8, 112:11, 112:13, 117:20, 118:3, 119:7, 120:8, 121:4
**communicate** [2] - 101:8, 101:18
**communication** [8] - 14:4, 85:4, 87:25, 88:4, 88:17, 99:11, 113:10, 120:13
**communications** [7] - 42:4, 49:14, 80:15, 88:9, 119:13, 120:2, 120:17
**company** [5] - 11:9, 92:16, 106:7, 106:22, 119:25
**company's** [1] - 120:3
**Compilation** [1] - 3:20
**compilation** [1] - 84:23
**compiled** [1] - 87:9
**complaint** [4] - 8:12, 12:15, 12:21, 14:10
**Complaint** [3] - 3:11, 9:1, 12:18
**complete** [3] - 28:8, 28:17, 119:4
**completed** [8] - 51:2, 51:7, 51:10, 53:3, 54:5, 66:4, 112:9
**completely** [1] - 12:21
**completing** [1] - 66:8
**complicated** [2] - 68:8, 114:21
**comprise** [1] - 57:10
**comprised** [2] - 64:1, 68:21
**concern** [1] - 89:23
**concise** [1] - 86:18
**conclusion** [1] - 11:24
**condensed** [1] - 34:5
**conducted** [3] - 19:21, 19:22, 59:5
**confines** [1] - 95:25
**confirm** [1] - 28:19
**confused** [1] - 68:5

**confusing** [2] - 12:8, 21:9
**confusion** [2] - 68:4, 115:20
**connected** [1] - 123:16
**Consent** [5] - 70:1, 72:15, 72:18, 73:17, 74:17
**consideration** [1] - 86:20
**considering** [1] - 107:2
**constitute** [4] - 36:4, 36:11, 85:20, 85:23
**contact** [1] - 65:24
**contain** [8] - 17:25, 18:25, 24:19, 26:1, 28:8, 33:20, 43:24, 44:2
**contained** [52] - 5:18, 7:2, 21:5, 23:14, 24:4, 26:19, 30:6, 30:8, 31:6, 31:15, 31:25, 33:15, 33:25, 34:10, 34:17, 34:19, 41:25, 42:1, 42:2, 45:7, 52:8, 53:10, 54:11, 80:10, 80:19, 81:17, 83:11, 83:18, 84:3, 84:5, 85:9, 85:17, 85:20, 85:24, 87:1, 88:1, 90:15, 93:18, 94:3, 94:11, 94:16, 95:22, 96:3, 99:20, 99:23, 102:13, 103:4, 118:14, 119:16, 120:1, 120:13, 120:18
**containing** [1] - 4:21
**contains** [5] - 17:25, 18:1, 26:4, 42:20, 88:21
**contested** [1] - 93:2
**context** [2] - 68:2, 88:2
**continue** [3] - 66:12, 72:22, 108:22
**control** [3] - 62:21, 102:23, 116:8
**convergence** [4] - 90:6, 90:20, 91:17, 92:19
**convergent** [1] - 92:7
**conversation** [1] - 7:25
**converted** [1] - 107:18
**coordinator** [1] -

101:22
**copy** [13] - 3:14, 5:10, 8:23, 8:25, 17:21, 17:23, 18:20, 18:22, 19:5, 22:2, 58:6, 118:12, 118:25
**Corp** [2] - 11:6, 11:8
**corporate** [2] - 93:1, 108:1
**Corporation** [13] - 7:10, 7:13, 9:21, 10:2, 10:4, 10:5, 10:7, 10:13, 10:19, 10:20, 11:2, 12:4, 15:17
**corporation** [1] - 10:15
**correct** [5] - 11:16, 21:24, 37:11, 112:3, 112:4
**corrected** [1] - 113:8
**corrections** [1] - 26:10
**correctly** [6] - 67:15, 68:14, 74:14, 114:22, 114:24, 115:18
**correlate** [1] - 40:4
**correspond** [4] - 39:1, 61:13, 62:2, 99:1
**correspondence** [4] - 24:1, 32:10, 39:9, 76:7
**corresponding** [1] - 42:4
**costs** [5] - 26:7, 33:21, 34:19, 59:17, 60:18
**counsel** [28] - 4:3, 6:25, 8:1, 12:25, 13:4, 14:4, 14:9, 14:19, 16:13, 16:20, 17:1, 17:7, 64:20, 80:15, 86:3, 91:10, 91:23, 93:6, 95:12, 95:16, 96:1, 96:19, 101:9, 101:19, 120:8, 123:14, 123:16
**counting** [1] - 103:25
**COUNTY** [2] - 122:4, 123:4
**couple** [1] - 22:24
**course** [4] - 63:18, 93:7, 95:5, 97:19
**COURT** [2] - 1:1, 1:20
**court** [1] - 106:16
**Court** [14] - 1:17, 4:9, 51:12, 59:12, 64:20, 71:1, 91:5, 100:3, 117:21, 118:13,

121:6, 122:15, 123:6, 123:22
**covered** [4] - 42:24, 73:11, 116:2, 117:13
**covers** [1] - 13:13
**Cox** [2] - 105:25, 106:2
**create** [4] - 19:24, 22:7, 29:16, 66:8
**created** [7] - 30:2, 30:16, 32:15, 33:18, 37:16, 68:20, 69:6
**creating** [3] - 69:3, 70:16, 70:17
**credit** [3] - 47:2, 61:10, 111:7
**credited** [1] - 71:20
**creditor** [1] - 49:25
**credits** [4] - 26:8, 61:8, 61:19, 61:21
**Cross** [1] - 3:4
**cross** [2] - 108:24, 109:1
**CROSS** [1] - 109:6
**CROWLEY** [75] - 2:7, 4:22, 5:20, 6:11, 6:17, 7:11, 7:23, 11:3, 11:23, 12:11, 12:22, 14:3, 15:2, 15:24, 16:11, 21:7, 21:25, 22:8, 22:22, 23:17, 23:24, 25:2, 25:15, 28:11, 30:4, 34:12, 35:2, 38:19, 39:4, 40:18, 44:20, 44:22, 47:10, 48:15, 50:14, 53:18, 55:11, 56:10, 57:6, 60:23, 62:4, 67:7, 67:16, 78:14, 78:18, 78:21, 80:13, 82:5, 82:22, 83:25, 84:21, 86:1, 86:15, 87:6, 95:10, 96:12, 97:14, 98:15, 99:8, 105:5, 107:21, 108:4, 109:1, 109:7, 111:9, 114:14, 116:18, 117:22, 118:18, 119:18, 120:4, 120:19, 120:23, 121:2, 121:9
**Crowley** [3] - 3:4, 3:5, 67:5
**cure** [2] - 117:18, 117:19
**Cure** [24] - 49:18, 49:20, 49:21, 49:25, 50:19, 51:14, 54:3, 54:4, 54:22, 55:1, 55:10, 55:25, 57:16,

57:17, 62:17, 63:23, 64:3, 64:8, 64:18, 65:17, 72:6, 118:16, 119:12, 121:7
**current** [12] - 12:14, 20:8, 70:9, 70:19, 70:24, 73:7, 74:6, 76:4, 106:13, 110:18, 113:13, 114:12
**customer** [12] - 20:10, 32:5, 44:10, 46:14, 47:1, 70:13, 70:15, 70:23, 77:25, 92:13, 94:15, 114:9
**customer's** [5] - 57:2, 79:17, 93:12, 93:14, 94:10
**customer-account** [1] - 77:25
**customers** [2] - 97:12, 97:21
**cut** [5] - 7:12, 31:3, 88:11, 88:18, 89:7

**D**

**dashboard** [7] - 100:20, 100:22, 100:23, 100:24, 101:3, 101:20, 102:7
**data** [14] - 22:1, 26:18, 30:2, 30:8, 30:10, 31:15, 31:20, 31:24, 35:25, 81:17, 84:4, 85:11, 92:10, 95:7
**database** [13] - 29:4, 29:7, 29:14, 29:16, 29:24, 31:19, 79:19, 80:11, 80:17, 81:21, 81:22, 88:14, 96:20
**databases** [1] - 81:20
**date** [35] - 18:8, 20:13, 26:21, 26:23, 28:9, 30:15, 30:18, 30:21, 35:16, 45:12, 46:20, 46:21, 46:22, 46:23, 47:4, 47:9, 47:17, 47:22, 48:5, 48:10, 48:11, 48:16, 48:18, 48:22, 48:23, 48:24, 49:2, 52:14, 57:19, 78:11, 78:13, 87:1, 101:15, 102:1
**DATE** [1] - 1:12
**dated** [9] - 32:12, 36:10, 45:18, 46:5, 57:22, 62:11, 65:3, 78:8, 114:17

**Dated** [1] - 123:19
**dates** [4] - 27:2, 47:20, 62:2, 101:21
**days** [1] - 102:3
**deal** [1] - 93:11
**debits** [1] - 26:8
**Debtor** [1] - 1:4
**December** [6] - 3:17, 27:23, 28:1, 72:13, 73:9, 114:17
**decommissioned** [3] - 79:15, 80:4, 80:18
**default** [1] - 73:14
**defaults** [1] - 73:15
**Defendant** [1] - 2:10
**defendant** [1] - 7:19
**defendant's** [2] - 16:4, 79:1
**defendants** [1] - 5:17
**Defendants** [1] - 1:8
**defer** [1] - 14:19
**deferred** [14] - 19:25, 20:1, 36:16, 36:21, 42:10, 68:21, 69:5, 69:23, 70:3, 74:13, 115:14, 115:16, 115:17, 115:18
**deficiencies** [1] - 95:7
**definitely** [1] - 107:9
**delinquency** [1] - 120:10
**department** [48] - 24:3, 32:4, 51:22, 52:14, 58:4, 60:6, 62:24, 63:3, 63:5, 63:12, 63:14, 63:18, 64:2, 64:11, 64:17, 64:24, 66:3, 66:5, 66:10, 66:11, 66:13, 66:16, 66:21, 66:22, 67:1, 70:21, 71:17, 75:3, 76:8, 76:19, 84:25, 85:15, 85:16, 92:25, 93:3, 101:13, 105:9, 105:11, 106:12, 106:19, 112:7, 112:8, 112:10, 112:13, 112:21, 117:20, 119:7, 121:4
**Department** [1] - 111:21
**department's** [1] - 118:3
**departments** [1] - 32:8
**Deposition** [2] - 3:10, 5:11
**deposition** [7] - 4:5, 6:24, 14:13, 86:17,

108:6, 108:23, 123:10
**DEPOSITION** [1] - 1:11
**depositions** [2] - 93:9, 107:5
**describe** [7] - 6:9, 49:8, 53:23, 59:2, 62:14, 80:6, 97:18
**described** [11] - 31:17, 39:2, 43:22, 43:25, 45:25, 47:5, 55:8, 78:25, 90:10, 94:24, 100:21
**describes** [1] - 41:19
**describing** [3] - 47:20, 64:24, 65:21
**designated** [5] - 5:16, 6:10, 6:12, 7:6, 35:14
**designation** [3] - 21:1, 56:24, 66:25
**desktop** [1] - 89:5
**despite** [1] - 110:20
**destroy** [1] - 82:8
**Detailed** [6] - 29:22, 33:6, 33:11, 34:4, 34:9, 34:17
**detailed** [3] - 33:9, 33:23, 34:15
**details** [1] - 87:9
**determine** [1] - 54:15
**difference** [2] - 33:8, 47:19
**different** [12] - 10:12, 23:22, 43:7, 44:12, 47:3, 63:15, 67:20, 77:15, 87:13, 98:13, 99:13, 99:14
**difficulty** [1] - 4:23
**digital** [1] - 89:2
**DIRECT** [1] - 4:11
**Direct** [1] - 3:4
**directly** [3] - 31:11, 31:12, 32:9
**disburse** [1] - 113:17
**disbursed** [3] - 38:7, 50:1, 115:13
**disbursement** [1] - 49:24
**disbursements** [3] - 26:5, 33:14, 34:7
**discharge** [10] - 54:20, 71:24, 73:25, 76:5, 114:6, 114:13, 117:12, 117:13, 117:14, 117:16
**discharged** [4] - 51:12, 72:3, 76:1, 113:20
**disclose** [2] - 14:3,

95:11
**disclosure** [1] - 80:15
**discovery** [2] - 13:13, 95:22
**Discovery** [1] - 3:12
**discrepancy** [1] - 47:5
**discussing** [2] - 40:21, 111:23
**discussion** [3] - 75:9, 95:12, 117:1
**discussions** [4] - 17:1, 73:24, 86:3, 95:15
**dispute** [3] - 89:25, 92:13, 94:13
**disputed** [2] - 71:15, 89:21
**Disputed** [1] - 3:22
**disputing** [1] - 94:15
**distinction** [1] - 63:15
**DISTRICT** [1] - 1:1
**division** [1] - 11:22
**divorce** [1] - 107:15
**docs** [1] - 3:12
**Document** [1] - 3:19
**document** [26] - 5:5, 5:14, 9:7, 16:2, 17:9, 18:18, 21:15, 22:2, 23:16, 25:20, 28:19, 59:20, 77:12, 79:1, 82:24, 84:20, 89:19, 92:1, 95:2, 95:18, 95:20, 95:25, 102:16, 103:2, 108:5, 108:13
**documentation** [1] - 92:14
**documents** [22] - 13:23, 13:25, 14:7, 14:12, 16:8, 16:10, 18:20, 19:1, 25:3, 25:5, 25:8, 86:6, 91:1, 91:8, 91:12, 91:15, 108:21, 118:2, 118:7, 119:5, 119:14, 120:16
**Documents** [6] - 3:13, 13:15, 13:21, 15:14, 15:20, 16:5
**dollars** [1] - 41:8
**done** [6] - 31:9, 54:13, 66:15, 68:16, 79:12, 114:5
**double** [1] - 110:19
**double-checked** [1] - 110:19
**down** [19] - 20:6, 36:15, 37:10, 37:14, 37:20, 42:8, 57:22,

69:5, 74:12, 83:22, 91:7, 103:10, 103:19, 103:21, 103:25, 107:25, 108:11, 116:23, 118:23
**drive** [2] - 85:18, 85:25
**drives** [1] - 85:13
**Dropbox** [2] - 4:21, 4:23
**due** [16] - 20:13, 36:22, 37:18, 40:9, 40:10, 46:19, 59:15, 68:11, 69:10, 69:21, 72:6, 73:2, 73:12, 75:2, 86:13, 117:16
**duly** [3] - 4:8, 122:8, 123:7
**during** [12] - 23:12, 31:4, 48:12, 61:22, 71:2, 71:10, 79:25, 97:19, 99:6, 101:7, 106:18, 110:3
**duty** [1] - 94:9
**DUVAL** [2] - 122:4, 123:4

**E**

**early** [1] - 115:5
**effect** [2] - 45:17, 48:24
**effective** [6] - 28:2, 35:16, 45:12, 48:22, 102:22, 116:8
**effort** [1] - 82:19
**eight** [6] - 36:3, 36:10, 103:10, 103:19, 103:21, 103:25
**eighth** [2] - 78:7, 102:20
**either** [6] - 79:24, 89:11, 93:8, 95:5, 103:2, 105:24
**email** [7] - 70:12, 71:24, 85:21, 87:1, 87:16, 87:22, 89:8
**emailed** [1] - 58:20
**emails** [18] - 3:20, 70:12, 84:23, 85:9, 85:16, 85:20, 85:23, 86:11, 86:13, 86:23, 86:24, 87:3, 87:14, 87:17, 88:1, 88:13, 88:22, 119:9
**employee** [3] - 94:4, 123:14, 123:15
**employer** [2] - 7:9, 10:1

**employment** [1] - 97:19

**End** [1] - 121:12

**end** [7] - 69:11, 69:22, 73:5, 75:14, 86:17, 93:15, 108:23

**ends** [1] - 57:8

**enhance** [1] - 42:5

**enlarge** [1] - 100:14

**ensure** [3] - 82:3, 102:23, 116:9

**entered** [1] - 114:13

**entire** [2] - 52:10, 73:21

**entity** [9] - 7:15, 8:15, 9:13, 9:18, 9:20, 9:22, 10:10, 10:12, 18:4

**entity's** [1] - 10:19

**entries** [10] - 36:5, 37:2, 39:22, 43:21, 45:25, 46:1, 57:10, 111:18, 111:23, 115:24

**entry** [20] - 36:11, 44:6, 44:14, 47:7, 47:8, 47:14, 47:16, 49:9, 52:13, 56:5, 57:21, 57:24, 59:3, 60:19, 62:11, 65:2, 109:14, 109:23, 116:7

**equated** [1] - 42:7

**Equator** [3] - 101:1, 101:6, 101:14

**escrow** [7] - 26:6, 26:13, 34:7, 37:3, 37:24, 70:17, 75:19

**ESP** [1] - 36:25

**ESQUIRE** [2] - 2:2, 2:7

**essentially** [12] - 20:2, 29:14, 40:1, 58:12, 62:23, 64:5, 65:9, 65:18, 68:3, 68:6, 71:14, 101:17

**establish** [1] - 24:11

**establishing** [1] - 82:6

**estimation** [1] - 107:4

**et** [1] - 1:8

**events** [1] - 72:1

**eventually** [1] - 110:12

**evidently** [1] - 73:22

**exactly** [4] - 6:23, 85:14, 86:6, 107:16

**Examination** [5] - 1:16, 3:4, 3:4, 3:5, 3:5

**EXAMINATION** [4] -

---

4:11, 109:6, 117:25, 121:1

**examined** [1] - 4:9

**exchange** [1] - 113:2

**exhibit** [7] - 27:17, 30:9, 31:14, 36:7, 52:9, 77:1, 114:16

**Exhibit** [125] - 3:8, 5:7, 5:19, 6:9, 8:18, 8:20, 9:5, 9:19, 12:9, 12:10, 12:14, 12:16, 12:19, 13:6, 13:9, 15:7, 15:10, 15:15, 15:22, 17:16, 17:18, 17:22, 18:11, 18:17, 18:19, 19:2, 19:3, 19:4, 19:13, 19:14, 20:8, 20:17, 21:5, 21:14, 21:18, 21:22, 22:3, 23:7, 23:23, 24:15, 24:17, 25:4, 25:18, 27:15, 27:25, 28:5, 28:7, 28:15, 28:18, 30:14, 31:7, 32:25, 33:3, 35:6, 36:4, 36:8, 39:2, 39:10, 39:12, 39:22, 39:25, 40:4, 40:20, 42:18, 43:5, 43:7, 43:9, 43:10, 43:16, 44:14, 45:20, 46:1, 47:6, 47:14, 47:24, 49:7, 50:10, 50:15, 56:3, 56:16, 57:20, 58:25, 60:12, 60:25, 61:2, 61:6, 61:12, 61:14, 62:1, 62:3, 62:10, 64:14, 67:3, 77:15, 77:22, 78:8, 78:20, 84:18, 85:19, 85:22, 86:23, 88:21, 89:17, 90:9, 93:18, 94:25, 100:7, 102:19, 103:10, 103:21, 107:20, 107:24, 109:11, 109:19, 111:15, 116:4, 118:8, 119:16, 120:2, 120:18

**Exhibits** [1] - 28:4

**exhibits** [7] - 4:21, 4:24, 5:3, 24:18, 28:7, 60:20, 77:3

**EXHIBITS** [1] - 3:7

**exist** [2] - 91:18, 92:7

**exists** [1] - 81:22

**expect** [1] - 32:16

**expense** [3] - 52:4, 54:7, 55:17

**expenses** [2] - 52:2, 56:19

---

**experiencing** [1] - 91:2

**explain** [5] - 28:25, 35:9, 35:12, 37:1, 52:20

**explanation** [1] - 38:25

**Export** [1] - 3:16

**export** [9] - 26:18, 27:21, 28:22, 28:24, 30:7, 31:11, 32:2, 32:8, 43:18

**exported** [6] - 20:23, 27:10, 30:11, 30:24, 51:4

**Exported** [1] - 3:20

**exporting** [2] - 31:15, 53:17

**exports** [2] - 24:4, 77:13

**extensive** [1] - 112:25

**extent** [13] - 6:4, 6:21, 7:1, 11:24, 16:11, 30:6, 67:16, 80:14, 82:11, 83:15, 86:2, 95:10, 120:6

**external** [2] - 104:7, 104:13

**extracted** [1] - 37:14

**eye** [1] - 104:14

---

# F

**face** [1] - 95:18

**fact** [22] - 38:6, 68:7, 68:8, 70:2, 70:18, 72:9, 79:13, 82:9, 82:25, 83:5, 85:1, 87:24, 94:1, 95:21, 96:1, 99:2, 99:10, 104:7, 110:2, 110:14, 110:20, 112:20

**failed** [1] - 72:10

**falls** [1] - 52:23

**familiar** [11] - 7:15, 9:14, 29:10, 30:7, 32:3, 49:19, 68:1, 91:20, 94:2, 105:23, 106:2

**Fannie** [1] - 104:9, 104:14

**far** [2] - 61:4, 100:11

**fashion** [1] - 102:10

**February** [12] - 28:3, 28:9, 30:25, 32:13, 43:1, 78:8, 78:12, 90:19, 90:21, 90:24, 105:18, 105:22

**fees** [8] - 26:7, 33:21,

---

34:19, 51:25, 59:13, 59:17, 60:17, 61:24

**Feezer** [20] - 4:13, 5:4, 7:9, 17:18, 35:8, 44:16, 49:5, 57:24, 65:5, 67:5, 67:12, 78:23, 96:17, 100:12, 107:12, 107:16, 107:18, 109:10, 118:21, 119:5

**FEEZER** [3] - 1:11, 3:3, 4:7

**fell** [1] - 74:21

**felt** [1] - 14:9

**few** [1] - 115:24

**field** [1] - 31:21

**fields** [3] - 29:15, 29:20, 43:24

**Fifth** [2] - 3:9, 5:10

**fifths** [1] - 108:10

**figures** [3] - 42:9, 61:17, 69:6

**file** [11] - 22:14, 24:21, 49:24, 59:12, 63:19, 66:13, 69:13, 70:1, 70:25, 74:11, 74:15

**filed** [23] - 19:6, 50:8, 50:12, 50:19, 50:25, 51:14, 51:18, 55:1, 56:6, 57:15, 57:18, 63:22, 64:9, 69:10, 69:21, 72:13, 74:16, 98:6, 102:4, 102:5, 117:20, 118:15

**files** [1] - 26:2

**filing** [4] - 62:17, 64:20, 80:7, 110:4

**fill** [1] - 52:17

**Final** [23] - 49:18, 49:20, 49:21, 49:25, 50:19, 51:14, 54:2, 54:4, 54:22, 55:1, 55:10, 55:24, 57:16, 57:17, 63:23, 64:3, 64:8, 64:18, 65:16, 72:6, 118:15, 119:12, 121:7

**final** [2] - 49:24, 112:23

**finally** [2] - 114:7, 117:1

**Financial** [13] - 7:10, 7:13, 10:2, 10:4, 10:7, 10:21, 10:22, 11:1, 11:6, 11:8, 11:22, 12:4, 92:21

**financial** [4] - 35:17, 35:18, 35:19, 45:13

**financially** [1] -

---

123:17

**findings** [1] - 93:4

**fine** [2] - 35:2, 60:4

**FINNER** [81] - 2:2, 4:12, 4:19, 5:1, 6:7, 6:15, 7:5, 7:14, 8:17, 11:13, 12:5, 12:13, 13:5, 14:24, 15:6, 16:1, 17:2, 21:13, 22:3, 23:5, 23:20, 24:16, 25:13, 25:17, 28:14, 30:13, 34:24, 35:4, 35:5, 38:24, 39:6, 39:8, 41:17, 45:16, 47:13, 49:4, 50:15, 50:17, 53:21, 53:22, 56:1, 57:12, 62:9, 67:10, 67:21, 67:22, 76:25, 77:8, 77:9, 78:15, 78:20, 78:22, 84:17, 85:8, 86:10, 86:21, 88:7, 91:3, 91:16, 96:7, 96:15, 96:21, 96:23, 97:17, 99:5, 100:6, 105:16, 107:23, 108:9, 108:19, 111:4, 113:24, 116:16, 117:9, 117:24, 118:1, 118:20, 119:3, 119:24, 120:22, 120:25

**Finner** [7] - 2:3, 3:4, 3:5, 4:15, 12:12, 109:14, 111:24

**First** [2] - 13:14, 13:20

**first** [38] - 4:8, 9:25, 11:6, 14:1, 18:20, 20:12, 20:16, 20:17, 23:9, 23:10, 23:14, 27:24, 36:3, 36:10, 36:13, 44:14, 47:7, 47:14, 47:15, 49:9, 53:2, 57:4, 57:7, 59:3, 62:11, 67:11, 69:12, 78:8, 86:25, 100:9, 100:17, 102:20, 102:21, 103:1, 103:25, 107:13, 109:19, 122:8

**FIRST** [1] - 1:20

**five** [5] - 19:1, 57:10, 81:12, 109:3, 109:8

**flag** [4] - 98:5, 98:20, 98:24, 99:2

**flags** [1] - 82:10

**Fletcher** [10] - 1:4, 1:5, 19:6, 71:3, 71:12, 72:10, 74:18, 110:3,

110:14, 113:2
**fletcher's** [1] - 116:15
**Fletcher's** [29] - 13:20, 22:15, 25:1, 25:14, 25:16, 27:4, 27:8, 28:9, 30:22, 36:5, 36:12, 50:8, 55:2, 55:9, 67:13, 69:14, 71:11, 74:3, 80:9, 82:2, 83:23, 85:24, 86:12, 87:4, 95:23, 118:4, 119:15, 120:1, 120:17
**flip** [1] - 52:15
**FLORIDA** [3] - 1:21, 122:3, 123:3
**Florida** [1] - 123:8
**flow** [11] - 58:8, 62:16, 62:23, 64:6, 65:10, 65:16, 65:18, 66:11, 66:19, 83:13, 111:19
**flows** [2] - 65:14, 68:2
**focus** [1] - 71:6
**follow** [5] - 102:2, 102:3, 102:4, 117:24, 120:24
**follow-up** [3] - 102:2, 117:24, 120:24
**followed** [1] - 64:7
**following** [3] - 97:7, 98:8, 98:16
**follows** [1] - 4:10
**FOR** [1] - 1:1
**forbearance** [1] - 69:24
**foregoing** [1] - 123:10
**form** [39] - 5:20, 11:23, 12:22, 15:2, 15:24, 21:7, 21:25, 22:8, 23:11, 23:15, 23:17, 23:24, 28:11, 30:4, 34:12, 39:4, 47:10, 51:1, 55:11, 56:10, 60:23, 62:4, 83:25, 86:1, 87:6, 97:14, 98:15, 99:8, 99:19, 99:21, 102:10, 105:5, 111:4, 113:24, 116:16, 117:9, 119:18, 120:4, 120:19
**format** [10] - 29:5, 29:18, 30:8, 31:4, 31:13, 31:16, 32:3, 32:11, 81:16
**formats** [1] - 99:14
**formatted** [2] - 30:9,

98:13
**forth** [4] - 24:11, 61:25, 88:3, 113:10
**forward** [8] - 4:20, 20:14, 35:17, 36:2, 46:18, 58:24, 60:11, 85:1
**forwarded** [1] - 24:13
**four** [6] - 36:18, 72:19, 73:11, 86:25, 108:10, 116:2
**FRANCIS** [1] - 2:7
**Frank** [3] - 4:19, 96:22, 108:25
**Freddie** [2] - 104:9, 104:15
**Freedman** [1] - 64:21
**front** [1] - 18:14
**froze** [3] - 38:19, 54:24, 103:7
**full** [5] - 30:18, 76:16, 114:5, 118:8, 119:10
**fully** [1] - 19:23
**function** [1] - 11:11
**funds** [12] - 41:15, 50:1, 50:3, 50:4, 51:22, 52:3, 55:16, 56:19, 57:23, 109:15, 114:10, 115:18
**FURTHER** [2] - 117:25, 121:1

## G

**gain** [2] - 98:11, 118:10
**gap** [4] - 72:25, 74:24, 86:23, 87:22
**gate** [1] - 46:19
**general** [3] - 44:21, 53:23, 63:2
**generally** [3] - 29:3, 32:21, 52:11
**generate** [1] - 29:1
**generated** [7] - 21:15, 21:19, 21:23, 22:5, 22:11, 28:25, 52:9
**GINA** [3] - 1:11, 3:3, 4:7
**Gina** [3] - 107:11, 107:14, 108:2
**given** [2] - 61:13, 123:12
**Gonzales** [2] - 105:21, 105:23
**goodbye** [1] - 45:4
**group** [2] - 92:23,

112:2
**GSE** [1] - 104:8
**guess** [6] - 36:24, 73:21, 79:7, 88:15, 110:4, 119:21
**guidelines** [2] - 104:10, 104:15
**guise** [1] - 104:14
**guys** [1] - 77:4

## H

**hand** [2] - 102:22, 122:10
**handing** [1] - 65:19
**handle** [6] - 47:21, 63:3, 66:7, 66:23, 92:13, 95:8
**handled** [6] - 62:25, 66:20, 112:13
**handling** [3] - 63:12, 88:6, 112:14
**head** [1] - 18:10
**headed** [1] - 108:11
**header** [1] - 103:20
**headers** [1] - 53:15
**hear** [2] - 36:7, 47:12
**heard** [5] - 53:18, 54:23, 90:5, 91:4, 104:22
**held** [1] - 29:14
**hello/goodbye** [2] - 45:5, 46:15
**help** [1] - 76:17
**helping** [1] - 70:8
**hence** [1] - 111:19
**hereby** [2] - 122:6, 123:8
**hired** [1] - 107:13
**histories** [7] - 19:15, 58:19, 58:21, 60:21, 79:23, 84:7, 115:1
**History** [9] - 3:14, 3:17, 3:18, 29:22, 33:6, 33:11, 34:4, 34:10, 34:18
**history** [70] - 3:15, 17:23, 18:24, 19:5, 19:9, 19:17, 19:19, 19:24, 20:4, 20:7, 20:21, 20:23, 22:21, 23:4, 24:9, 24:14, 25:24, 26:1, 26:3, 26:20, 27:22, 28:8, 28:17, 28:23, 29:22, 30:18, 30:24, 31:3, 31:12, 32:6, 32:9, 32:15, 33:10, 33:12, 33:16, 33:17, 33:20, 34:11, 34:16, 37:15,

38:12, 38:16, 41:13, 42:2, 42:12, 42:13, 44:3, 47:22, 48:8, 48:21, 58:7, 58:13, 58:23, 60:13, 62:8, 68:19, 73:20, 73:21, 83:14, 83:19, 84:12, 89:5, 93:10, 110:9, 111:7, 111:13, 115:6, 115:24, 116:23
**holding** [1] - 70:3
**honest** [2] - 14:6, 86:4
**hopes** [1] - 9:3
**hours** [2] - 68:14, 68:15
**house** [1] - 7:25
**housed** [1] - 102:13
**Houston** [2] - 67:2, 111:21
**hundred** [3] - 107:1, 107:8, 107:9

## I

**ID** [4] - 59:24, 60:1, 78:10
**IDBLC** [1] - 78:9
**identification** [1] - 86:12
**identified** [14] - 60:9, 61:12, 62:13, 71:18, 89:25, 95:6, 96:4, 98:4, 98:18, 98:19, 99:24, 104:24, 113:6, 116:1
**identifies** [1] - 9:20
**identify** [8] - 6:8, 42:19, 56:7, 60:19, 90:14, 92:5, 98:22, 105:9
**identifying** [2] - 105:8, 105:14
**identity** [1] - 59:21
**image** [10] - 14:16, 21:19, 22:4, 22:13, 22:23, 23:21, 23:22, 24:1, 89:12
**imaged** [1] - 23:16
**images** [14] - 14:17, 23:8, 24:19, 24:25, 25:13, 25:15, 79:16, 81:9, 88:9, 88:22, 88:23, 89:2, 89:9, 89:10
**imaging** [4] - 22:14, 23:3, 81:11, 84:10
**implemented** [3] - 60:14, 60:15, 100:21
**IN** [1] - 1:1

**in-house** [1] - 7:25
**inaudible** [1] - 69:3
**include** [1] - 88:9
**included** [2] - 38:17, 118:8
**including** [1] - 103:20
**inclusive** [2] - 87:20, 113:1
**incorporate** [3] - 42:11, 68:18, 69:25
**incorporated** [6] - 28:2, 55:9, 62:6, 80:20, 80:23, 89:13
**incorporating** [1] - 38:15
**increase** [1] - 45:20
**independent** [2] - 12:24, 41:23
**indicate** [5] - 32:17, 50:12, 50:18, 67:6, 104:5
**indicated** [3] - 36:22, 38:4, 112:2
**indicates** [3] - 30:15, 45:4, 95:18
**indicating** [1] - 66:1
**indication** [4] - 20:19, 62:2, 64:16, 116:13
**indirect** [1] - 10:6
**individual** [2] - 103:3, 103:13
**indulgence** [1] - 5:3
**info** [1] - 3:19
**information** [81] - 6:4, 7:1, 16:12, 16:18, 21:4, 24:4, 29:8, 29:15, 29:17, 30:14, 31:6, 31:23, 32:13, 32:16, 33:15, 33:23, 33:24, 34:6, 34:10, 34:17, 34:18, 35:15, 35:18, 35:19, 36:14, 36:15, 36:17, 37:1, 39:1, 41:18, 44:21, 44:24, 45:6, 45:11, 45:14, 45:24, 48:2, 51:8, 52:7, 52:14, 52:17, 52:23, 53:10, 57:18, 62:14, 63:22, 63:25, 65:7, 71:9, 81:12, 82:20, 82:23, 83:10, 83:18, 83:22, 84:3, 84:7, 84:16, 88:12, 89:15, 89:16, 94:3, 95:11, 96:3, 96:6, 97:12, 98:2, 98:12, 98:13, 99:20, 99:23, 102:8, 102:12,

102:21, 104:20, 104:25, 105:2, 105:13, 120:7
**information's** [1] - 53:14
**ingrained** [1] - 101:15
**initial** [2] - 36:13, 45:19
**initiated** [1] - 56:8
**inquiry** [1] - 92:17
**inserted** [1] - 58:17
**inside** [1] - 115:18
**instance** [4] - 44:7, 46:13, 48:13, 63:24
**instead** [1] - 56:23
**instruct** [1] - 7:23
**instructed** [1] - 7:21
**instructing** [1] - 6:15
**intended** [1] - 116:25
**interest** [5] - 38:1, 38:9, 40:8, 41:4, 71:5
**interested** [1] - 123:17
**interim** [5] - 39:16, 51:6, 53:3, 54:4, 55:15
**internal** [1] - 104:11
**internally** [1] - 32:23
**internet** [1] - 9:4
**investor** [1] - 76:22
**invoices** [1] - 61:8
**involved** [11] - 15:3, 16:16, 76:23, 86:5, 90:25, 91:8, 93:24, 105:2, 105:9, 105:10, 105:15
**involvement** [1] - 13:19
**involves** [2] - 16:18, 93:7
**isolate** [1] - 46:21
**issue** [8] - 69:10, 89:22, 94:14, 94:15, 96:4, 104:19, 104:21, 104:23
**issued** [1] - 105:4
**issues** [4] - 69:21, 73:23, 91:2, 94:24
**IT** [2] - 85:14, 85:16
**item** [1] - 48:24
**Items** [1] - 3:22
**items** [1] - 89:21
**itself** [2] - 80:12, 80:17

## J

**JACKSONVILLE** [1] - 1:21

---

**January** [1] - 90:16
**job** [5] - 92:20, 94:8, 103:3, 103:13, 106:9
**Johnson** [3] - 107:14, 107:19, 108:3
**joint** [1] - 45:5
**jpeg** [1] - 89:12
**July** [1] - 80:5
**jumped** [1] - 73:7
**juncture** [1] - 79:6
**June** [11] - 3:17, 23:13, 27:5, 27:8, 27:22, 46:25, 47:9, 47:17, 48:1, 73:8, 79:21
**justification** [1] - 53:19

## K

**keep** [3] - 31:20, 68:23, 81:6
**keeping** [2] - 27:3, 74:21
**keeps** [1] - 68:24
**Kelly** [2] - 105:21, 105:23
**kept** [2] - 82:15, 109:2
**kicked** [1] - 112:16
**kind** [9] - 35:11, 42:5, 67:24, 68:3, 70:21, 71:24, 71:25, 74:21, 88:2
**Knight** [3] - 27:14, 30:23, 77:24
**knowledge** [4] - 12:25, 16:25, 17:8, 92:9
**known** [1] - 7:15
**knows** [1] - 6:17

## L

**label** [1] - 20:22
**large** [3] - 72:10, 85:3, 87:16
**large-trailing** [1] - 87:16
**last** [6] - 43:18, 87:1, 91:4, 91:5, 113:17, 114:7
**late** [9] - 33:21, 34:20, 37:6, 37:8, 37:9, 37:21, 40:15, 40:19, 40:21
**late-charge** [1] - 34:20
**law** [2] - 92:25, 93:3
**laws** [1] - 99:12

---

**lawsuit** [4] - 7:19, 7:22, 82:2, 82:4
**leading** [2] - 70:12, 71:2
**leads** [1] - 75:10
**Leah** [1] - 64:21
**learned** [2] - 95:11, 95:24
**leave** [3] - 46:8, 48:4, 77:5
**ledger** [3] - 39:19, 115:8, 115:12
**left** [3] - 100:11, 102:22, 115:4
**left-hand** [1] - 102:22
**legal** [8] - 9:13, 11:24, 13:2, 14:9, 14:19, 16:24, 17:7, 17:9
**legally** [1] - 8:10
**letter** [6] - 45:4, 45:5, 45:8, 46:15, 99:14, 99:25
**letters** [1] - 100:4
**letting** [1] - 52:21
**level** [5] - 91:12, 91:25, 92:12, 92:13, 93:11
**lien** [2] - 91:24, 91:25
**lien-level** [1] - 91:25
**likely** [2] - 31:2, 32:14
**line** [19] - 20:17, 36:15, 53:7, 59:3, 62:18, 87:12, 87:13, 100:10, 102:20, 103:15, 104:2, 104:3, 104:18, 104:25, 105:1, 105:8, 108:4, 108:8, 113:10
**lines** [7] - 36:24, 37:10, 103:10, 103:19, 103:20, 103:21, 103:25
**list** [1] - 86:18
**listed** [7] - 22:20, 39:21, 40:23, 41:10, 59:10, 61:16, 78:5
**lists** [1] - 57:7
**litigated** [1] - 93:2
**litigation** [6] - 16:19, 82:10, 82:12, 82:20, 94:2
**LLC** [6] - 7:16, 7:19, 7:21, 9:17, 11:11, 11:18
**LLC's** [1] - 15:18
**LLP** [1] - 2:8
**LM** [4] - 65:22, 65:23, 66:25, 111:20

---

**load** [1] - 9:3
**Loan** [30] - 3:16, 3:19, 7:16, 7:18, 7:21, 8:4, 8:5, 8:6, 8:9, 8:16, 9:16, 9:17, 10:8, 11:11, 11:18, 11:20, 14:23, 15:18, 22:17, 23:2, 26:3, 26:14, 29:24, 31:5, 43:19, 81:10, 92:22, 106:21, 120:14
**loan** [117] - 18:6, 20:17, 20:25, 22:15, 22:16, 24:6, 24:20, 25:1, 25:14, 25:16, 26:7, 26:10, 26:11, 26:16, 26:23, 27:4, 27:8, 27:9, 27:22, 28:9, 28:23, 30:22, 31:22, 35:9, 35:12, 35:13, 35:22, 35:23, 36:6, 36:12, 37:5, 39:15, 44:1, 44:4, 44:15, 44:24, 45:2, 45:9, 46:1, 46:7, 47:15, 47:25, 48:3, 54:8, 55:9, 58:16, 58:17, 59:14, 59:18, 59:19, 60:18, 62:20, 66:2, 67:13, 67:14, 68:13, 68:17, 69:4, 69:16, 73:21, 74:3, 74:14, 76:5, 76:21, 77:14, 78:2, 78:3, 79:11, 79:17, 79:25, 80:9, 80:20, 80:21, 82:7, 82:8, 82:11, 82:13, 82:15, 82:16, 83:7, 83:23, 84:13, 89:6, 91:12, 92:12, 92:13, 93:10, 93:11, 94:20, 95:23, 96:25, 98:4, 98:7, 98:19, 98:22, 99:2, 99:12, 99:24, 108:2, 111:22, 112:11, 113:14, 114:21, 115:11, 116:1, 116:13, 116:15, 117:2, 117:3, 117:4, 117:8, 117:14, 118:4, 120:1, 120:17, 121:4
**loan-level** [2] - 92:13, 93:11
**loans** [2] - 95:8, 97:21
**Loans** [1] - 33:7
**locate** [2] - 57:23, 109:15
**located** [1] - 58:14

---

**location** [1] - 58:20
**log** [24] - 42:3, 42:5, 42:14, 42:20, 42:25, 43:17, 44:6, 44:13, 49:7, 53:14, 60:22, 62:7, 77:20, 83:8, 83:11, 87:25, 88:1, 88:5, 88:10, 88:18, 89:1, 94:12, 94:17, 120:14
**Log** [1] - 3:19
**Logan** [1] - 2:8
**logs** [3] - 77:19, 81:15, 84:8
**Lolita** [9] - 3:21, 68:7, 75:22, 76:7, 76:8, 76:14, 84:23, 112:17, 114:17
**look** [27] - 20:16, 25:4, 25:19, 27:15, 32:11, 33:1, 39:13, 40:4, 52:11, 54:10, 55:23, 60:25, 61:20, 79:3, 87:12, 87:24, 94:18, 103:8, 104:18, 104:23, 108:17, 109:18, 114:15, 115:1, 115:7, 116:4, 118:11
**looked** [2] - 60:20, 89:4
**looking** [17] - 12:8, 24:21, 28:4, 32:1, 45:20, 47:6, 47:23, 52:18, 52:19, 52:20, 52:25, 76:6, 78:7, 79:7, 89:3, 90:9, 115:6
**looks** [16] - 17:24, 30:19, 32:3, 42:22, 43:1, 49:15, 51:2, 52:10, 58:14, 66:24, 90:12, 100:9, 104:8, 104:15, 104:17, 110:6
**loss** [2] - 65:23, 67:1
**lost** [1] - 104:22
**low** [1] - 71:5

## M

**magnify** [1] - 90:13
**maiden** [1] - 107:15
**main** [6] - 19:23, 20:3, 20:7, 24:8, 33:12, 68:19
**maintained** [1] - 30:2
**maintains** [2] - 97:11, 97:20
**managed** [1] - 106:19

management [6] - 89:24, 90:4, 91:9, 91:22, 92:3
manager [5] - 60:9, 76:18, 105:11, 106:11, 106:18
manner [9] - 19:20, 19:21, 20:15, 31:20, 38:13, 39:14, 44:1, 61:20, 115:2
manually [1] - 83:20
married [1] - 107:14
Maryland [1] - 2:4
MARYLAND [1] - 1:1
matter [4] - 4:16, 29:3, 70:5, 87:17
matters [2] - 93:3, 93:12
Matthew [2] - 105:17, 105:19
mean [24] - 12:6, 19:18, 20:20, 21:10, 21:11, 29:9, 34:9, 52:6, 62:19, 64:14, 67:23, 72:7, 74:3, 81:1, 83:3, 84:15, 90:2, 93:17, 95:1, 97:23, 98:9, 110:12, 119:8
meaning [2] - 69:11, 69:22
means [3] - 35:9, 35:12, 35:13
meant [1] - 67:13
mechanism [1] - 101:18
mentioned [1] - 4:9
merged [3] - 8:6, 9:16, 11:18
Merger [1] - 15:17
merger [5] - 11:12, 11:20, 97:4, 97:7, 97:10
method [3] - 29:2, 29:11, 31:10
Michael [6] - 3:21, 70:7, 71:3, 75:22, 84:24, 112:17
Michelle [3] - 76:7, 76:12, 76:13
middle [5] - 36:19, 40:14, 56:17, 61:8, 103:7
might [1] - 90:13
milestones [1] - 101:22
Millner [3] - 3:21, 84:23, 114:17
Milner [5] - 68:7, 75:22, 76:7, 76:8,

112:17
mind [2] - 10:18, 108:24
mine [1] - 100:16
minutes [4] - 34:25, 35:2, 77:6, 109:3
misapplication [2] - 104:20, 105:3
misapplied [1] - 52:2
miscellaneous [2] - 40:23, 41:7
mischaracterizes [1] - 11:4
missing [2] - 19:16, 19:18
mistaken [1] - 79:5
mitigation [2] - 65:24, 67:1
model [2] - 83:2, 83:4
modification [9] - 70:10, 71:4, 71:9, 76:21, 79:10, 79:12, 80:1, 82:25, 83:7
modify [1] - 15:21
module [8] - 34:19, 34:20, 68:25, 69:24, 79:5, 117:3, 117:4, 117:8
mom [1] - 73:23
money [3] - 40:25, 41:4, 52:1
month [3] - 49:1, 49:2, 74:5
monthly [2] - 72:20, 74:22
months [3] - 71:23, 75:1, 75:2
morning [3] - 4:13, 4:14, 4:17
Mortgage [11] - 8:7, 9:16, 9:20, 10:4, 10:9, 10:11, 10:12, 10:16, 10:19, 10:20, 11:2
mortgage [1] - 10:9
Motion [10] - 69:10, 69:13, 69:21, 70:2, 72:12, 74:11, 74:15, 74:16, 101:25, 102:10
move [2] - 70:4, 76:25
moving [4] - 20:13, 36:2, 60:17, 85:1
moving-forward [1] - 36:2
MR [154] - 4:12, 4:19, 4:22, 5:1, 5:20, 6:7, 6:11, 6:15, 6:17, 7:5, 7:11, 7:14, 7:23, 8:17, 11:3, 11:13, 11:23,

12:5, 12:11, 12:13, 12:22, 13:5, 14:3, 14:24, 15:2, 15:6, 15:24, 16:1, 16:11, 17:2, 21:7, 21:13, 21:25, 22:3, 22:8, 22:22, 23:5, 23:17, 23:20, 23:24, 24:16, 25:2, 25:13, 25:15, 25:17, 28:11, 28:14, 30:4, 30:13, 34:12, 34:24, 35:2, 35:4, 35:5, 38:19, 38:24, 39:4, 39:6, 39:8, 40:18, 41:17, 44:20, 44:22, 45:16, 47:10, 47:13, 48:15, 49:4, 50:14, 50:15, 50:17, 53:18, 53:21, 53:22, 55:11, 56:1, 56:10, 57:6, 57:12, 60:23, 62:4, 62:9, 67:7, 67:10, 67:16, 67:21, 67:22, 76:25, 77:8, 77:9, 78:14, 78:15, 78:18, 78:20, 78:21, 78:22, 80:13, 82:5, 82:22, 83:25, 84:17, 84:21, 85:8, 86:1, 86:10, 86:15, 86:21, 87:6, 88:7, 91:3, 91:16, 95:10, 96:7, 96:12, 96:15, 96:21, 96:23, 97:14, 97:17, 98:15, 99:5, 99:8, 100:6, 105:5, 105:16, 107:21, 107:23, 108:4, 108:9, 108:19, 109:1, 109:7, 111:4, 111:9, 113:24, 114:14, 116:16, 116:18, 117:9, 117:22, 117:24, 118:1, 118:18, 118:20, 119:3, 119:18, 119:24, 120:4, 120:19, 120:22, 120:23, 120:25, 121:2, 121:9
MSP [4] - 27:14, 77:20, 80:22, 81:2
multi [1] - 3:12
Multi [1] - 3:19
multi-docs [1] - 3:12
Multi-page [1] - 3:19
multiple [1] - 13:13
municipalities [1] - 100:4
mute [1] - 80:13

## N

name [16] - 4:15, 7:8, 9:22, 10:1, 10:19, 26:25, 27:12, 59:25, 90:1, 90:4, 92:23, 103:2, 103:12, 107:11, 107:14, 107:15
named [5] - 6:3, 8:11, 8:15
National [1] - 1:7
nature [12] - 26:6, 29:23, 32:24, 34:3, 34:8, 75:10, 87:18, 99:15, 100:5, 102:11, 104:11, 112:15
necessarily [11] - 32:19, 46:11, 63:10, 81:1, 81:5, 81:24, 83:3, 93:13, 101:4, 105:13, 109:2
necessary [2] - 12:20, 112:19
need [8] - 48:9, 54:9, 58:4, 59:8, 59:18, 65:10, 94:9, 100:14
needed [7] - 14:10, 46:16, 56:19, 66:3, 68:18, 70:4, 93:22
needless [1] - 75:25
needs [1] - 100:5
negative [2] - 37:23, 70:16
negatives [1] - 36:18
negotiation [1] - 75:15
negotiations [2] - 71:10, 71:22
net [2] - 75:15, 75:25
network [2] - 85:13, 85:18
never [2] - 73:7, 114:11
new [3] - 81:3, 84:10, 99:21
next [11] - 36:14, 51:19, 51:20, 54:18, 55:5, 62:18, 64:12, 64:13, 65:12, 68:12, 76:15
nine [1] - 103:20
ninth [1] - 100:10
NLB [1] - 36:25
NOFCX [1] - 62:13
non [1] - 102:21
non-redacted [1] - 102:21
normal [1] - 63:18
North [1] - 2:9

Notary [1] - 123:7
notation [4] - 23:12, 26:4, 37:3, 62:6
notations [1] - 13:16
note [4] - 44:3, 61:14, 77:25, 110:11
noted [10] - 24:7, 44:5, 44:8, 44:10, 50:24, 67:25, 82:12, 83:7, 83:10, 117:18
notes [10] - 24:2, 32:17, 43:19, 43:22, 44:11, 44:19, 50:21, 78:4, 78:5, 109:24
nothing [1] - 94:8, 117:22
notice [11] - 6:25, 50:3, 50:7, 50:12, 50:25, 59:12, 66:12, 66:13, 66:20, 70:25, 108:6
Notice [26] - 3:9, 5:10, 49:18, 49:19, 49:21, 49:25, 50:19, 51:14, 54:2, 54:3, 54:22, 55:1, 55:10, 55:24, 57:16, 57:17, 62:17, 63:23, 64:3, 64:8, 64:18, 65:16, 72:6, 118:15, 119:11, 121:6
noting [1] - 40:9
NOTS [2] - 77:21, 78:1
November [6] - 1:12, 5:22, 90:12, 91:18, 122:11, 123:19
Number [78] - 9:19, 12:9, 12:10, 12:14, 12:16, 12:20, 13:6, 13:9, 15:8, 15:10, 15:16, 15:22, 17:16, 17:18, 17:22, 18:12, 18:17, 18:19, 19:2, 19:3, 19:13, 19:14, 20:17, 21:5, 21:14, 21:18, 21:22, 22:4, 23:7, 23:8, 23:23, 24:15, 24:17, 25:4, 25:18, 27:15, 27:25, 28:5, 28:7, 28:15, 30:15, 31:7, 32:25, 35:6, 36:4, 39:2, 39:11, 39:25, 40:5, 40:20, 42:18, 43:5, 43:10, 44:14, 45:21, 46:1, 47:6, 47:14, 47:24, 49:7, 50:11, 50:15, 56:3, 77:10, 84:18, 85:19, 85:22,

86:23, 88:21, 89:17, 90:10, 94:25, 100:8, 102:19, 109:19, 118:8, 120:2, 120:18
**number** [23] - 22:15, 27:17, 36:7, 43:6, 43:7, 45:2, 45:3, 45:8, 52:16, 56:22, 56:24, 57:2, 61:2, 72:10, 78:2, 78:3, 79:17, 88:22, 94:4, 94:20, 104:19, 112:22
**numbered** [3] - 5:18, 6:8, 12:9
**numbers** [9] - 41:20, 42:20, 43:4, 68:22, 75:6, 76:24, 83:9, 83:17
**nutshell** [1] - 75:13

## O

**Oakland** [1] - 2:4
**OATH** [1] - 122:1
**object** [4] - 15:2, 67:16, 86:2, 108:4
**objected** [2] - 5:21, 6:13
**objecting** [1] - 80:14
**objection** [9] - 5:20, 5:25, 11:3, 16:11, 47:10, 82:5, 82:22, 95:10, 96:12
**Objection** [30] - 11:23, 12:22, 15:24, 21:7, 21:25, 22:8, 23:17, 23:24, 28:11, 30:4, 34:12, 39:4, 55:11, 56:10, 60:23, 62:4, 83:25, 86:1, 87:6, 97:14, 98:15, 99:8, 105:5, 111:4, 113:24, 116:16, 117:9, 119:18, 120:4, 120:19
**objections** [4] - 6:14, 6:18, 6:22, 13:15
**observation** [1] - 103:4
**obtain** [5] - 41:12, 45:10, 91:10, 91:21, 93:22
**obtainable** [1] - 84:16
**obtained** [4] - 86:5, 89:11, 91:13, 92:2
**obtaining** [4] - 81:15, 89:15, 90:25, 91:8
**obviously** [3] - 70:16, 88:14, 111:11

**October** [1] - 96:9
**Ocwen** [96] - 5:21, 6:10, 7:13, 7:16, 7:18, 7:21, 8:4, 8:5, 8:6, 8:8, 8:15, 9:15, 9:17, 10:2, 10:3, 10:6, 10:8, 10:20, 10:22, 11:1, 11:6, 11:8, 11:11, 11:17, 11:20, 11:22, 12:4, 14:23, 15:18, 18:7, 19:25, 22:12, 22:17, 23:2, 26:3, 26:14, 28:23, 29:24, 31:5, 31:10, 33:7, 35:21, 35:24, 36:20, 37:13, 38:2, 38:4, 38:5, 38:10, 38:14, 38:22, 40:6, 40:10, 40:16, 43:19, 45:8, 46:7, 46:17, 46:18, 46:23, 48:9, 48:17, 59:9, 68:23, 68:24, 69:4, 74:8, 74:9, 74:14, 79:18, 80:7, 81:10, 82:1, 82:19, 82:24, 90:23, 92:20, 94:4, 95:5, 96:8, 96:25, 97:1, 102:22, 103:11, 103:22, 106:10, 107:13, 112:10, 114:25, 115:3, 115:21, 115:25, 116:7, 119:13, 120:14
**Ocwen's** [15] - 25:23, 26:15, 37:2, 41:18, 42:24, 45:24, 77:18, 79:11, 80:22, 83:3, 83:6, 84:13, 85:16, 87:24, 108:1
**OF** [7] - 1:1, 1:11, 122:1, 122:3, 122:4, 123:3, 123:4
**office** [2] - 67:2, 106:3
**official** [1] - 122:10
**officially** [1] - 35:21
**once** [14] - 19:6, 20:5, 20:22, 26:20, 35:21, 41:12, 49:23, 54:3, 54:13, 55:13, 74:16, 113:19, 115:21
**One** [1] - 2:8
**one** [21] - 18:20, 26:2, 28:7, 29:12, 45:4, 49:1, 53:2, 53:25, 71:2, 71:19, 86:18, 87:15, 89:20, 101:12, 102:4, 117:24, 118:12,

118:18, 119:2, 120:23
**ones** [1] - 6:18
**ongoing** [4] - 18:1, 18:2, 20:8, 20:15
**online** [1] - 88:21
**open** [24] - 5:4, 8:18, 9:5, 13:6, 15:7, 17:15, 18:11, 25:18, 27:15, 28:18, 32:25, 43:10, 45:1, 45:10, 46:20, 77:2, 77:10, 77:11, 84:18, 84:19, 89:17, 107:20, 109:2, 109:20
**opened** [4] - 48:17, 48:19, 48:20, 98:23
**opening** [2] - 35:18, 51:4
**operating** [2] - 81:7, 88:16
**operational** [1] - 98:25
**operations** [2] - 62:21, 95:6
**opposed** [8] - 10:15, 46:17, 48:23, 53:16, 53:20, 69:2, 70:24, 107:18
**Order** [4] - 70:1, 72:16, 72:18, 73:17
**order** [27] - 12:25, 20:5, 29:16, 33:19, 37:13, 42:9, 45:9, 47:20, 48:5, 49:25, 51:22, 58:22, 59:12, 60:11, 65:13, 69:1, 70:14, 70:20, 74:10, 74:18, 76:2, 76:21, 78:2, 92:3, 92:17, 112:18, 113:12
**original** [1] - 101:13
**otherwise** [2] - 8:2, 10:18
**outcome** [2] - 71:14, 110:23
**outlined** [1] - 88:5
**outlining** [1] - 59:16
**Outlook** [2] - 88:13, 88:15
**outside** [6] - 8:1, 17:1, 93:5, 101:8, 101:18, 119:8
**outstanding** [1] - 41:4
**overview** [2] - 71:25, 75:13
**owed** [2] - 40:2, 40:6
**own** [3] - 10:20, 10:22, 115:12
**ownership** [1] - 11:7
**owns** [1] - 11:1

## P

**P.C** [1] - 2:3
**p.m** [1] - 1:13
**P.O** [1] - 2:4
**package** [1] - 101:4
**Page** [2] - 3:2, 3:8
**page** [84] - 3:19, 18:20, 20:16, 23:9, 23:10, 23:14, 23:21, 24:7, 24:13, 27:24, 28:5, 28:7, 28:15, 39:2, 39:10, 39:12, 39:25, 40:14, 40:20, 43:6, 43:7, 43:8, 47:15, 49:6, 49:9, 50:10, 50:14, 50:15, 51:19, 52:15, 53:1, 53:2, 53:5, 56:4, 56:6, 56:15, 56:18, 57:20, 57:22, 58:2, 58:25, 59:3, 61:3, 61:9, 61:12, 61:14, 62:1, 62:10, 64:12, 64:13, 64:14, 65:1, 67:3, 67:7, 67:12, 76:15, 78:8, 78:14, 78:16, 78:20, 87:1, 90:14, 90:18, 100:7, 102:18, 103:10, 103:19, 103:20, 104:16, 104:17, 107:24, 108:8, 108:10, 109:11, 109:19, 111:15, 114:15, 116:5, 118:13
**pages** [15] - 18:16, 18:21, 19:2, 23:23, 24:3, 24:18, 52:8, 56:12, 58:24, 85:19, 85:22, 86:25, 90:11, 90:18
**painstakingly** [1] - 71:17
**Palm** [1] - 106:4
**paragraph** [1] - 108:11
**paragraphs** [3] - 5:19, 6:8, 12:9
**parent** [2] - 10:24, 10:25
**part** [10] - 25:6, 32:20, 50:22, 59:14, 60:7, 65:10, 65:15, 103:8, 104:22, 111:12
**particular** [16] - 9:13, 18:4, 31:22, 32:14, 45:7, 48:13, 63:21, 63:24, 83:1, 90:1, 94:2, 95:1, 95:3,

95:25, 105:7, 110:24
**parties** [2] - 4:3, 123:15
**parties'** [1] - 123:16
**party** [3] - 8:9, 8:11, 81:21
**past** [2] - 73:12, 75:2
**paste** [1] - 31:3
**pasted** [3] - 88:11, 88:18, 89:7
**path** [4] - 58:13, 58:16, 58:19, 58:22
**patience** [1] - 5:2
**Patrick** [2] - 105:25, 106:2
**pause** [1] - 56:11
**pay** [1] - 20:6
**payment** [50] - 17:23, 25:23, 25:25, 29:21, 33:9, 33:15, 33:17, 33:23, 34:11, 34:21, 34:23, 38:13, 42:8, 46:15, 46:16, 46:18, 47:2, 57:1, 58:5, 71:18, 72:16, 72:20, 72:22, 72:23, 73:8, 73:9, 73:10, 73:14, 73:15, 74:22, 74:25, 75:16, 87:18, 110:5, 110:16, 110:17, 111:8, 113:17, 114:3, 114:4, 114:8, 114:9, 115:2, 116:20, 116:24, 117:18, 117:19
**Payment** [1] - 3:14
**payments** [50] - 20:5, 20:6, 20:11, 26:5, 33:13, 34:6, 34:22, 38:2, 38:10, 47:21, 48:6, 54:17, 69:1, 69:15, 69:17, 69:19, 69:25, 70:13, 70:16, 71:16, 71:19, 72:5, 72:11, 72:17, 72:19, 73:1, 73:4, 73:6, 73:11, 73:12, 73:16, 73:19, 74:5, 74:8, 74:9, 74:19, 74:20, 75:4, 75:10, 75:21, 85:2, 85:6, 102:24, 105:4, 113:3, 113:5, 116:9, 116:14, 117:14, 119:1
**payments'** [1] - 85:7
**PDF** [2] - 43:4, 56:15
**Penley** [3] - 76:8, 76:12, 76:16
**Pennsylvania** [1] - 2:9

**performed** [1] - 63:8
**period** [12] - 23:13, 47:20, 48:12, 61:22, 74:9, 85:3, 90:10, 90:15, 90:17, 92:5, 99:7, 101:7
**periods** [2] - 91:18, 92:6
**permission** [1] - 59:13
**person** [5] - 5:16, 7:6, 59:25, 83:8, 88:19
**person's** [2] - 103:3, 103:13
**personal** [3] - 13:19, 73:23, 92:8
**personally** [1] - 73:4
**pertaining** [1] - 25:14
**petition** [29] - 20:11, 20:13, 20:15, 34:23, 57:1, 59:15, 59:17, 60:17, 69:15, 69:19, 70:19, 70:24, 72:5, 72:8, 72:11, 73:7, 74:5, 74:6, 74:7, 74:22, 75:13, 85:2, 102:23, 110:18, 113:13, 114:12, 116:9, 116:14, 120:9
**PHH** [65] - 3:11, 3:17, 3:20, 8:6, 9:11, 9:12, 9:16, 9:18, 9:20, 9:23, 10:4, 10:8, 10:11, 10:12, 10:15, 10:16, 10:18, 10:19, 10:20, 10:22, 11:1, 11:15, 11:18, 11:19, 11:21, 12:2, 12:6, 12:15, 14:1, 14:23, 15:17, 16:8, 18:25, 22:16, 22:18, 23:2, 25:15, 27:22, 31:1, 39:3, 43:5, 43:8, 43:9, 43:17, 43:20, 49:8, 53:1, 54:12, 56:16, 61:1, 67:4, 67:8, 77:14, 79:16, 80:7, 81:4, 82:1, 82:19, 83:1, 90:23, 95:5, 97:4, 97:6, 118:13
**PHH's** [22] - 12:21, 13:20, 19:5, 21:6, 21:10, 21:15, 21:23, 22:6, 23:15, 24:6, 24:18, 24:20, 26:16, 27:11, 27:12, 42:25, 77:16, 77:20, 80:23, 81:11, 82:3, 83:2

**Philadelphia** [1] - 2:9
**phonetic** [1] - 32:5
**physical** [1] - 88:20
**physically** [1] - 66:7
**pick** [1] - 66:17
**picking** [1] - 64:11
**PLACE** [1] - 1:14
**place** [11] - 26:23, 32:10, 44:5, 46:2, 71:13, 71:22, 78:3, 102:23, 113:9, 116:8, 119:11
**placed** [13] - 19:7, 20:4, 21:10, 21:11, 22:14, 30:23, 38:22, 40:17, 59:23, 69:6, 69:8, 89:7, 116:1
**plaintiff** [2] - 4:16, 16:6
**Plaintiff** [1] - 2:5
**Plaintiff's** [3] - 3:8, 13:14, 15:19
**plan** [2] - 49:24, 105:3
**platform** [11] - 26:4, 26:15, 26:18, 26:25, 27:11, 27:13, 96:14, 96:24, 97:4, 98:11, 102:16
**play** [1] - 69:12
**plus** [1] - 3:15
**point** [8] - 21:6, 63:13, 65:24, 72:4, 73:12, 101:14, 103:8, 112:6
**points** [2] - 51:16, 81:17
**populate** [3] - 31:22, 35:19, 99:21
**populated** [4] - 29:15, 31:21, 53:14, 102:9
**populates** [1] - 33:25
**populating** [1] - 34:5
**portal** [3] - 101:7, 101:11, 102:14
**portals** [1] - 102:17
**portfolio** [1] - 76:18
**portion** [10] - 11:9, 17:24, 19:11, 20:6, 24:6, 24:10, 38:1, 43:15, 56:3, 100:10
**possibly** [4] - 46:9, 48:6, 48:24, 70:9
**post** [41] - 20:5, 20:11, 20:13, 20:15, 34:23, 46:9, 46:11, 48:6, 48:7, 48:10, 48:12, 51:23, 51:24, 57:1, 59:15, 59:17,

60:17, 69:15, 69:19, 70:19, 70:24, 72:5, 72:11, 73:7, 74:5, 74:6, 74:7, 74:22, 75:13, 85:2, 102:23, 110:18, 110:21, 113:13, 114:12, 116:9, 116:14, 117:12, 117:13, 117:14, 120:9
**post-discharge** [2] - 117:12, 117:14
**post-petition** [27] - 20:11, 20:13, 20:15, 34:23, 57:1, 59:17, 60:17, 69:15, 69:19, 70:19, 70:24, 72:5, 72:11, 73:7, 74:5, 74:6, 74:7, 74:22, 75:13, 85:2, 102:23, 110:18, 113:13, 114:12, 116:9, 116:14, 120:9
**posted** [15] - 34:6, 34:22, 34:23, 38:9, 38:13, 41:2, 41:10, 54:15, 58:5, 110:8, 111:2, 111:7, 113:7, 116:21
**posting** [4] - 34:22, 46:22, 47:2, 57:9
**posting/paying** [1] - 116:23
**postings** [2] - 54:6, 116:23
**posture** [1] - 82:14
**practice** [1] - 64:4
**pre** [4] - 72:8, 102:23, 116:9, 116:13
**pre-petition** [1] - 72:8
**preparation** [1] - 14:12
**prepare** [1] - 63:19
**prepared** [4] - 31:8, 32:18, 63:19, 63:20
**presented** [3] - 14:8, 98:13, 110:3
**preserve** [2] - 80:8, 82:19
**pretty** [5] - 31:13, 74:19, 85:17, 88:4, 113:19
**previous** [3] - 52:15, 68:16, 104:16
**previously** [3] - 9:15, 51:18, 81:13
**principal** [2] - 68:21, 115:19
**principle** [17] - 20:1,

26:12, 36:16, 36:21, 37:4, 38:6, 38:9, 38:21, 40:5, 42:10, 69:5, 69:23, 70:3, 74:13, 115:14, 115:17, 117:8
**print** [1] - 33:19
**printed** [4] - 26:20, 26:21, 26:22, 104:18
**privilege** [3] - 13:25, 86:14, 120:12
**proceed** [2] - 72:2, 112:3
**proceeding** [2] - 80:8, 121:12
**Proceeding** [1] - 1:5
**proceedings** [1] - 106:16
**process** [10] - 35:22, 56:8, 64:3, 65:13, 79:25, 89:25, 93:23, 93:24, 94:20, 96:5
**processed** [2] - 63:1, 63:4, 63:7
**processes** [4] - 54:1, 56:18, 99:13, 99:25
**processing** [2] - 60:11, 94:5
**produced** [25] - 5:23, 13:17, 14:2, 14:8, 14:14, 14:22, 16:8, 16:23, 17:5, 17:9, 17:12, 22:4, 25:3, 25:9, 29:12, 42:15, 79:1, 81:16, 86:7, 86:13, 90:21, 90:22, 94:1, 95:21, 96:1
**producing** [1] - 29:5
**production** [13] - 14:7, 14:12, 15:1, 15:4, 16:15, 17:12, 24:24, 79:2, 86:6, 86:11, 90:22, 118:9, 118:21
**Production** [7] - 3:12, 13:14, 13:21, 15:14, 15:19, 16:5, 16:9
**professionally** [1] - 107:12
**progress** [1] - 99:12
**progression** [2] - 99:18, 100:2
**proof** [4] - 71:16, 75:9, 87:18, 113:3
**Proof** [18] - 19:22, 24:12, 36:23, 37:16, 37:22, 38:18, 38:20, 39:19, 41:5, 50:5, 51:17, 55:21, 59:6,

68:24, 72:9, 99:19, 103:15, 108:11
**Property** [1] - 96:25
**protection** [5] - 70:14, 70:20, 72:22, 110:16, 113:11
**Protection** [2] - 72:16, 74:17
**provide** [1] - 105:14
**provided** [9] - 16:13, 16:19, 22:12, 27:10, 45:3, 58:16, 58:21, 62:14, 65:7
**Public** [1] - 123:7
**pull** [8] - 29:17, 31:21, 58:22, 78:5, 81:14, 84:6, 118:10
**pulled** [6] - 29:12, 29:20, 29:21, 32:22, 68:19, 83:9
**pulling** [2] - 29:4, 29:10
**purpose** [3] - 55:14, 55:22, 94:5
**purposes** [2] - 10:17, 32:22
**pursuant** [1] - 13:17
**pushed** [1] - 71:23
**put** [2] - 37:1, 68:15
**putting** [1] - 38:15
**PYMT0003** [1] - 62:3

## Q

**QC** [2] - 62:19, 111:20
**qualified** [1] - 123:7
**questioning** [1] - 108:5
**questions** [6] - 16:24, 79:8, 108:19, 109:4, 109:9, 109:13

## R

**raised** [2] - 6:19, 94:14
**range** [1] - 48:11
**rate** [1] - 71:5
**rather** [2] - 63:17, 108:22
**re** [1] - 1:3
**Re** [1] - 3:11
**reached** [2] - 113:15
**read** [8] - 15:15, 67:11, 91:5, 100:15, 100:17, 100:18, 100:19, 104:4
**reader** [1] - 67:23
**reading** [2] - 4:4,

15:21
**ready** [1] - 76:25
**real** [1] - 97:2
**Real** [43] - 27:1, 27:2, 29:5, 29:25, 30:2, 31:16, 31:25, 70:4, 77:19, 79:12, 79:13, 80:1, 80:4, 80:10, 80:11, 80:19, 82:18, 82:24, 83:21, 84:3, 84:5, 88:8, 88:25, 89:4, 96:25, 97:3, 97:6, 97:11, 97:20, 98:3, 98:11, 98:17, 99:20, 99:22, 100:23, 100:24, 100:25, 101:5, 101:11, 101:12, 102:9, 102:13
**reality** [1] - 115:7
**realize** [1] - 46:16
**really** [6] - 71:6, 71:8, 82:12, 94:8, 94:18, 97:16
**reapply** [1] - 52:4
**reason** [3] - 61:11, 73:13, 94:18
**receipt** [1] - 38:11
**receive** [5] - 4:20, 45:1, 54:3, 55:20, 72:7
**received** [35] - 22:13, 26:5, 34:6, 36:1, 36:14, 36:16, 41:1, 41:3, 41:10, 41:21, 44:10, 44:23, 46:10, 46:21, 47:3, 48:7, 48:8, 48:10, 48:23, 48:25, 50:2, 50:4, 54:16, 55:19, 69:16, 71:21, 75:5, 87:3, 89:13, 110:5, 111:20, 114:7, 114:10, 114:11, 116:20
**receiving** [7] - 54:20, 56:25, 69:1, 85:2, 113:16, 114:6, 115:1
**recess** [4] - 4:25, 35:3, 77:7, 109:5
**RECOM** [2] - 53:2, 53:3
**recommendation** [4] - 59:7, 59:22, 60:5, 60:13
**RECON** [1] - 65:3
**reconcile** [1] - 61:21
**reconciliation** [44] - 25:23, 26:1, 33:9, 33:16, 33:17, 33:24, 34:11, 34:16, 39:16, 50:22, 50:25, 51:1,

51:6, 51:9, 51:10, 53:8, 53:24, 54:4, 54:18, 55:15, 56:9, 59:4, 60:7, 61:23, 62:24, 63:8, 63:11, 66:4, 66:5, 66:6, 66:15, 111:19, 112:3, 112:8, 112:9, 112:20, 112:22, 112:24, 113:22, 114:5, 118:4, 119:6, 119:10, 121:3
**record** [12] - 5:21, 6:11, 22:10, 27:4, 33:13, 42:8, 68:20, 96:10, 96:17, 100:19, 116:12, 123:11
**recorded** [2] - 20:22, 72:5
**recording** [1] - 44:12
**records** [69] - 3:15, 6:5, 7:1, 3:17, 14:11, 14:13, 14:15, 14:16, 14:17, 14:21, 14:22, 14:25, 16:23, 17:4, 17:10, 18:23, 18:25, 21:16, 21:23, 22:11, 22:16, 22:20, 22:21, 23:15, 24:5, 24:19, 26:16, 27:7, 27:10, 30:22, 39:18, 39:23, 41:19, 41:24, 41:25, 59:9, 68:24, 69:3, 80:9, 80:18, 80:23, 80:24, 81:8, 81:9, 81:24, 82:3, 82:7, 82:8, 82:14, 84:9, 91:17, 92:11, 92:18, 93:5, 93:13, 93:20, 93:21, 94:19, 94:22, 110:22, 111:3, 111:12, 115:8, 117:7, 119:20, 119:21, 119:25
**records'** [1] - 22:6
**redacted** [2] - 100:9, 102:21
**redactions** [1] - 52:16
**reduces** [1] - 9:3
**refer** [16] - 9:12, 9:18, 10:15, 10:17, 18:3, 26:15, 44:13, 44:18, 49:22, 58:1, 60:2, 77:21, 90:2, 90:8, 108:13, 111:18
**reference** [4] - 51:11, 108:1, 109:13, 114:16
**referenced** [3] - 3:8, 49:17, 90:17
**references** [1] -

111:18
**referencing** [1] - 95:4
**referral** [4] - 101:4, 101:21, 101:23, 102:1
**Referral** [1] - 102:11
**referred** [2] - 57:3, 79:18
**referring** [15] - 9:23, 11:14, 18:4, 27:24, 43:3, 51:20, 64:23, 77:3, 83:1, 83:5, 96:20, 98:2, 100:24, 102:6, 103:15
**refers** [9] - 43:8, 49:9, 49:20, 51:19, 53:24, 65:22, 66:24, 78:24, 101:24
**reflect** [2] - 56:13, 119:6
**reflected** [5] - 57:15, 117:15, 117:17, 118:3, 121:5
**reflective** [1] - 117:11
**reflects** [3] - 77:16, 97:20, 97:25
**regard** [12] - 5:23, 6:12, 7:22, 7:24, 11:25, 25:7, 27:3, 67:13, 85:23, 95:7, 116:11, 121:3
**regarding** [13] - 34:6, 44:11, 44:24, 45:8, 51:9, 85:5, 87:4, 87:9, 92:18, 94:14, 105:2, 117:2
**regular** [3] - 72:20, 72:23, 74:22
**reinstate** [1] - 76:4
**reinstating** [1] - 71:6
**REJ** [1] - 65:4
**rejected** [3] - 62:18, 110:5, 111:20
**relate** [6] - 6:5, 26:9, 81:9, 89:23, 109:23, 119:15
**related** [8] - 14:10, 24:20, 24:25, 25:16, 85:21, 86:11, 87:11, 117:17
**relates** [9] - 3:22, 24:6, 44:3, 51:17, 61:22, 62:7, 89:21, 93:12, 119:17
**relating** [2] - 104:8, 116:12
**relation** [1] - 9:25
**relationship** [2] - 10:3, 12:1

**relative** [2] - 123:13, 123:15
**released** [1] - 92:3
**reliance** [1] - 42:7
**relief** [1] - 71:1
**Relief** [9] - 69:10, 69:13, 69:21, 70:2, 72:13, 74:11, 74:15, 74:16, 101:25
**rely** [1] - 16:12
**remain** [3] - 20:8, 82:4, 97:3
**remains** [1] - 72:9
**remedy** [2] - 70:22, 76:2
**remember** [3] - 107:16, 108:16, 118:5
**remove** [1] - 19:23
**removed** [5] - 19:7, 19:13, 20:3, 24:8, 24:14
**removing** [1] - 61:23
**reopened** [1] - 79:5
**repeat** [1] - 8:24
**report** [33] - 21:19, 21:22, 22:7, 26:2, 26:24, 29:4, 29:10, 29:16, 29:18, 29:20, 30:1, 30:9, 30:11, 30:15, 31:7, 32:1, 32:18, 33:14, 33:19, 33:20, 34:2, 34:18, 52:9, 78:6, 81:14, 90:1, 90:3, 90:4, 90:6, 90:8, 91:21, 101:9, 123:9
**reported** [6] - 37:17, 41:5, 41:11, 68:10, 75:24, 115:3
**Reporter** [5] - 1:17, 4:9, 122:15, 123:6, 123:22
**reporter** [1] - 91:5
**REPORTERS** [1] - 1:20
**reporting** [2] - 93:4, 115:10
**reports** [12] - 29:19, 77:24, 84:6, 89:21, 90:20, 90:23, 91:18, 92:7, 93:18, 94:6, 94:8, 94:10
**Reports** [1] - 3:22
**represent** [1] - 4:16
**representative** [2] - 93:1, 108:2
**Request** [7] - 3:12, 13:14, 13:20, 15:13, 15:19, 16:5, 16:9
**request** [16] - 3:14,

14:1, 17:13, 18:21, 23:10, 24:24, 25:8, 25:11, 25:12, 32:5, 51:21, 53:9, 58:3, 86:15, 109:22, 110:10
**requested** [2] - 55:7, 56:8
**requesting** [2] - 79:11, 79:16
**requests** [2] - 75:5, 86:19
**requirements** [1] - 100:3
**research** [6] - 32:4, 32:20, 58:3, 58:22, 68:15, 93:4
**researched** [1] - 110:13
**RESERVED** [1] - 4:5
**residential** [2] - 63:3, 63:16
**resolution** [1] - 110:10
**Resolution** [4] - 100:25, 101:6, 101:11
**resolved** [1] - 73:16
**respect** [107] - 5:17, 6:2, 8:4, 8:8, 8:10, 11:7, 11:8, 11:20, 13:12, 14:9, 14:18, 14:20, 15:3, 16:22, 19:10, 19:12, 23:7, 23:11, 26:6, 26:8, 26:16, 29:9, 30:17, 31:24, 34:21, 34:22, 36:16, 36:20, 38:14, 39:13, 39:18, 39:24, 39:25, 40:8, 40:12, 40:25, 41:9, 41:24, 42:7, 45:22, 45:23, 46:8, 50:3, 50:23, 51:16, 52:13, 54:5, 59:6, 59:7, 59:9, 60:17, 61:15, 61:18, 61:23, 62:17, 63:11, 63:22, 64:7, 64:18, 64:20, 69:25, 72:17, 74:21, 75:9, 79:8, 79:10, 79:23, 80:2, 80:25, 81:7, 81:19, 82:6, 82:9, 82:17, 82:23, 83:6, 83:12, 83:17, 84:9, 84:13, 85:13, 87:8, 87:13, 87:22, 89:5, 89:9, 91:25, 92:17, 93:23, 94:7, 98:17, 98:21, 98:25, 99:10, 99:16, 99:17, 100:22, 101:19, 102:7,

102:10, 105:7, 105:12, 114:1, 115:21, 119:11, 119:20, 120:11
**Respect** [1] - 9:10
**respective** [1] - 4:3
**respond** [7] - 12:25, 14:5, 39:5, 50:3, 54:14, 55:24, 58:10
**responded** [2] - 16:21, 17:14
**responding** [1] - 119:11
**Response** [2] - 15:18, 62:17
**response** [19] - 5:13, 7:4, 12:21, 13:12, 13:20, 14:9, 14:18, 16:4, 22:23, 32:20, 49:18, 50:24, 54:21, 54:25, 55:10, 56:6, 57:15, 117:18, 121:6
**Responses** [1] - 3:12
**responsible** [1] - 93:2
**responsive** [3] - 14:1, 16:8, 17:5
**results** [1] - 119:10
**resume** [1] - 35:1
**retired** [1] - 82:18
**retiring** [1] - 45:13
**returned** [4] - 110:6, 110:25, 111:1, 111:6
**revealing** [1] - 95:15
**reverified** [1] - 110:13
**reversal** [5] - 50:22, 51:21, 53:9, 56:18, 62:5
**reversals** [1] - 55:7
**reverse** [2] - 34:14, 51:22
**review** [18] - 6:22, 18:16, 41:22, 41:23, 54:5, 54:23, 54:25, 56:2, 59:4, 59:18, 60:10, 64:1, 75:7, 104:14, 112:14, 113:21, 116:12, 117:6
**reviewed** [12] - 6:24, 14:11, 14:15, 14:16, 54:21, 56:12, 73:4, 74:3, 112:23, 117:4, 118:7, 118:21
**reviewing** [5] - 32:22, 51:16, 73:20, 89:24, 93:2
**Reynolds** [4] - 1:17, 122:15, 123:6, 123:22
**rise** [1] - 94:9

**risk** [8] - 90:4, 90:5, 90:20, 91:9, 91:17, 91:22, 92:6, 92:18
**Robin** [4] - 1:17, 122:15, 123:6, 123:22
**role** [2] - 106:13, 106:20
**Rome** [1] - 2:8
**root** [2] - 90:3, 90:8
**root-cause** [2] - 90:3, 90:8
**running** [1] - 26:12
**RVRQ** [1] - 53:13

# S

**save** [1] - 36:9
**saved** [1] - 88:19
**saw** [1] - 12:16
**scheduled** [1] - 5:11
**scope** [2] - 95:13, 108:6
**screenshot** [1] - 89:6
**screenshots** [2] - 88:24, 89:3
**scroll** [1] - 90:14
**seal** [1] - 122:10
**second** [3] - 17:13, 103:8, 107:24
**Second** [5] - 3:12, 15:13, 15:19, 16:5, 16:9
**section** [7] - 3:15, 18:23, 19:7, 19:10, 19:16, 19:19, 34:1
**secured** [2] - 96:25, 102:16
**See** [1] - 78:10
**see** [38] - 17:20, 19:8, 24:12, 30:14, 32:16, 32:21, 37:12, 39:9, 40:13, 40:15, 41:2, 43:4, 44:16, 46:15, 53:8, 53:10, 55:4, 56:17, 56:20, 56:22, 57:24, 60:12, 61:9, 64:13, 65:5, 65:16, 79:3, 98:23, 100:12, 101:24, 102:4, 103:23, 104:2, 109:4, 109:16, 116:13, 118:17, 119:2
**seeing** [2] - 37:8, 37:9
**send** [5] - 25:11, 46:14, 63:19, 66:12, 101:25
**sending** [4] - 58:8, 59:7, 99:25, 113:3
**senior** [2] - 89:23,

108:2
**Senior** [2] - 92:22, 106:21
**sense** [3] - 32:12, 76:20, 76:22
**sent** [13] - 22:15, 44:9, 58:12, 60:8, 64:19, 64:21, 66:21, 71:15, 87:3, 99:1, 100:5, 101:21, 102:11
**sentence** [8] - 68:12, 100:18, 102:21, 103:5, 103:11, 103:14, 103:21, 116:11
**separate** [2] - 19:24, 20:4
**separated** [1] - 115:16
**September** [10] - 49:10, 50:13, 50:19, 56:5, 56:9, 57:22, 62:11, 63:8, 65:1, 65:3
**series** [3] - 56:17, 70:11, 70:12
**served** [1] - 82:1
**server** [4] - 85:11, 85:12, 85:18, 85:25
**service** [5] - 22:12, 23:1, 27:9, 27:22, 45:12
**serviced** [3] - 28:23, 44:4, 44:25
**servicer** [12] - 16:19, 18:5, 22:21, 35:14, 35:17, 36:1, 46:10, 47:3, 48:25, 58:6, 81:1
**servicer's** [7] - 22:19, 23:4, 45:13, 58:7, 58:18, 58:21, 58:23
**Services** [3] - 10:21, 10:22, 11:1
**Servicing** [67] - 3:18, 7:16, 7:18, 7:21, 8:4, 8:5, 8:6, 8:9, 8:16, 9:16, 9:17, 10:8, 10:9, 10:11, 11:11, 11:18, 11:20, 14:23, 15:18, 22:17, 23:2, 26:4, 26:14, 27:1, 27:3, 29:6, 29:25, 30:3, 31:16, 31:25, 43:19, 70:4, 77:19, 79:13, 80:2, 80:4, 80:10, 80:11, 80:19, 81:10, 82:18, 82:24, 83:22, 84:3, 84:5, 88:8,

88:25, 89:4, 97:2, 97:3, 97:6, 97:11, 97:20, 98:3, 98:11, 98:17, 99:20, 99:22, 100:23, 101:5, 101:12, 102:9, 102:14, 120:14
**servicing** [36] - 10:7, 10:9, 11:9, 11:16, 11:17, 11:19, 18:6, 18:8, 23:13, 24:5, 26:18, 26:19, 27:11, 27:12, 30:20, 30:24, 32:17, 35:22, 36:6, 43:22, 44:3, 44:5, 44:12, 68:11, 77:14, 83:2, 83:4, 84:12, 84:13, 92:14, 93:10, 96:13, 96:24, 97:4, 111:13
**Servicing's** [1] - 29:24
**Serving** [1] - 31:5
**set** [6] - 24:11, 29:19, 57:4, 57:7, 100:16, 118:9
**setting** [1] - 38:14
**setup** [2] - 29:18, 35:23, 39:11, 58:16, 58:17
**seven** [1] - 37:9
**seventh** [1] - 28:5
**several** [3] - 45:19, 46:5, 71:23
**share** [1] - 4:21
**sheets** [2] - 79:15, 79:20
**shell** [1] - 44:15, 45:1, 45:10, 45:18, 46:4, 47:7, 47:15, 47:25, 48:17, 48:19, 49:2
**short** [3] - 34:24, 73:10, 75:1
**shortage** [1] - 37:4
**show** [1] - 110:8
**showed** [1] - 109:24
**showing** [1] - 117:12
**shown** [3] - 25:6, 36:4, 39:10
**side** [1] - 102:22
**signature** [1] - 76:16
**signing** [1] - 4:4
**similar** [3] - 29:10, 34:3, 54:10
**simplicity** [1] - 60:2
**simultaneously** [1] - 115:9
**single** [5] - 24:21, 65:24, 71:18, 114:3,

114:4
**sitting** [1] - 86:8
**six** [2] - 37:9, 73:11
**sixth** [1] - 36:15
**someone** [1] - 67:17
**somewhere** [1] - 107:17
**sooner** [1] - 35:1
**Sorry** [2] - 50:14, 57:6
**sorry** [10] - 7:11, 12:8, 19:13, 44:23, 45:17, 67:7, 78:10, 78:16, 78:18, 103:24
**sort** [2] - 23:22, 102:15
**source** [3] - 86:7, 89:14, 105:12
**sourcing** [1] - 87:21
**space** [1] - 70:4
**speaks** [1] - 65:22
**specific** [1] - 104:10
**specifically** [2] - 6:18, 111:17
**speculate** [2] - 67:17, 74:1
**speed** [1] - 89:18
**split** [5] - 67:14, 68:13, 69:4, 114:21, 115:2
**spread** [1] - 116:21
**spreadsheet** [1] - 104:17
**Square** [1] - 2:8
**stage** [5] - 29:7, 54:19, 81:12, 113:15
**stage-five** [1] - 81:12
**staging** [7] - 29:7, 29:8, 29:13, 29:17, 31:17, 31:18, 31:19
**stamp** [14] - 42:23, 43:6, 43:8, 43:9, 54:11, 56:16, 58:15, 58:25, 61:2, 61:6, 67:4, 78:15, 118:13, 119:1
**stamped** [8] - 13:16, 14:14, 14:22, 39:3, 49:8, 50:11, 50:16, 87:2
**standard** [1] - 63:16
**stands** [1] - 8:15
**start** [4] - 35:24, 36:24, 42:22, 56:18
**started** [3] - 46:23, 85:4, 97:9
**starters** [1] - 47:23
**starting** [1] - 43:5
**starts** [8] - 51:2, 51:8, 52:12, 52:22,

53:12, 56:3, 57:8, 103:21
**STATE** [2] - 122:3, 123:3
**state** [9] - 6:19, 7:8, 14:11, 30:10, 37:20, 63:21, 96:2, 100:19
**State** [1] - 123:8
**statement** [5] - 44:7, 44:9, 77:21, 77:25, 100:1
**statements** [1] - 34:1
**STATES** [1] - 1:1
**states** [1] - 12:17
**stating** [1] - 40:2
**station** [1] - 78:4
**status** [1] - 70:24
**stay** [3] - 35:6, 69:14, 71:1
**Stay** [1] - 72:13
**staying** [1] - 62:10
**stemmed** [3] - 72:15, 72:20, 74:11
**stenographically** [1] - 123:9
**step** [1] - 65:12
**steps** [3] - 53:25, 80:6, 82:2
**sticking** [1] - 86:22
**still** [13] - 11:19, 37:17, 40:9, 40:10, 72:6, 73:9, 74:25, 75:2, 78:18, 81:22, 82:15, 97:22, 99:23
**stipulated** [1] - 4:2
**stopped** [4] - 69:14, 70:13, 70:15, 73:19
**stopping** [2] - 66:19, 66:20
**stops** [2] - 53:6, 53:7
**straight** [1] - 5:3
**stream** [1] - 36:9
**Street** [1] - 2:9
**strictly** [1] - 46:24
**strike** [2] - 39:6, 85:21
**string** [2] - 67:25, 68:1
**subject** [4] - 17:11, 87:12, 87:13, 87:17
**subjects** [1] - 5:18
**submitted** [4] - 64:2, 110:21, 113:5, 121:5
**submitting** [1] - 101:9
**subsequent** [1] - 60:13
**subsequently** [3] - 22:17, 41:15, 41:16
**subset** [2] - 34:10,

34:16
**subsidiary** [5] - 10:6, 10:24, 11:8, 11:22, 12:3
**Successor** [1] - 15:17
**summation** [2] - 68:3, 71:25
**sums** [2] - 19:14, 54:7
**supposed** [1] - 55:20
**surmise** [1] - 68:7
**suspect** [1] - 87:15
**switched** [1] - 101:14
**sworn** [2] - 4:8, 122:9
**System** [1] - 3:22
**system** [47] - 4:22, 14:16, 20:22, 20:24, 21:6, 21:10, 21:12, 22:6, 22:11, 22:20, 23:3, 23:8, 24:5, 26:15, 30:23, 31:13, 33:18, 35:16, 35:20, 36:1, 37:2, 38:22, 40:17, 41:19, 45:11, 45:15, 48:3, 52:8, 57:19, 68:20, 75:24, 77:20, 78:5, 81:6, 81:11, 81:18, 83:1, 84:11, 84:14, 85:9, 88:16, 89:21, 95:8, 96:10, 96:17, 103:6, 110:23
**systems** [4] - 68:24, 79:14, 80:25, 98:22

## T

**table** [4] - 29:8, 29:13, 31:17, 31:19
**tables** [4] - 29:18, 31:18, 81:12, 84:4
**tact** [1] - 84:12
**takeaway** [1] - 73:22
**talks** [2] - 53:8, 102:15
**Tanner** [2] - 105:17, 105:19
**task** [1] - 88:20
**team** [8] - 35:23, 60:7, 62:24, 64:23, 91:10, 91:23, 92:23, 112:9
**technical** [1] - 91:2
**template** [1] - 99:14
**ten** [3] - 34:25, 35:2, 77:6
**term** [1] - 90:5

**terms** [1] - 117:6
**testified** [12] - 73:13, 85:25, 106:15, 106:21, 106:24, 107:6, 109:22, 114:18, 115:22, 117:7, 118:22, 119:6
**testify** [3] - 4:10, 106:19, 122:9
**testimony** [9] - 5:17, 6:9, 11:4, 65:21, 108:1, 108:14, 112:1, 118:5, 123:12
**text** [2] - 89:2, 100:15
**THE** [2] - 1:1, 1:1
**there're** [1] - 52:16
**thereafter** [1] - 74:23
**Third** [4] - 3:11, 8:23, 8:25, 12:18
**third** [4] - 47:8, 47:16, 78:12, 81:21
**third-party** [1] - 81:21
**thirds** [2] - 57:21, 107:25
**three** [3] - 28:6, 36:13, 36:25
**throughout** [2] - 50:1, 68:17
**TIME** [1] - 1:13
**time-period** [1] - 92:5
**timeframe** [2] - 84:25, 87:23
**timeline** [1] - 101:19
**timelines** [1] - 104:10
**timely** [3] - 102:24, 116:10, 116:14
**timing** [3] - 73:6, 79:10, 113:16
**title** [6] - 15:15, 15:21, 77:22, 77:23, 92:20, 106:9
**titled** [1] - 5:5
**today** [3] - 5:12, 5:13, 86:8
**together** [3] - 19:16, 52:3, 80:1
**took** [5] - 46:1, 64:17, 69:4, 71:22, 115:25
**top** [13] - 18:10, 19:11, 24:10, 51:7, 51:8, 52:12, 52:25, 53:5, 53:16, 53:20, 58:15, 59:3, 61:14
**topic** [1] - 94:1
**topics** [3] - 6:3, 6:6,

7:2
**total** [1] - 24:18
**totals** [1] - 26:12
**toward** [1] - 120:9
**towards** [5] - 41:4, 51:23, 51:25, 115:11, 115:13
**track** [2] - 68:25, 113:12
**tracking** [2] - 101:3, 102:7
**trailing** [1] - 87:16
**transaction** [55] - 3:15, 18:23, 19:5, 19:8, 19:15, 19:24, 20:4, 20:7, 20:21, 20:23, 22:21, 23:4, 23:12, 24:9, 24:14, 26:3, 27:21, 28:22, 29:21, 31:3, 31:12, 32:6, 32:9, 32:15, 33:9, 33:19, 36:25, 37:10, 37:15, 38:12, 38:16, 41:13, 42:2, 42:12, 42:13, 45:19, 47:22, 48:8, 48:21, 58:7, 58:13, 58:19, 60:21, 62:7, 68:19, 79:23, 83:13, 83:18, 84:7, 89:5, 110:9, 111:7, 115:6, 115:24, 116:22
**Transaction** [7] - 3:16, 29:22, 33:6, 33:11, 34:4, 34:9, 34:17
**transactions** [8] - 26:22, 28:8, 36:3, 36:10, 36:12, 36:19, 39:11, 46:9
**transcript** [3] - 20:18, 20:25, 123:11
**transfer** [5] - 18:9, 22:13, 30:20, 31:1, 77:17
**transferred** [6] - 18:6, 23:2, 27:9, 44:25, 80:20, 81:10
**transition** [1] - 47:21
**transmits** [1] - 102:16
**transpired** [1] - 72:1
**transported** [1] - 84:10
**Trial** [1] - 108:11
**trials** [2] - 93:9, 106:23
**tried** [2] - 73:8, 74:24
**trigger** [1] - 66:9
**true** [1] - 123:11

**truncated** [1] - 51:3
**truncation** [1] - 52:6
**trustee** [12] - 20:6, 34:22, 38:7, 41:1, 49:23, 52:3, 54:2, 57:1, 69:2, 113:17, 114:7, 115:13
**trustee's** [6] - 39:19, 50:12, 50:18, 54:17, 115:12, 117:19
**trustees'** [1] - 115:8
**truth** [1] - 122:9
**try** [3] - 14:3, 34:25, 70:7
**trying** [9] - 17:20, 25:3, 52:19, 55:4, 68:7, 70:20, 70:22, 110:16, 113:11
**turn** [6] - 9:2, 49:6, 58:24, 67:3, 100:7, 109:10
**two** [16] - 18:19, 19:15, 36:24, 40:4, 47:19, 53:1, 54:1, 57:21, 58:24, 68:23, 69:16, 74:7, 75:1, 107:25, 117:13
**two-thirds** [1] - 57:21
**type** [23] - 14:7, 39:23, 44:4, 45:3, 70:22, 73:22, 80:21, 81:17, 82:25, 89:11, 91:25, 92:10, 92:14, 93:11, 93:21, 94:9, 94:13, 98:25, 100:4, 101:10, 101:17, 104:8
**types** [1] - 99:18

## U

**U.S** [3] - 1:7, 3:11, 9:10
**ultimately** [4] - 38:1, 44:25, 75:5, 113:20
**un-redacted** [1] - 100:9
**under** [22] - 13:24, 22:14, 25:10, 34:1, 36:23, 37:7, 40:5, 44:13, 49:24, 50:5, 62:3, 65:1, 73:17, 76:3, 78:2, 79:12, 79:16, 81:4, 83:2, 86:16, 86:20, 107:4
**under-estimation** [1] - 107:4
**underlying** [9] - 31:24, 81:8, 81:12, 81:23, 83:17, 84:4,

89:25, 94:5, 99:22
**underneath** [1] - 40:21
**undersigned** [1] - 122:6
**undertake** [1] - 82:2
**unfortunately** [3] - 4:22, 73:2, 73:18
**unit** [16] - 49:16, 62:20, 63:17, 64:6, 65:11, 65:12, 65:19, 65:20, 66:5, 76:11, 76:12, 93:16, 101:8, 105:15, 120:8
**UNITED** [1] - 1:1
**units** [3] - 32:7, 35:24, 105:8
**unpaid** [6] - 26:12, 37:4, 38:6, 69:23, 74:13
**up** [61] - 5:5, 7:7, 8:18, 9:5, 12:11, 13:6, 15:7, 17:15, 18:11, 22:22, 22:24, 25:18, 29:4, 29:19, 31:21, 32:13, 32:25, 35:11, 38:15, 40:14, 40:18, 41:6, 42:25, 43:10, 44:20, 44:22, 46:20, 48:15, 48:20, 53:16, 55:19, 56:4, 57:6, 64:11, 66:17, 70:3, 70:12, 71:2, 71:23, 73:9, 74:18, 74:22, 75:11, 77:5, 77:10, 78:5, 81:6, 84:18, 89:18, 98:20, 102:1, 102:2, 102:3, 102:4, 104:22, 107:20, 109:20, 115:25, 117:24, 118:10, 120:24
**upload** [1] - 45:14
**uploaded** [3] - 22:24, 23:1, 23:3
**upper** [2] - 89:24, 92:2
**user** [11] - 59:21, 59:24, 60:1, 60:3, 62:12, 65:2, 78:9, 78:10, 88:11
**users** [1] - 98:10
**utilized** [6] - 32:4, 35:23, 69:25, 81:20, 82:24, 101:7

## V

**vague** [1] - 97:22
**variances** [1] - 41:19

**various** [7] - 35:24, 39:11, 44:12, 51:15, 56:20, 99:10, 119:9
**VENKATMU** [1] - 59:24
**verification** [5] - 35:25, 41:14, 75:23, 93:5, 113:4
**verified** [2] - 110:13, 110:20
**verify** [8] - 24:22, 50:2, 58:7, 58:8, 75:19, 91:22, 92:15, 93:9
**via** [1] - 122:8
**Via** [1] - 1:14
**video** [2] - 9:2, 36:9
**Videoconference** [1] - 1:14
**videoconference** [1] - 122:8
**view** [2] - 94:21, 100:14
**viewing** [1] - 118:2
**vs** [1] - 1:6

## W

**waiting** [1] - 113:17
**waive** [1] - 38:2
**waived** [1] - 79:25
**ways** [1] - 98:14
**weeks** [2] - 45:19, 46:5
**WENDELL** [1] - 2:2
**Wendell** [3] - 2:3, 4:15, 118:18
**West** [1] - 106:4
**whatsoever** [1] - 110:9
**whole** [5] - 55:14, 55:22, 73:21, 75:12, 122:9
**window** [1] - 48:4
**windows** [1] - 77:1
**withheld** [2] - 13:24, 15:1
**WITNESS** [1] - 122:10
**Witness** [1] - 3:2
**witness** [15] - 1:16, 4:4, 4:5, 4:20, 5:23, 6:12, 6:16, 6:17, 6:19, 25:7, 67:19, 99:9, 108:7, 122:7, 123:12
**word** [1] - 68:4
**words** [2] - 22:25, 67:14
**work-flow** [8] - 58:8, 62:16, 62:23, 65:10,

65:16, 65:18, 66:11, 111:19
**work-flows** [1] - 65:14
**works** [1] - 106:6
**worksheet** [3] - 83:6, 83:16
**worksheets** [4] - 78:24, 78:25, 79:9, 117:2
**wrote** [2] - 103:14, 104:3

## Y

**years** [2] - 73:16, 94:4
**yes)** [1] - 120:25
**yourself** [1] - 100:19

## Z

**Zoom** [1] - 91:7